Patrice L. Bishop (182256)
service@ssbla.com
STULL, STULL & BRODY
9430 West Olympic Boulevard
Suite 400
Beverly Hills, CA  90212
Tel:   (310) 209-2468
Fax:   (310) 209-2087

*Liaison Counsel for Plaintiff and the Putative Class*

FILED
CLERK, U.S. DISTRICT COURT

SEP 1 6 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| NATHANIEL L. ANDERSON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> PEREGRINE PHARMACEUTICALS, INC., STEVEN W. KING, PAUL J. LYTLE, JOSEPH S. SHAN and ROBERT L. GARNICK, <br><br> Defendants. | Case No. SACV12-01647 PSG (FMOx) <br><br> **CLASS ACTION** <br><br> **FIRST AMENDED COMPLAINT** |

Lead Plaintiff James T. Fahey ("Plaintiff"), individually and on behalf of all persons similarly situated, by his undersigned attorneys, for his first amended complaint against Defendants alleges the following based upon personal knowledge as to his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Peregrine Pharmaceuticals, Inc. ("Peregrine" or the "Company"), securities analysts' reports and advisories about the Company, interviews with past Company employees and other individuals with personal knowledge, and information readily obtainable from public sources.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.   This is a federal class action on behalf of persons (the "Class") who purchased or otherwise acquired the Company's securities between May 21, 2012 and September 26, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.   Peregrine is a clinical-stage biopharmaceutical company that develops and manufactures monoclonal antibodies for the possible treatment of cancer and viral infections.   Peregrine's key product is bavituximab, a phosphatidylserine targeting anti-body.  Peregrine is studying bavituximab as a primary (front-line) and second-line treatment for non-small cell lung cancer ("NSCLC") and other cancers.

3.   The Phase II clinical trial in issue was named the "Study of Bavituximab Plus Docetaxel in Patients With Locally Advanced or Metastatic Non-Squamous Non-Small Cell Lung Cancer" (hereinafter, the "Phase II Trial").   The Phase II Trial enrolled 121 patients (117 evaluable per the study protocol) with

1

**FIRST AMENDED COMPLAINT**

second-line non-squamous NSCLC following one prior chemotherapy regimen at over 40 clinical centers. Patients were equally randomized to 1 of the 3 treatment arms, docetaxel (75mg/m2) plus either placebo, 1 mg/kg bavituximab, or 3 mg/kg bavituximab until disease progression. Approximately 50% of the patients were enrolled in the U.S. and 50% were enrolled internationally with equal distribution between all treatment groups. Throughout the Class Period, Defendants violated the Exchange Act by disseminating materially false and misleading statements to the investing public about the effectiveness of the Company's experimental drug bavituximab as a treatment for NSCLC, making it impossible for shareholders to gain a meaningful or realistic understanding of the drug's prospects. As a result of Defendants' materially false and misleading statements, Peregrine's securities traded at artificially inflated prices during the Class Period, reaching a high of $5.39 per share on September 21, 2012.

4. On the first day of the Class Period, May 21, 2012, Peregrine's Phase II Trial was unblinded. The unblinding of the Phase II Trial meant Defendants had access to all the information and data garnered to date during the Phase II Trial. It was on this date that Defendants should have begun to verify the accuracy of the data allegedly collected therein. Instead, on this day, as outlined below in more detail, Defendants chose to begin to tout the Phase II Trial's alleged "significant" results without ever verifying the data or confirming that those patients assigned to receive the placebo did so, and those patients assigned to receive the 1 mg. dose of bavituximab did so. Defendants also failed to inform investors that they had not verified the data and the doses received.

5. Then, suddenly, on September 24, 2012, after four months of touting the data as positive, Peregrine issued a press release warning of "major discrepancies" in the results of the Phase II Trial and advising investors that they should not rely on the "clinical data" the Company had previously disclosed from this trial. Peregrine blamed the "major discrepancies" on a third-party vendor who

**FIRST AMENDED COMPLAINT**

worked on the Phase II Trial prior to its unblinding.  As described *infra*, that third-party vendor has specifically denied Peregrine's accusations.

6.     On this news, Peregrine's stock plummeted $4.23 per share to close at $1.16 per share on September 24, 2012, a one-day decline of 78%.

7.     On September 26, 2012, Peregrine filed a Form 8-K with the SEC, which disclosed that the Company had received a written notice of default from Oxford Finance LLC ("Oxford"), Silicon Valley Bank ("SVB") and MidCap Financial SBIC, LP ("MidCap") (collectively, the "Oxford Group Lenders"), with respect to a security agreement the Company had entered into on August 30, 2012. According to the Company, the lender deemed the Company's disclosure on September 24, 2012, concerning the "major discrepancies" in the results from its Phase II Trial to be a material adverse change under the terms of the loan agreement and, as result, the Oxford Group Lenders accelerated the repayment of the loan and demanded repayment in full for the outstanding amounts.

8.     On this news, Peregrine's stock declined $0.55 per share to close at $1.11 per share on September 27, 2012, a one-day decline of 33%.

9.     Further, one of the most important values that can be assigned to findings by the process of statistical analysis is the p-value, or "probability" value.

10.     The p-value is a number between 0.00 and 1.0, and is used to demonstrate the strength of a conclusion drawn from clinical trial data.  It enables analysts to assign a widely accepted numerical value to the strength of a statement or hypothesis. Essentially, the p-value measures consistency between the results actually obtained in the trial and the "pure chance" explanation for those results.

11.     A statement and corresponding p-value are considered of strong significance if the probability of the same reaction occurring randomly or by chance is less than one in twenty, or 5%, corresponding to a p-value of $p<0.05$.

12.     On September 7, 2012, Defendant Peregrine made an announcement about the interim data as to the overall survival of patients purportedly gathered

**FIRST AMENDED COMPLAINT**

from the Phase II Trial and claimed that the p-value was .0154.  This p-value, if accurate, would be statistically significant in showing that bavituximab had been efficacious in the Phase II Trial.  *See* ¶ 85 below.  However, this description of the p-value as to the overall survival of patients was false and misleading as it was based on false data.  Defendant Peregrine later admitted on February 19, 2013, that the p-value as to the overall survival of patients was 0.217, which means that chance would be responsible for the outcome of the data in more than one of five times, which is not statistically significant.  Defendant Peregrine also failed to disclose any reason for the extreme negative change as to the p-value in the overall survival of patients from the earlier reported false data.

13.   In addition, Defendants ***admit*** that they knew that the interim data regarding the Phase II Trial was false and misleading **on or about** September 20, 2012 (Thursday) – ***at least four (4) days before Defendants disclosed to investors (on September 24, 2012 (Monday)) that the interim results for Phase II should not be relied upon***, but allowed investors to continue to purchase Peregrine securities on this materially false and misleading information for at least two (2) market trading days, September 20 and 21.  *See* ¶ 58 below.

14.   As a result of Defendants' materially false and misleading statements, Peregrine securities traded at artificially inflated levels during the Class Period.  However, after the above revelations were revealed to the market, the Company's securities dropped precipitously, sending them down over 75% from their Class Period high.

## JURISDICTION AND VENUE

15.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule l0(b)-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

**FIRST AMENDED COMPLAINT**

16. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

17. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

18. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

19. Lead Plaintiff James T. Fahey ("Plaintiff"), as set forth in the attached certification, purchased Peregrine securities at artificially inflated prices during the Class Period and has been damaged as a result of the revelations by Defendants of their prior false statements and material omissions.

20. **Defendant Peregrine**, as stated *supra*, is a clinical-stage biopharmaceutical company that develops and manufactures monoclonal antibodies for the potential treatment of cancer and viral infections. Defendant Peregrine's key product is bavituximab, a phosphatidylserine targeting anti-body. Defendant Peregrine is studying bavituximab as a primary (front-line) and second-line treatment for NSCLC and other cancers.

21. **Defendant Stephen W. King** ("King") is, and at all relevant times was, the Company's Chief Executive Officer ("CEO"), President and a Director. Pursuant to the Company DEF 14A filed August 27, 2012, Defendant King owns 703,325 shares of Peregrine securities, which includes shares that Defendant King

FIRST AMENDED COMPLAINT

1    had a right to acquire as of August 16, 2012 (or within 60 days thereafter, pursuant

2    to outstanding stock options amounting to 633,438).  Thus, at the time of the false

3    and misleading statements, Defendant King owned 69,887 shares of Peregrine stock.

4    *See* Peregrine's DEF 14A, filed August 27, 2012 at p. 19.

5        22.    ***Defendant Paul J. Lytle*** ("Lytle") is, and at all relevant times was, the

6    Company's Chief Financial Officer ("CFO").  Pursuant to the Company DEF 14A

7    filed August 27, 2012, Defendant Lytle owns 374,557 shares of Peregrine securities,

8    which includes shares that Defendant Lytle had a right to acquire as of August 16,

9    2012 (or within 60 days thereafter, pursuant to outstanding stock options amounting

10   to 305,939).  Thus, at the time of the false and misleading statements, Defendant

11   Lytle owned 68,618 shares of Peregrine stock.  *See* Peregrine's DEF 14A, filed

12   August 27, 2012 at p. 19.

13       23.    ***Defendant Joseph S. Shan*** ("Shan") is, and at all relevant times was,

14   the Company's Vice President, Clinical and Regulatory Affairs.  Pursuant to the

15   Company DEF 14A filed August 27, 2012, Defendant Shan owns 221,936 shares of

16   Peregrine securities, which includes shares that Defendant Shan had a right to

17   acquire as of August 16, 2012 (or within 60 days thereafter, pursuant to outstanding

18   stock options amounting to 211,500).  Thus, at the time of the false and misleading

19   statements, Defendant Shan owned 10,436 shares of Peregrine stock.  *See*

20   Peregrine's DEF 14A, filed August 27, 2012 at p. 19.

21       24.    ***Defendant Robert L. Garnick*** ("Garnick") is, and at all relevant times

22   was, the Head of Regulatory Affairs.

23       25.    Defendants named above in ¶¶ 21-24 are referred to herein as the

24   "Individual Defendants."

25

26

27

28

**FIRST AMENDED COMPLAINT**

# BACKGROUND

## A.   The Company Background

26.   The drug bavituximab, given by intravenous infusion, is a genetically engineered antibody designed to target a lipid molecule found on tumor blood vessels that acts to suppress the body's immune system.

27.   The antibody binds to the targeted molecule to reactivate "the immune response locally at the site of the tumor," allowing the immune system to combat cancer cells, stated Defendant Shan, head of clinical and regulatory affairs at Peregrine.  *See* Peregrine's Form 10-K for year ended April 30, 2010 ("2010 Form 10-K").

28.   Defendant Peregrine stated in its public statements to investors that lung cancer is the second most commonly diagnosed cancer with 219,440 new cases and 159,000 deaths in 2009 in the United States alone.

29.   Defendant Peregrine also stated in its public statements to investors that NSCLC is the most common type of lung cancer accounting for approximately 85% to 90% of all lung cancers.

30.   NSCLC is any type of epithelial lung cancer other than small cell lung carcinoma ("SCLC").  As a class, NSCLCs are relatively resistant to chemotherapy, compared to small cell carcinoma.

31.   Defendant Peregrine stated in its public statements to investors that the five year survival for NSCLC patients is only 1%.

32.   Defendant Peregrine has attempted to develop bavituximab as a therapeutic agent against various types of cancer for many years.  As of fiscal year ended 2012, Defendant Peregrine was engaged in seven (7) clinical trials in Phase I and Phase II attempting to test whether bavituximab was efficacious against five different types of cancer:  NSCLC, pancreatic, liver, prostate, and breast.  As of fiscal year ended 2012, Defendant Peregrine was also attempting to develop bavituximab as an imaging agent to help identify tumors.

FIRST AMENDED COMPLAINT

33.    Clinical development of bavituximab for the treatment of cancer began in 2008.  Since that time, Peregrine has conducted twelve (12) Phase-I/-II studies and treated 613 cancer patients, but has yet to observe a statistically significant improvement over a contemporary standard-of-care ("SOC").

34.    Defendant Peregrine's only other potential product is a second agent called Cotera.  Defendant Peregrine is attempting to develop Cotera as a single treatment brain cancer therapy.  Defendant Peregrine has conducted four (4) clinical trials and claims that "Cotera has demonstrated encouraging survival, localization to the tumor, and an acceptable safety profile in patients with brain cancer."  *See* Form 10-K for year ended April 30, 2012 ("2012 Form 10-K") at p. 8.  Despite the fact that Cotera has been granted Food and Drug Administration ("FDA") and European Medicines Agency ("EMA") orphan drug status for glioblastoma multiforme ("GBM") and anaplastic astrocytoma, and fast track designation in the U.S. for the treatment of recurrent GBM, Defendant Peregrine has been unable to develop Cotera as a commercial drug.  Orphan drug status refers to a pharmaceutical agent that has been developed specifically to treat a rare medical condition.  Even if Defendant Peregrine was able to commercially develop Cotera, the market for the drug is small.  According to Defendant Peregrine, there will be only an estimated 22,900 malignant brain tumors diagnosed in 2012 of which only 15% are GMB (approximately 3,435).  Accordingly, any profits that may ultimately been achieved from Cotera will not be enough to ensure the survival of Defendant Peregrine – only the commercial development of bavituximab can do that.

35.    Defendant Peregrine has not made a profit in its last eight years of existence and, upon information and belief, has never made a profit during its entire existence.

36.    As outlined *infra*, for its past eight (8) fiscal years, Defendant Peregrine has operated at a net loss:

**FIRST AMENDED COMPLAINT**

(a)     As of April 30, 2005, Defendant Peregrine had a net loss of $15,452,000;

(b)     As of April 30, 2006, Defendant Peregrine had a net loss of $17,061,000;

(c)     As of April 30, 2007, Defendant Peregrine had a net loss of $20,796,000;

(d)     As of April 30, 2008, Defendant Peregrine had a net loss of $23,176,000;

(e)     As of April 30, 2009, Defendant Peregrine had a net loss of $16,524,000;

(f)     As of April 30, 2010, Defendant Peregrine had a net loss of $14,494,000;

(g)     As of April 30, 2011, Defendant Peregrine had a net loss of $34,151,000;

(h)     As of April 30, 2012, Defendant Peregrine had a net loss of $42,119,000;

(i)     As of April 30, 2012, Defendant Peregrine had an accumulated deficit of $338,124,000 for fiscal year ended April 30, 2012;

(j)     As of April 30, 2013, Defendant Peregrine had a net loss of $29,780,000; and

(k)     As of April 30, 2013, Defendant Peregrine had an accumulated deficit of $367,904,000 for fiscal year ended April 30, 2013.

37.     Defendant Peregrine's only way to finance its operations, which consistently run at a loss, is to either borrow money from lenders or to issue stock into the public markets.

38.     In recent years, Defendant Peregrine has only been able to borrow money from lenders in two (2) instances.

**FIRST AMENDED COMPLAINT**

39.     The first such loan was on or about December 9, 2008, when Peregrine entered into a loan and security agreement with MidCap Financial, LLC ("MidCap") and BlueCrest Capital Finance, LP to borrow $10 million.   Defendant Peregrine received initial funding of $5 million under the loan and security agreement.

40.     Defendant Peregrine repaid this loan in full by December 2011 through Company stock sold into the public markets.

41.     Defendant Peregrine's second loan transaction was with the Oxford Group Lenders on or about August 30, 2012.  This loan provided for up to $30 million in total funding available in two (2) tranches of $15 million.   Defendant Peregrine took the first $15 million in funding available on or about August 30, 2012.

42.     Defendant Peregrine was able to secure the first tranche ($15 million) as a result of the false and misleading statements issued to the market during the Class Period.

43.     Defendant Peregrine represented to the public that, at its option, it could draw down the second $15 million tranche, "if, on or before March 31, 2013, we (i) achieve positive overall survival data in our bavituximab Phase II second-line non small cell lung cancer ('NSCLC') clinical trial and (ii) have a positive end of Phase II meeting with the U.S. Food and Drug Administration ('FDA') regarding our bavituximab second-line NSCLC clinical trial (defined as our ability to move into a Phase III trial design) (the 'End of Phase II Event')."  *See* Form 10-Q for period ending July 31, 2013 ("2Q 2012 Form 10-Q") at p. 12.

44.     The only other method for Defendant Peregrine to raise money to fund its operations and cover its net losses was to sell Company stock into the public markets.  Defendant Peregrine did this by making several shelf registrations of its common stock and entering into At Market Sales Issuance Agreements ("AIMs") whereby its agents consistently sold Peregrine's stock into the market, thereby raising funds but, each time, diluting the ownership interest of existing shareholders.

**FIRST AMENDED COMPLAINT**

45.    From 2007 to the present, Defendant Peregrine sold its stock into the market, raising in excess of $335 million, and each time diluting shareholder value.

46.    Some of Defendant Peregrine's motives for being deliberately reckless in touting the so-called positive nature of the data from the bavituximab Phase II Trial was to obtain loans to show the public it was credit-worthy and be able to raise more money through stock sales to the market but to do so at higher, artificially inflated prices so that less stock would have to be sold to raise the target amount of money and thus causing less dilution of the Individual Defendants' ownership interests.

47.    Defendant Peregrine admitted that it does not have the technology, capacity or the money to bring bavituximab into a Phase III clinical trial by itself.

48.    If Defendant Peregrine is unable to successfully bring bavituximab through a Phase III clinical trial, either alone or with a partner, Defendant Peregrine will fail as a company.

**B.    Phase I Through III**

49.    In order to market a drug in the United States, developers must first obtain the approval of the FDA.  This approval process includes, among other required research, conducting a series of clinical trials to establish the safety and efficacy of the drug.  The maker of the drug then submits the clinical results of these trials to the FDA to satisfy the safety and efficacy of the new drug as part of its New Drug Application ("NDA"):

- *Phase I* trials test the safety, dose tolerance, and other pharmacokinetic/bioavailability properties of the drug.  Phase I trials also identify the primary side-effects, if any, that the drug may cause.

- In *Phase II* trials, researchers test the drug in a patient population to gather information about efficacy, optimal dosage levels, adverse effects, and safety risks versus the benefits.  Phase II studies are

11

**FIRST AMENDED COMPLAINT**

conducted in a significant patient population designed to assess the most effective and safe dose that will be evaluated in a Phase III study. During the clinical development of a new drug, the results of a Phase II study will determine if a drug is safe and effective to administer in a larger patient population.  A Phase II study is critical in the new drug development process.  If the risks outweigh the benefits and the patient safety is severely jeopardized during the Phase II study, the research on that drug is almost always stopped.  The FDA will approve a drug that demonstrated sufficient data to show the most effective dose correlated with the safety profile.  This is established in the Phase II program and will be the dose selected to be evaluated in the Phase III study.

- *Phase III* trials test the efficacy and safety of the drug in an expanded patient population at geographically dispersed trial sites.  The results of the Phase III program must demonstrate that the drug is statistically significantly better than the current standard of care.

**C.    Defendants Admit That Reliance On Third Parties to Conduct Clinical Trials Do Not Relieve Them of Conducting, Monitoring[1], Recording and Reporting the Results of Clinical Trials to Ensure That the Data and Results Are Scientifically Credible and Accurate**

50.    Defendants admit in their 2012 Form 10-K that, in the course of discovery, preclinical testing and clinical trials, the Company relies on third parties, including universities, investigators and clinical research organizations, to perform critical services for them.  For example, the Company relies on third parties to

---

[1]    "Monitoring" is defined by Section 1.38 of E6 of the ICH on Good Clinical Practices as "the act of overseeing the progress of a clinical trial, and of ensuring that it is conducted, recorded, and reported in accordance with the protocol, Standard Operating Procedures (SOPs), Good Clinical Practice (GCP), and the applicable regulatory requirements."

12

**FIRST AMENDED COMPLAINT**

conduct its clinical trials and many of its preclinical studies.  Clinical research organizations and investigators are responsible for many aspects of the trials, including finding and enrolling patients for testing and administering the trials. Although the Company relies on these third parties to conduct its clinical trials, "***the Company is responsible for ensuring that each of its clinical trials is conducted in accordance with its investigational plan and protocol***.[2]" (emphasis added).

51.   Moreover, the FDA and foreign regulatory authorities, including the International Conference on Harmonisation ("ICH"), require the Company to comply with regulations and standards, commonly referred to as ***Good Clinical Practice***[3] for conducting, monitoring, recording and reporting the results of clinical trials to ensure that the data and results are scientifically credible, accurate and viable and that the trial subjects are adequately informed of the potential risks of participating in clinical trials via a signed Informed Consent ("IC").   ***The Company's reliance on third parties does not relieve it of these responsibilities and requirements***.

52.   According to the Company's SEC filings, "[a] clinical trial must be conducted according to ***good clinical practice*** following protocols that detail the trial's objectives, inclusion and exclusion criteria, the parameters to be used to monitor safety and the efficacy criteria to be evaluated, and informed consent must be obtained from all study subjects."   *See* 2012 Form 10-K at p. 14 (emphasis added).

---

[2]   "Protocol" is defined by Section 1.44 of E6 of the ICH on Good Clinical Practices as "a document that describes the objective(s), design, methodology, statistical considerations, and organization of a trial."

[3]   "Good Clinical Practice" is defined by Section 1.24 of E6 of the ICH on Good Clinical Practices as "a standard for the design, conduct, performance, monitoring, auditing, recording, analyses, and reporting of clinical trials that provides assurance that the data and reported results are credible and accurate, and that the rights, integrity and confidentiality of trial subjects are protected."

13

**FIRST AMENDED COMPLAINT**

53.     The Company's participation in conducting clinical research on a new drug makes them totally obligated to follow Good Clinical Practice as outlined in the Code of Federal Regulations, the European Directives and the ICH Guidelines. These regulations are specific and demand that all clinical research be conducted according to these regulations.   Any conduct by investigators, their staffs, drug packaging and distributing third parties, statistician, internal staff, all come under the responsible persons in charge of a company or their designees and must follow Good Clinical Practice.

54.     It is up to the sponsor company (Peregrine) to monitor and ensure that every aspect of the clinical research development is conducted according to Good Clinical Practice.   Any errors or omissions that occur during the clinical research development must be scrutinized and reported during the clinical trials.   Distribution of study medication must have a complete accountability.   Each study center should have been monitored closely to guard any protocol violations or mistakes in study drug administration to the patients participating in this study.

55.     The Phase II Trial in issue was not properly administered and monitored by Defendants in violation of Good Clinical Practice.

**D.     The Company Attempts to Divert the Attention Away from Its Deliberate Recklessness and Deviation from Good Clinical Practices and Place the Blame on Clinical Supplies Management, Inc.**

56.     In order to divert attention from Defendants' deliberate recklessness in their failure to properly monitor, record, verify and report the results of the Phase II Trial, on September 24, 2012 (the *same day* the Company announced to the investors that it had discovered "major discrepancies" in the Phase II clinical data previously reported), the Company filed a suit against Clinical Supplies Management, Inc. ("CSM").   *See* Complaint for Breach of Contract and Negligence; Demand for Jury Trial, *Peregrine Pharmaceuticals, Inc. v. Clinical Supplies Mgmt.*, C.D. Cal. Civil Action No.: 12-cv-01608-JGB-AN ("*Peregrine v. CSM*") (Dkt. No.

**FIRST AMENDED COMPLAINT**

1   1).  The reasonable inference is that Defendant Peregrine was aware of the "major

2   discrepancies" for many days or weeks enabling it time to retain counsel, discuss the

3   situation and have a complaint prepared, reviewed and filed in coordination with the

4   preparation and issuance of the September 24, 2012 press release.

5        57.   CSM is a third party, independent, FDA-approved Contract Research

6   Organization ("CRO")[4] that the Company contracted with to execute treatment

7   group assignments and oversee clinical trial material coding and distribution in its

8   second-line NSCLC double-blinded trial.

9        58.   The Company alleges in its complaint against CSM that "[o]n or about

10  September 20, 2012, Peregrine discovered major discrepancies between some

11  patient sample test results and patient treatment code assignments.  CSM's error(s)

12  call in to question the accuracy of the results noted and reported on September 7,

13  2012.  While the scope of CSM's error(s) is currently under review, its error(s) will

14  diminish the goodwill achieved from the trial results and require analysis and

15  evaluation presently under way and continuing.  The magnitude of the resulting

16  harm is currently unknown." *Peregrine v. CSM* at ¶10.

17       59.   On January 16, 2013 (only six days before the expiration of the 120

18  days provided for service under Fed. R. Civ. Proc. 4(m)), the Company served the

19  complaint on CSM. *See Id.* (Dkt. No. 7).

20       60.   Shortly thereafter, on March 7, 2013, the Company and CSM entered

21  into a stipulation to stay the action (*see id.* (Dkt. No. 8)) because the Master Services

22  Agreement entered into between Peregrine and CSM, dated on or about March 18,

23  2010, required the parties to participate in a dispute resolution process in the event

24  of any controversy or claim arising out of, relating to or in connection with any

25

26  [4]   A CRO is defined by Section 1.20 of E6 of the ICH on Good Clinical

27  Practices as "a person or an organization (commercial, academic or other) contracted
    by the sponsor to perform one or more of a sponsor's trial-related duties and

28  functions."

**FIRST AMENDED COMPLAINT**

provision of said agreement, or the rights or obligations of the parties thereunder, before pursuing their rights and remedies at law or equity. Thus, there was no realistic chance that the Company's lawsuit against CSM could have proceeded without a prior participation in a dispute resolution process. Indeed, had the Company not been looking to divert attention away from its own misconduct, it could have simply initiated a dispute resolution process with CSM directly and without the publicity of the lawsuit.

61. On March 8, 2013, the Court in the *Peregrine v. CSM* lawsuit entered an order staying the proceedings for a period of 120 days from the entry of the Order to allow the parties to pursue the dispute resolution process. *See id.* (Dkt. No. 11).

62. On July 11, 2013, CSM answered Peregrine's complaint, denying any wrongdoing. *See Peregrine v. CSM* (Dkt. No. 13) (the "CSM Answer"). According to the CSM Answer, "Peregrine's alleged damages and losses, if any, were caused by its own actions or the actions of other parties or entities, which were not proximately caused by CSM." *See* CSM Answer at 6:1-3.

**DEFENDANTS' MATERIALLLY FALSE AND MISLEADING
STATEMENTS ISSUED DURING THE CLASS PERIOD**

63. On May 21, 2012, Defendant Peregrine unblinded the Phase II Trial. At that point in time, Defendant Peregrine (as the sponsor) had, upon information and belief based on interview with confidential witnesses as to how this Phase II Trial was conducted, all of the patient Case Report Forms[5] listing the treatments received, tests conducted and data gathered to date in its possession or under its control.

---

[5]     A "Case Report Form" is defined by Section 1.10 of E6 of the ICH on Good Clinical Practices as "a printed, optical, or electronic document designed to record all of the protocol required information to be reported to the sponsor on each trial subject."

**FIRST AMENDED COMPLAINT**

64.   As of May 21, 2012, Defendant Peregrine (as the sponsor) had the ability to verify the accuracy of the unblinded clinical data gathered to date and confirm through routine blood tests that each patient had received the proper dose assigned to them (placebo or 1 mg. or 3 mg. of bavituximab).

65.   On May 21, 2012, the Company issued a press release entitled *Peregrine Announces Positive Top-Line Data from Randomized, Double-Blind Bavituximab Phase II Trial in Second-Line Non-Small Cell Lung Cancer -- Bavituximab Plus Chemotherapy Demonstrates Doubling of Overall Response Rates Versus Chemotherapy Alone -- 50% Improvement in Progression-Free Survival and Overall Survival Trends Support Phase III Development*.

66.   Nowhere in this May 21, 2012 press release did Defendants disclose that the data was preliminary data which Peregrine had not verified as accurate.  The following bold and italicized statements were materially false and misleading:

> Peregrine Pharmaceuticals, Inc. (NASDAQ: PPHM) today announced ***positive top-line results*** from its randomized, double-blind, placebo-controlled Phase IIb trial evaluating two dose levels of bavituximab plus docetaxel versus docetaxel plus placebo (control arm) in patients with second-line non-small cell lung cancer (NSCLC).  ***Data from the trial showed a doubling of overall response rates (ORR), the primary endpoint, and an improvement in progression-free survival (PFS), a secondary endpoint, in patients treated in the bavituximab-containing arms when compared to the control arm***.  […]

Based on independent radiology reviews and current status of patients, top-line data from the trial are as follows:

| Treatment Arm | Placebo plus docetaxel | Bavituximab (1 mg/kg) plus docetaxel | Bavituximab (3 mg/kg) plus docetaxel) |
|---|---|---|---|
| *Overall Response Rate* | *7.9%* | *15%* | 17.9% |
| *Median Progression-Free Survival* | *3.0 months* | *4.2 months* | 4.5 months |

*The compelling results from this rigorously designed trial clearly demonstrate that the combination of bavituximab and docetaxel is more active than docetaxel alone in treating second-line non-small cell lung cancer. We saw twice as many patients demonstrating an objective tumor response, increased progression-free survival, and already promising survival trends in this refractory setting.* […]

\*     \*     \*

"After working on 17 drug approvals, it is data like this that continues to energize me. *These robust data* will be important in discussions with the FDA regarding advancing bavituximab's clinical development in second-line non-small cell lung cancer," said Robert Garnick, PhD, head of regulatory affairs at Peregrine. "We look forward to working closely with the FDA to identify the most efficient path toward commercialization for this

**FIRST AMENDED COMPLAINT**

1    promising candidate in this indication where new

2    therapies are desperately needed."

3              *    *    *

4    "*These data are a significant validation of the clinical*

5    *potential of bavituximab for patients with few effective*

6    *treatment options*.  These data will be instrumental in

7    planning Phase III development in NSCLC and we are

8    excited to share these data as part of ongoing partnering

9    discussions," said Steven W. King, president and chief

10   executive officer of Peregrine.

11   (Emphasis added).

12        67.    Notably, in the May 21, 2012 press release, Defendants misleadingly

13   informed shareholders that Defendants themselves "saw" (*see, e.g.,* "we saw") the

14   claimed advantages of bavituximab, but gave no indication that Defendants had not

15   verified the accuracy of the data.

16        68.    On this news, Peregrine stock traded up from $0.44 to $0.53.

17        69.    According to Defendants' admissions in the September 24, 2012 press

18   release and later, all the unverified data reported regarding the placebo and 1 mg.

19   arms in the Phase II Trial was false and misleading and any conclusions drawn

20   comparing the 3 mg. arm results to the results of the placebo and 1 mg. arms were

21   false and misleading.  Defendants later stated they did not know which patients

22   received the placebo or the 1 mg. dosage when they were touting the data.

23        70.    On July 16, 2012, the Company issued a press release entitled

24   *Peregrine Pharmaceuticals Reports Fourth Quarter and Fiscal Year 2012 Financial*

25   *Results and Recent Developments -- Exceptional Data from Bavituximab Proof-of-*

26   *Concept Phase II Trial in Second-Line NSCLC Validates Platform and Positions*

27   *Program for Phase III Development -- Wholly-owned Subsidiary Reports Record*

28

19

**FIRST AMENDED COMPLAINT**

*Revenue and Over $30 Million in Revenue Backlog from Contract Manufacturing Business*. (Emphasis added).

71.   Nowhere in the July 16, 2012 press release did Defendants disclose that the data was preliminary data which Peregrine had not verified as accurate.   The following bold and italicized statements below were materially false and misleading for the reasons discussed in ¶ 69 (above):

"Since our last quarterly update, we reported ***transformational data*** from a robust double-blinded, placebo-controlled Phase II proof-of-principle trial evaluating the potential of bavituximab in treating second-line non-small cell lung cancer patients. ***The doubling of tumor response rates, a 50% increase in median progression free survival, and trends toward significant improvement in median overall survival strongly support advancing the program toward Phase III development.*** " said Steven W. King, president and chief executive officer of Peregrine. "We could not be happier with the ***strength of the data*** from this robustly designed trial which gives us a clear direction and greatly enhances the probability of success as we look to Phase III development . . . ."

(Emphasis added).

72.   On this news, Peregrine stock traded up from $0.97 to $1.06.

73.   The following bold and italicized statements below in the Company's 2012 Form 10-K were materially false and misleading regarding the Phase II Trial for the reasons discussed in ¶ 69 (above):

In May 2012, we announced ***positive top-line data*** from this trial from 117 evaluable patients, based on

FIRST AMENDED COMPLAINT

independent radiology reviews and ***current status of patients as of that date***, as shown in the following table:

| Treatment Arm | Placebo plus docetaxel | Bavituximab (1 mg/kg) plus docetaxel | Bavituximab (3 mg/kg) plus docetaxel) |
|---|---|---|---|
| ***Overall Response Rate*** | ***7.9%*** | ***15%*** | 17.9% |
| ***Median Progression-Free Survival*** | ***3.0 months*** | ***4.2 months*** | 4.5 months |

> ***Both dose levels of bavituximab and docetaxel combination treatment were generally safe and well tolerated with adverse events being similar to the patients receiving docetaxel with placebo. Another secondary endpoint***, ***median OS, in the control arm has already been determined at less than 6 months, while the median has not been reached in either bavituximab-containing arm.*** We anticipate announcing median OS from this trial in the second half of calendar year 2012, but this is a time-to-event endpoint and could take longer to reach.
>
> Based on these ***encouraging data*** and our discussions with medical advisors, our strategy is to pursue Phase III development with bavituximab in second-line NSCLC.

(Emphasis added).

74.    On July 16, 2012, the Company conducted a Fourth Quarter 2012 Earnings Conference Call ("4Q Conference Call").   It was on this call that Defendant King, President, CEO and a director of the Company, falsely stated:

21

**FIRST AMENDED COMPLAINT**

It has been a transformational time at Peregrine since our last quarterly conference call.  Since that call, ***our lead clinical program, bavituximab, yielded exceptional proof of principle data that was announced May 21***, [2012] when the trial testing bavituximab in combination with docetaxel versus docetaxel alone was unblinded.

***Results from the study showed a doubling of tumor shrinkage or tumor response; 50% improvement in progression-free survival, or PFS; and a significant trend in overall survival, or OS, in which median OS has already been reached in the docetaxel alone arm, and a majority of patients are still alive in both bavituximab-containing arms of the trial***.  […].

\*　　\*　　\*

***The strength of this data*** in this large area of high unmet medical need has also sparked a surge in partnering discussions that has included over 15 in-person partnering meetings since that time with major players in oncology, with follow-up discussions ongoing and additional parties showing interest.

(Emphasis added).

75.　　The preceding bold and italicized statements made by Defendant King in the 4Q Conference Call were materially false and misleading regarding the Phase II Trial for the reasons discussed in ¶ 69 (above).

76.　　In addition, at no time during the 4Q Conference Call did Defendant King warn the market that Defendant Peregrine had not verified the accuracy of the

FIRST AMENDED COMPLAINT

1    data, had not confirmed that those patients assigned to receive placebo or 1 mg.

2    bavituximab had actually received the assigned dose, and thus none of the

3    Defendants knew whether the statements they were making were true.

4         77.    In that same 4Q Conference Call, Defendant Shan, Vice President of

5    Clinical and Regulatory Affairs, falsely stated:

6                      ***We truly could not have expected anything more from***

7                      ***this successful proof of concept trial, in which not only***

8                      ***did the control arm produce expected results, but both***

9                      ***bavituximab doses yielded similar improved efficacy***

10                     ***results,*** as we expected going into the study, which

11                     mirrored the consistently positive trend across all

12                     efficacy end points that we observed in our prior single

13                     arm studies, as well as our overall clinical experience to

14                     date with bavituximab. ***We have also conducted further***

15                     ***analyses of the top line results, and determined that not***

16                     ***only were baseline characteristics well-balanced across***

17                     ***all treatment groups, but there are no subgroup***

18                     ***differences in geography, age, gender, race, et cetera***.

19                     And because of the rigorous trial design, these data have

20                     ignited a great deal of excitement within the medical

21                     community, with our clinical advisors as well as thought

22                     leaders in the field supporting advancement to Phase III.

23   (Emphasis added).

24        78.    The preceding bold and italicized statements made by Defendant Shan

25   in the 4Q Conference Call were materially false and misleading regarding the Phase

26   II Trial for the reasons discussed in ¶ 69 (above).

27        79.    In addition, at no time during the 4Q Conference Call did Defendant

28   Shan warn the market that Defendant Peregrine had not verified the accuracy of the

**FIRST AMENDED COMPLAINT**

1    data, had not confirmed that those patients assigned to receive placebo or 1 mg.

2    bavituximab had actually received the assigned dose, and thus none of the

3    Defendants knew whether the statements they were making were true.

4         80.     However, Defendant Shan's statement that Peregrine had "conducted

5    further analyses" of the results of the Phase II Trial misleadingly led investors to

6    believe that the Company had verified the accuracy of the data and thus was

7    truthfully reporting the results of the Phase II Trial.

8         81.     On August 30, 2012, the Company announced that it had secured a $30

9    million term loan from the Oxford Group Lenders.  Under the loan facility, the

10    Company received initial funding of $15 million and had the option to receive an

11    addition $15 million.

12         82.     On this news, Peregrine stock traded up from $2.47 to $2.51.

13         83.     Defendants were able to secure the loan and draw down the first tranche

14    as a result of the false and misleading statements (¶¶ 60, 70, 71, 73, 74, 77)

15    regarding the Phase II Trial.

16         84.     On September 7, 2012, the Company issued a press release announcing

17    data from the Phase II Trial was presented at the 2012 Chicago Multidisciplinary

18    Symposium in Thoracic Oncology.  According to the Company, the results indicated

19    that lung cancer patients taking bavituximab lived twice as many months as those

20    treated with only chemotherapy.  ("The interim data showed a statistically

21    significant improvement in overall survival (Hazard Ratio 0.524, p-value .0154) and

22    a doubling of median overall survival (OS) in the bavituximab-containing arms

23    compared to the control arm.").  This statement was false and misleading.

24    Defendants also claim that the patients given a lower dose of bavituximab and the

25    chemotherapy drug docetaxel lived for a median of 11.1 months compared with 5.6

26    months for patients treated with the chemotherapy drug and a placebo.  Patients

27    given a higher dose of the drug lived for a median of 13.1 months, resulting in a

28

**FIRST AMENDED COMPLAINT**

pooled survival time of 12.1 months for the treated group.  These statements were false and misleading for the reasons discussed in ¶ 69.

85.   The Company's September 7, 2012 press release also falsely stated in relevant part:

> […] ***The interim data showed a statistically significant improvement in overall survival (Hazard Ratio 0.524, p-value .0154) and a doubling of median overall survival (OS) in the bavituximab-containing arms compared to the control arm***.

> \*     \*     \*

> "***This study was a rigorous trial designed to minimize bias and we are encouraged that this trial yielded such positive results in the most important endpoint, overall survival***.  ***The positive overall response rates and progression free survival in both bavituximab-containing arms seen earlier in the study has now translated into a statistically significant extension in overall survival for patients, a result rarely achieved in phase II clinical trials***." said Joseph Shan, vice president of clinical and regulatory affairs at Peregrine.  "***The quality of this data gives us a solid foundation for designing a Phase III trial with an increased probability of success***.  We are planning for an end-of-phase II meeting with the FDA as we plan to initiate this trial by mid-2013."

> The trial enrolled 121 patients (117 evaluable per the study protocol) with second-line non-squamous NSCLC

FIRST AMENDED COMPLAINT

following one prior chemotherapy regimen at over 40 clinical centers. Patients were equally randomized to 1 of the 3 treatment arms, docetaxel (75mg/m2) plus either placebo, 1 mg/kg bavituximab, or 3 mg/kg bavituximab until disease progression. Approximately 50% of the patients were enrolled in the U.S. and 50% were enrolled internationally with equal distribution between all treatment groups.

"*Robust data from this Phase II trial clearly demonstrate a significant benefit in overall survival with a good safety profile in patients receiving bavituximab plus docetaxel compared to those receiving docetaxel plus placebo*," said Steven W. King, president and chief executive officer of Peregrine. "*We are currently in discussions with several potential pharmaceutical partners who have expressed great interest in our bavituximab oncology program. It is our goal to identify the optimal partner to assist with the design and logistics of a multinational Phase III pivotal trial*."

*The interim results from the study showed no significant safety differences between the three treatment arms as determined by the trial's independent data monitoring committee*. Baseline characteristics were well balanced across all three treatment arms of the study, including performance (ECOG) status, age,

**FIRST AMENDED COMPLAINT**

gender, and race.  Tumor responses were determined in accordance with Response Evaluation Criteria In Solid Tumors (RECIST 1.1) based on blinded central radiology review.

"***The median overall survival results from the Proof-of Concept study are truly outstanding and great news for patients***.  Statistically significant overall survival results at this stage of development are rare and have put us in an excellent position for advancing the program.  Our attention is now turned to an end of phase II meeting by year end which will help us define the most efficient path forward to potential regulatory approval." said Robert Garnick, PhD, head of regulatory affairs at Peregrine. "A global Phase III trial designed very similarly to the robust design of this Phase II trial greatly increases bavituximab's likelihood of success."

(Emphasis added).

86.    The preceding bolded and italicized statements in the September 7, 2012 press release were false and misleading for the reasons discussed in ¶ 69 (above).  In addition, the September 7, 2012 press release failed to warn the market that Defendant Peregrine had not verified the accuracy of the data, had not confirmed that those patients assigned to receive placebo or 1 mg. bavituximab had actually received the assigned dose, and thus none of the Defendants knew whether the statements they were making were true.

87.    After this news, the Company's stock rose from $3.07 to close on September 7, 2012 at $4.50.

**FIRST AMENDED COMPLAINT**

1    88.    On September 10, 2012, the Company issued a press release

2    announcing its First Quarter fiscal year 2013 financial results.

3    89.    The September 10, 2012 press release noted that the Phase II Trial was

4    unblinded in May 2012 ("We have achieved major milestones since the end of last

5    quarter with the ***unblinding of our proof-of-principle bavituximab study in second-***

6    ***line NSCLC in May*** and the recent announcement of overall survival data from the

7    study being the most significant.") (emphasis added).

8    90.    Further, the September 10, 2012 press release falsely stated the

9    following:

10            […]  ***The statistically significant overall survival seen in***

11            ***that study is an obvious green light for us to begin plans***

12            ***to advance the program into phase III and goes a long***

13            ***way toward validating the technology platform***," said

14            Steven W. King, president and chief executive officer of

15            Peregrine.

16    (Emphasis added).

17    91.    The preceding bolded and italicized statements in the September 10,

18    2012 press release were false and misleading for the reasons discussed in ¶ 69

19    (above).  In addition, the September 10, 2012 press release failed to warn the market

20    that Defendant Peregrine had not verified the accuracy of the data, had not

21    confirmed that those patients assigned to receive placebo or 1 mg. bavituximab had

22    actually received the assigned dose, and thus none of the Defendants knew whether

23    the statements they were making were true.

24    92.    On September 10, 2012, the Company conducted its First Quarter 2013

25    Conference Call ("1Q Conference Call").  It was on that call that Defendant King

26    stated the following:

27            Since the beginning of last quarter, it has been an

28            exceptional time for Peregrine, as we have seen two of

28

**FIRST AMENDED COMPLAINT**

the most important milestones in the Company history achieved, transitioning the Company toward late-stage drug development. ***The exclamation point for these milestones came just last Friday with the report that patients receiving Bavituximab plus chemotherapy in our proof-of-concept studying second-line non-small-cell lung cancer had double the median overall survival compared to patients receiving chemotherapy plus placebo***. ***These are truly remarkable results that are not only great for the program, providing a clear signal to proceed toward a Phase III clinical trial, providing proof of concept that Bavituximab is an active drug when given with Docetaxel, but also great news for the non-small-cell lung cancer patients in the trial***.

(Emphasis added).

93.    Defendant Kings' bolded statements in paragraph 92 (above) were materially false and misleading for the reasons set forth in ¶ 69 above.

94.    In addition, Defendant King failed to warn the market that Defendant Peregrine had not verified the accuracy of the data, had not confirmed that those patients assigned to receive placebo or 1 mg. bavituximab had actually received the assigned dose, and thus none of the Defendants knew whether the statements they were making were true.

95.    At the same 1Q Conference Call, Defendant Shan stated in relevant part:

***Bavituximab continues to demonstrate a favorable safety profile, with a combination of Docetaxel plus Bavituximab being well tolerated, with no increase in frequency or nature of adverse events compared to the***

**FIRST AMENDED COMPLAINT**

*control arm*.  Notably, no increase in bleeding or clotting adverse events were reported with the addition of Bavituximab, unlike the experience with other compounds which target blood vessels.

In terms of efficacy outcomes, let me start with the primary endpoint, overall response rate, or ORR, which was determined by independent central radiology reviews according to RECIST criteria, or Response Evaluation Criteria in Solid Tumors.  *As reported in May when the study was initially unblinded, the response rate in the Docetaxel plus placebo arm was 8% compared to 15% in the Bavituximab 1-milligram per kilogram arm.  And 18% in the Bavituximab 3-milligramper kilogram arm.  And 16.5% in the pooled Bavituximab arm*.

(Emphasis added).

96.   Defendant Shan's bold and italicized statements in paragraph 95 (above) were materially false and misleading for the reasons set forth in ¶ 69 above.

97.   In addition, Defendant Shan failed to warn the market that Defendant Peregrine had not verified the accuracy of the data, had not confirmed that those patients assigned to receive placebo or 1 mg. bavituximab had actually received the assigned dose, and thus none of the Defendants knew whether the statements they were making were true.

98.   At the same 1Q Conference Call, Defendant Garnick, Head of Regulatory Affairs at the Company, stated in relevant part:

As you have just heard from Joe, *the data we announced last week has far exceeded our expectations*.  […]

(Emphasis added).

FIRST AMENDED COMPLAINT

99.   Defendant Garnick' statements in paragraph 98 (above) were materially false and misleading for the reasons set forth in ¶ 69 above.

100.   In addition, Defendant Garnick failed to warn the market that Defendant Peregrine had not verified the accuracy of the data, had not confirmed that those patients assigned to receive placebo or 1 mg. bavituximab had actually received the assigned dose, and thus none of the Defendants knew whether the statements they were making were true.

101.   At the same 1Q Conference Call, Defendant Lytle, CFO of the Company, stated in relevant part:

> *This second tranche becomes available to us upon the attainment of certain pre-determined milestones, one of which was just achieved last Friday with the announcement of the positive overall survival data from our second-line lung cancer trial*. […]

(Emphasis added).

102.   Defendant Lytle's statements in paragraph 101 (above) were materially false and misleading for the reasons set forth in ¶ 69 above.

103.   On September 10, 2012, the Company filed its 1Q 2013 Form 10-Q. The 1Q 2013 Form 10-Q contained the positive findings concerning bavituximab that were contained in the Company's September 7, 2012 press release.  Defendants King and Lytle signed the 1Q 2013 Form 10-Q attesting to the accuracy of the information presented in the SEC filing.

104.   The 1Q 2013 Form 10-Q stated the following regarding the Company's Phase II Trial in Second-Line Non-Small Cell Lung Cancer, and the statements in bold were materially false and misleading:

> […]  *In May 2012, we announced positive top-line overall response rate ("ORR") data (primary endpoint) and median progression-free survival ("PFS") (one*

31

*secondary endpoint) from this trial from 117 evaluable patients, based on independent radiology reviews and current status of patients as of that date, as shown in the following table*:

| Treatment Arm | Placebo plus docetaxel | Bavituximab (1 mg/kg) plus docetaxel | Bavituximab (3 mg/kg) plus docetaxel) |
|---|---|---|---|
| *Overall Response Rate* | *7.9%* | *15%* | 17.9% |
| *Median Progression-Free Survival* | *3.0 months* | *4.2 months* | 4.5 months |

In addition, on September 7, 2012, we presented compelling interim median overall survival data ("OS"), another secondary endpoint from the trial, at the 2012 Chicago Multidisciplinary Symposium in Thoracic Oncology. *The data presented showed a doubling of median OS in each of the bavituximab-containing arms compared to the control arm, representing a significant improvement in survival*.

(Emphasis added).

105.   The 1Q 2013 Form 10-Q statements in bold were materially false and misleading for the reasons set forth in ¶ 69 above.

106.   Further, the statements made in ¶¶ 65, 66, 70, 71, 73, 74, 77, 80, 84, 85, 89, 90, 92, 95, 98, 101, 104 (above) regarding the efficacy of bavituximab in treating second-line NSCLC patients were materially false and misleading because:

(a)   Defendants had not properly administered and monitored the Phase II Trial of bavituximab in treating second-line NSCLC patients in

FIRST AMENDED COMPLAINT

accordance with Sections 5.1.1 of the ICH on Good Clinical Practice, E6 ("***The sponsor is responsible for implementing and maintaining quality assurance[6] and quality control systems*** with written SOPs to ensure that trials are conducted and data are generated, documented (recorded), and reported in compliance with the protocol, GCP, and the applicable regulatory requirement(s)") (emphasis added);

(b)    Defendants had not properly administered and monitored the Phase II Trial of bavituximab in treating second-line NSCLC patients in accordance with Section 5.1.3 of the ICH on Good Clinical Practice, E6 ("Quality control should be applied to each stage of data handling to ensure that all data are reliable and have been processed correctly");

(c)    Defendants had not properly administered and monitored the Phase II Trial of bavituximab in treating second-line NSCLC patients in accordance with Section 5.2.1 of the ICH on Good Clinical Practice, E6 ("A sponsor may transfer any or all of the sponsor's trial-related duties and functions to a [Contract Research Organization] CRO, ***but the ultimate responsibility for the quality and integrity of the trial data always resides with the sponsor***") (emphasis added);

(d)    Defendants had not properly administered and monitored the Phase II Trial of bavituximab in treating second-line NSCLC patients in accordance with Section 5.5.1 of the ICH on Good Clinical Practice, E6 ("The sponsor should utilize appropriately qualified individuals to supervise the

---

6    "Quality Assurance (QA)" is defined by Section 1.46 of E6 of the ICH on Good Clinical Practices as "all those planned and systematic actions that are established to ensure that the trial is performed and the data generated, documented (recorded), and reported in compliance with Good Clinical Practice (GCP) and the applicable regulatory requirements."

**FIRST AMENDED COMPLAINT**

overall conduct of the trial, to handle the data, to verify the data, to conduct the statistical analyses, and to prepare the trial reports.");

(e)    Defendants had not properly administered and monitored the Phase II Trial of bavituximab in treating second-line NSCLC patients in accordance with Section 5.13.1 of the ICH on Good Clinical Practice, E6 ("The sponsor should ensure that the investigational product(s) (including active comparator(s) and placebo, if applicable) is characterized as appropriate to the stage of development of the product(s), is manufactured in accordance with any applicable GMP, and is coded and labeled in a manner that protects the blinding, if applicable. In addition, the labeling should comply with applicable regulatory requirement(s).");

(f)    Defendants had not properly administered and monitored the Phase II Trial of bavituximab in treating second-line NSCLC patients in accordance with Section 5.18.1 of the ICH on Good Clinical Practice, E6 ("The purposes of trial monitoring are to verify that: . . . ***The reported trial data are accurate, complete, and verifiable from source documents***.[7] [...].") (emphasis added);

(g)    Defendants had not properly administered and monitored the Phase II Trial of bavituximab in treating second-line NSCLC patients in accordance with Section 5.18.3 of the ICH on Good Clinical Practice, E6

---

[7]    "Source Documents" is defined by Section 1.52 of E6 of the ICH on Good Clinical Practices as "original documents, data, and records (*e.g.*, hospital records, clinical and office charts, laboratory notes, memoranda, subjects' diaries or evaluation checklists, pharmacy dispensing records, recorded data from automated instruments, copies or transcriptions certified after verification as being accurate copies, microfiches, photographic negatives, microfilm or magnetic media, x-rays, subject files, and records kept at the pharmacy, at the laboratories and at medico-technical departments involved in the clinical trial."

**FIRST AMENDED COMPLAINT**

("*The sponsor should ensure that the trials are adequately monitored.* […].") (emphasis added);

(h)     Defendants had not properly administered and monitored the Phase II Trial of bavituximab in treating second-line NSCLC patients in accordance with Section 5.18.4(d) of the ICH on Good Clinical Practice, E6 ("Verifying that the investigator follows the approved protocol and all approved amendment(s), if any.");

(i)     Defendants had not properly administered and monitored the Phase II Trial of bavituximab in treating second-line NSCLC patients in accordance with Section 5.18.4(h) of the ICH on Good Clinical Practice, E6 ("*Verifying* that the investigator and the investigator's trial staff are performing the *specified trial functions*, in accordance with the protocol and any other written agreement between the sponsor and the investigator/institution, and have not delegated these functions to unauthorized individuals.") (emphasis added);

(j)     Defendants had not properly administered and monitored the Phase II Trial of bavituximab in treating second-line NSCLC patients in accordance with Section 5.18.3 of the ICH on Good Clinical Practice, E6 ("*The sponsor should ensure that the trials are adequately monitored.* […]") (emphasis added);

(k)     Defendants violated FDA Guideline on the Preparation of Investigational New Drug Products, 21 CFR § 211.125 ("*Strict control shall be exercised over labeling issued for use in drug product labeling operations* . . . .") (emphasis added);

(l)     Defendants violated FDA Guideline on the Preparation of Investigational New Drug Products, 21 CFR § 211.130 ("written procedures be designed *and followed* to assure that correct labels and labeling materials are used for drug products") (emphasis added);

FIRST AMENDED COMPLAINT

(m)   Defendants admitted in the Company's 2012 Form 10-K that the Company's reliance on third parties does not relieve them of Good Clinical Practice for conducting, monitoring, recording and reporting the results of clinical trials to ensure that the data and results are scientifically credible, accurate and viable; however, this statement was false as Defendants never conducted a ***thorough operational review*** of the third-party vendor operation to ensure the accuracy of their interim reporting of the Phase II Trial (as Defendants later admitted to in the Company's January 7, 2013 press release;

(n)   Peregrine lacked the proper internal controls related to conducting clinical trials and reporting the results of the clinical trials (*see* Confidential Witnesses ("CWs") at ¶¶ 114, 121, 122);

(o)   The Company's Class Period reports on the significance of the data from the Phase II Trial gave investors a false-positive conclusion of the outcome from the Phase II Trial.  Until a clinical study is completed and all components of the study's medications are analyzed, a projected outcome based on partial data cannot be cited as statistical evidence of safety or efficacy;

(p)   The Company made an announcement on September 7, 2012, about the interim data as to the overall survival of patients purportedly gathered from the Phase II Trial and claimed that the p-value was .0154.  This p-value, if accurate, would be statistically significant in showing that bavituximab had been efficacious in the Phase II Trial.  *See* ¶ 12.  However, this description of the p-value as to the overall survival of patients was false and misleading as it was based on incomplete data.  Defendant Peregrine later admitted on February 19, 2013, that the p-value as to the overall survival of patients was 0.217, which means that chance would be responsible for the outcome of the data in more than one of five times, which is not statistically significant.  Defendant Peregrine also failed to disclose any reason for the

36

extreme negative change as to the p-value in the overall survival of patients from the earlier reported data;

(q)     Defendants failed to properly ensure that "all clinical trial information" was "recorded, handled and stored in a way that allows its accurate reporting, interpretation and verification" in violation of Section 2.10 of the ICH on Good Clinical Practice, E6; and

(r)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Section 5.18.4(k) of the ICH on Good Clinical Practices, E6 ("*Verifying* that source documents and other trial records are accurate, complete, kept up-to-date and maintained.")(emphasis added).

107.   On September 24, 2012, the Company issued a press release entitled *Peregrine Pharmaceuticals Announces That It Has Discovered Major Discrepancies in Treatment Group Coding by an Independent Third-Party Vendor Responsible for Distribution of Blinded Investigational Product Used in Its Bavituximab Phase II Second-Line Non-Small Cell Lung Cancer Trial*, which stated in relevant part:

> Peregrine Pharmaceuticals announced today that during the course of preparing for an end-of-phase II meeting with regulatory authorities and following recent data announcements from its randomized, double-blind placebo-controlled Phase II trial of bavituximab in second-line non-small cell lung cancer, *it discovered major discrepancies between some patient sample test results and patient treatment code assignments*. Due to the double-blind nature of the trial, Peregrine was not permitted to have access to either patient group assignments or related product coding information. As part of the trial's execution, Peregrine contracted with

FIRST AMENDED COMPLAINT

independent third-party contractors to execute treatment group assignments and oversee clinical trial material coding and distribution according to established procedures. A subsequent review of information has determined that the source of these discrepancies appear to have been associated with the independent third-party contracted to code and distribute investigational drug product.

This discrepancy is specific to this trial and will have no impact on other ongoing bavituximab trials.

Peregrine intends to communicate further as soon as it is able to determine the impact of this issue. *In the meantime, investors should not rely on clinical data that the company disclosed on or before September 7, 2012 from its Phase II bavituximab trial in patients with second-line non-small cell lung cancer or any presentations or other documents related to this Phase II trial*.

(Emphasis added).

108. After this news, the Company's stock plummeted $4.23 per share to close at $1.16 per share on September 24, 2012, a one-day decline of 78%.

109. On September 26, 2012, the Company filed a Form 8-K with the SEC, which disclosed that it had received a written notice of default from the Oxford Group Lenders on September 24, 2012, with respect to a security agreement the Company had entered into on August 30, 2012. According to the Company, the Oxford Group Lenders deemed the Company's disclosure on September 24, 2012,

38

concerning the major discrepancies in the results from its cancer trial to be a material adverse change under the terms of the loan agreement and, as result, the Oxford Group Lenders accelerated the repayment of the loan and demanded repayment in full for the outstanding amounts.  The Company's Form 8-K stated in relevant part:

> On September 24, 2012, we received a written notice of default ("Notice of Default") from Oxford Finance LLC, as collateral agent ("Collateral Agent"), on behalf of itself, Silicon Valley Bank, and MidCap Financial SBIC, LP (collectively, the "Lenders"), with respect to that certain loan and security agreement dated as of August 30, 2012, by and among Peregrine, its wholly owned subsidiary, Avid Bioservices, Inc., and the Lenders (the "Loan Agreement").  ***Pursuant to the Notice of Default, all amounts due under the Loan Agreement were accelerated as a result of the above event***, *which was deemed a material adverse change under the Loan Agreement, and the Lenders demanded full payment of all obligations under the Loan Agreement, including the outstanding principal amount of $15 million and all accrued interest thereon, plus a final payment fee equal to 6.5% of the principal amount repaid*.  On September 25, 2012 Peregrine paid the Lenders all outstanding obligations and the Loan Agreement was terminated.

(Emphasis added).

110.   On this news, the Company's stock declined $0.55 per share to close at $1.11 per share on September 27, 2012, a one-day decline of 33% as demonstrated in the chart below:



111.   As a result of Defendants' materially false and misleading statements made regarding the data gathered from the Phase II Trial from May 2012 through September 2012, Peregrine securities traded at artificially inflated levels during the Class Period.   However, after the September 24 and 26 statements by Defendants reached the market, the Company's shares were hammered by massive sales, sending them down over 75% from their Class Period high.

## CONFIDENTIAL WITNESSES

112.   **Confidential Witness No. 1** ("CW1") is a former employee of Peregrine and was employed in a high level managerial position in the capacity of Chief Operating Officer ("COO") from April 2009 through December 2011.   CW1 was responsible for all operations of the Company.

FIRST AMENDED COMPLAINT

113.   CW1 stated that the Company would announce positive preliminary data when, in his/her opinion, nothing should be announced until the data was verified.

114.   CW1 also stated that he/she thought the Company lacked internal controls related to conducting clinical trials and reporting the data results of the clinical trials.  CW1 further stated that there was a very secretive inner circle in the Company which only included Defendants King, Lytle, Shan and Garnick.

115.   CW1 confirmed that patient blood is collected during clinical trials of bavituximab and sent to the central laboratory for testing and that the results are regularly and periodically reported to Defendant Peregrine and specifically to Defendant Shan.

116.   ***Confidential Witness No. 2*** ("CW2") is a former employee of Peregrine's subsidiary Avid Bioservices and was employed in a high level managerial position at Avid Bioservices from October 1996 to July 2011.  CW2 reported to CW1 during part of his/her employment with Avid Biosciences.

117.   CW2 stated that he/she was in charge of the manufacturing of all the drugs which were used for the clinical tests at the Company, including the bavituximab.  The manufacturing included filling the vials for the bavituximab tests which included the placebo and different strengths of the bavituximab being tested.  CW2 also stated that once the vials were filled they were shipped to a vendor to have them labeled.

118.   CW2 stated that Peregrine was trying to blame CSM for what he/she believed to be Peregrine's mistakes.

119.   CW2 stated that he/she was shocked at what Peregrine initially reported regarding the data from the Phase II Trial.  CW2 stated that the Company overstated the positive nature of the data and the final positive data that the Company promised was not present.  CW2 further stated that the announced Phase II Trial results were incredible and hard to believe.

FIRST AMENDED COMPLAINT

120.   ***Confidential Witness No. 3*** ("CW3") is a former employee of Peregrine and was a Process Development Scientist at the Company from July 2010 to September 2012.

121.   CW3 stated the Company never performed its due diligence on any project.  CW3 stated that "[i]f the Company received good results on a project they would never verify the results, they would just report the good news."

122.   CW3 further stated that the Company should have known that the Company's Phase II Trial could not be relied upon, as major discrepancies existed between patient sample test results and patient treatment codes.  CW3 stated that in "typical Peregrine fashion a result that is beneficial to them is what they want.  The Company does not try to see if it is reproducible or even makes sense."  CW3 further stated that "[i]n typical fashion they [Peregrine] looked at only the things that would make their case look good and not what was actually occurring.  Other people not even intimately familiar with the trial pointed out discrepancies in the safety profile that should have caused them to take a second, third or fourth look.  Every decision ultimately is done by Steve King.  He is not a scientist of any stature.  I would say the intellectual honesty of a Peregrine trial is very similar to those people who found WMDs in Iraq when none existed.  While I worked there I never heard one word from management about what is owed the shareholders in terms of giving them a return, of being honest, of getting a drug to market, of having any obligation to the shareholders.  They got the result they wanted to have, not the truth."

123.   CW3 confirmed that Defendants were successful, after touting the interim and unverified results of the Phase II Trial, in inducing a potential partner, Abbvie, Inc. ("Abbvie"), to review the data produced by the Phase II Trial but that Abbvie soured on a partnership when Peregrine admitted that its prior statements about the results of the data were false and misleading.

**FIRST AMENDED COMPLAINT**

124.   CW3 also confirmed that Defendant King flew to Chicago to meet with representatives of Abbvie in an effort to keep them interested in a partnership with Peregrine, but to no avail.

125.   Upon information and belief, CW3 believes that Abbvie refused to do business with a company or its executives who would be deliberately reckless in releasing statements about the positive nature of clinical data before verifying the accuracy of the data or the truth and accuracy of their own statements.

126.   Abbvie is a major company in the industry of developing proprietary drugs and bringing them to market.  Abbvie is a spin-off from Abbott Laboratories, Inc. ("Abbott").  On October 19, 2011, Abbott announced plans to separate into two publicly traded companies, one in diversified medical products and the other in research-based pharmaceuticals.

127.   The diversified medical products company consisted of Abbott's existing diversified medical products portfolio, including its branded generic pharmaceutical, devices, diagnostic and nutritional businesses and retained the Abbott name.

128.   The research-based pharmaceutical company consisted of Abbott's current portfolio of proprietary pharmaceuticals and biologics and was named Abbvie.

129.   At the time of the announcement, the Abbvie research-based pharmaceutical division had delivered market-leading performance with a sustainable mix of products and built a strong pipeline of proprietary medicines through internal discovery, in-licensing and collaboration efforts.

130.   At the time of the announcement, the Abbvie division had approximately $18 billion in annual revenue and had a sustainable portfolio of market-leading brands, including Humira, Lupron, Synagis, Kaletra, Creon and Synthroid.   Abbvie also had an attractive pipeline of innovative R&D assets in

FIRST AMENDED COMPLAINT

important specialty therapeutic areas such as Hepatitis C, immunology, chronic kidney disease, women's health, oncology and neuroscience.

131.  Abbvie continued as a division of Abbott until the actual separation occurred on January 1, 2013.

132.  Prior to the actual separation, Abbvie expressed an interest in a collaboration partnership effort with Peregrine as to bavituximab after Peregrine unblinded the Phase II study in May 2012 and began touting the interim data it was releasing as positive and accurate.

133.  A partnership with Abbvie would be everything that Peregrine and the Individual Defendants had dreamed.  Such a partnership would be a lifeline for Peregrine and very lucrative for the Individual Defendants.  To entice Abbvie into partnership, during the Class Period, Defendants, with deliberate recklessness, touted the efficacy of bavituximab and released public statements about the positive (but unverified) results of the Phase II Trial in the hope no errors in the Phase II Trial would be discovered.

134.  ***Confidential Witness No. 4*** ("CW4") was a former consultant at Defendant Peregrine for Clinical Operations from mid-2007 until March 2012.

135.  CW4 stated that all the Peregrine clinical trials, including the bavituximab clinical trial in issue, follow a standard set of operating procedures (SOPs) and a Clinical Protocol specific to each clinical trial.

136.  CW4 stated that the Clinical Protocol details all aspects of the clinical trial including the drug supply, packaging, labeling, shipping arrangements, safety procedures, patient population, preparation of Case Reports on patient treatment and data gathered, manufacturing processes and all other steps in the clinical trial.

137.  CW4 stated that the SOPs described how the data generated from the clinical trial should be monitored to ensure its accuracy.

138.  CW4 stated that all Peregrine employees involved in the trial are required to follow the SOPs and the Clinical Protocol.

**FIRST AMENDED COMPLAINT**

139.   In addition, according to CW4, Defendant Peregrine has Case Report Forms that are distributed to the clinical investigators and on which they are required to record the data collected from the patients in the clinical trial.  The data collected and reported back to Peregrine by the clinical investigators includes the patient's height, weight, date of birth, sex, date of diagnosis, and reports of treatments, including the results of diagnostic tests such as blood tests, radiology reports and electrocardiograms.

140.   CW4 stated that the SOPs, the Clinical Protocol and the Case Report Forms for the Phase II Trial are found on the main frame computer at Defendant Peregrine's offices.

141.   According to CW4 these documents are subject to non-disclosure agreements signed by Peregrine employees which prevent them from releasing these documents to outside parties without a subpoena.

142.   According to CW4, the SOPs, Clinical Protocol and Case Report Forms cannot be obtained from the FDA with a Freedom of Information Act ("FOIA") request as they are considered proprietary.  Plaintiff Fahey made a FOIA demand upon the FDA to obtain the SOPs, the Clinical Protocol and the Case Report Forms on the Phase II Trial, but the FDA refused to produce them.

143.   ***Confidential Witness No. 5*** ("CW5") was a former project manager at Clinical Supplies Management ("CSM"), the Contract Resource Organization (CRO) hired by Defendant Peregrine to manage the bavituximab clinical trial in issue, including the blinding of the drug and placebo vials and the distribution of the drug and placebo vials to the clinical investigators.

144.   CW5 stated that each clinical trial managed by CSM had its own set of Standard Operating Procedures (SOPs) and had a Clinical Protocol supplied to CSM by the drug company such as Peregrine conducting the clinical trial.   These documents were stored in the office of CSM in electronic format and hard copies

**FIRST AMENDED COMPLAINT**

were maintained in large binders in the work area for easy reference by the CSM workers.

145.   CW5 stated that these documents were never supposed to leave the CSM facility.

146.   CW5 stated that he/she and other CSM employees signed confidentiality agreements that would prevent them from revealing the contents of the SOPs and Clinical Protocol without a lawful subpoena.

147.   **Confidential Witness No. 6** ("CW6") was the clinical trial coordinator for the Phase II Trial at one of the investigator sites in California.

148.   CW6 confirmed that his/her office was one of the clinical sites participating in the Phase II Trial.

149.   CW6 confirmed that pursuant to the Protocol for this Phase II Trial, on every weekly visit by the patients assigned to the clinical trial, vials of blood were drawn from the patients.  Some of the blood was retained by the investigator site and tested.  The results of the tests were noted on the Case Report Forms and the Case Report Forms were sent to Peregrine on a periodic basis.

150.   CW6 also confirmed that blood drawn from patients on each weekly visit was also sent, pursuant to the study Protocol, to the central laboratory where it was also subjected to further tests.  CW6 stated that the results of these tests were sent to Defendant Peregrine and to those persons in charge of supervising the Phase II Trial, which in this instance were Defendants Shan and Garnick.

151.   **Confidential Witness No. 7** ("CW7") was the coordinator of clinical trials (which included the Phase II Trial) at one of the investigator sites in Florida.

152.   CW7 confirmed that, pursuant to the study Protocol, blood drawn on the weekly patient visits was sent to the central laboratory for tests to be run and reported to the sponsor, Peregrine.

**FIRST AMENDED COMPLAINT**

153. **Confidential Witness No. 8** ("CW8") was the Clinical Research Manager for the Phase II Trial at one of the investigator sites in the eastern United States.

154. CW8 confirmed that, pursuant to the study Protocol, blood was drawn on every patient visit. The blood was tested at the investigator site and Case Report forms were completed and sent to the sponsor, Peregrine, with the results of the tests.

155. In addition, CW8 confirmed that other vials of patient blood drawn at the time of each visit were sent, pursuant to the study Protocol, to the central laboratory for further testing.

156. **Confidential Witness No. 9** ("CW9") was a former Peregrine Clinical Research Associate who was employed at Peregrine from March 2011 through January 2013.

157. CW9 stated he/she was one of the persons who worked on the Phase II Trial in issue.

158. CW9 stated that he/she possessed detailed knowledge on the Phase II Trial, the study Protocol, and the knowledge of the Individual Defendants including, specifically, Defendant Shan.

159. CW9 also stated, however, that she was, like everyone who was employed by Peregrine to work on the Phase II Trial, a party to a confidentiality agreement with Defendant Peregrine which she understood to prevent employees such as herself from giving information about the Phase II Trial and about the misstatements made by Defendants, unless she received a lawful subpoena or a court order permitting her to do so.

160. Upon information and belief, Defendant Peregrine restricts its employees from giving their evidence through the use of these confidentiality agreements which tactic is against public policy and should not be condoned.

**FIRST AMENDED COMPLAINT**

### POST CLASS PERIOD STATEMENTS

161.   Defendants claim that it was through a "***routine collection*** of data in advance of the [C]ompany's end-of-Phase II meeting with regulatory authorities" that they discovered the discrepancies they claim existed in the randomized, double-blind placebo-controlled Phase II Trial of bavituximab in second-line NSCLC.  *See* December 10, 2012 Company press release entitled *Peregrine Pharmaceuticals Reports Second Quarter Fiscal Year 2013 Financial Results and Recent Developments* (emphasis added) and October 17, 2012 press release entitled *Peregrine Pharmaceuticals Provides Update on Corporate Activities* ("Peregrine is also conducting a detailed internal review into the discrepancies tied to the randomized, double-blind placebo-controlled Phase II trial of bavituximab in second-line NSCLC ***that were discovered as part of the routine collection of data*** in advance of the company's end-of-Phase II meeting with regulatory authorities.") (emphasis added).

A.     **The Company Had Substantial Motivation**
       **to Make False and/or Misleading Statements**

162.   Oxford is a lending institution with a long history of providing capital exclusively to life sciences and healthcare services companies throughout the world. Oxford prides itself on having a valued reputation for fairness and flexibility and claims to have achieved success by building solid relationships with its many clients. Oxford claims to have an extraordinarily knowledgeable lending team well-versed in science and healthcare and states that it works diligently to understand the specific goals of individual clients and provide sound financial solutions for their growth and development.  Oxford prides itself on partnering with its clients for the long-term and represents that it is committed to serve as a steadfast resource to its clients.

163.   MidCap is a commercial finance firm that focuses exclusively on providing debt solutions to middle-market life-science and healthcare companies. MidCap provides a broad array of products intended to finance the growth and

**FIRST AMENDED COMPLAINT**

manage the working capital of companies spanning the breadth of the healthcare industry. MidCap believes that companies in the life-science and healthcare industries need a lender that understands their business and has the creativity and flexibility to provide financing solutions that are suited to their needs. MidCap prides itself on its years of experience and strong balance sheet which make it the lender of choice for these companies.

164. SVB has $23 billion in assets and more than 1,600 employees. SVB provides commercial, international and private banking through 34 locations worldwide. SVB prides itself on being the bank of choice for the world's most innovative companies and exclusive wineries, and believes that its diverse financial services, knowledge, global network, and world class service increase their clients' probability of success. SVB also takes pride in being ranked by *Forbes* magazine as America's Best Banks.

165. Defendants were deliberately reckless in their positive touting of the interim and unverified data of the Phase II Trial because they needed to achieve positive results in this trial in order to induce the Oxford Group Lenders to make the loan and allow Defendant Peregrine to draw down the first tranche ($15 million) of money that could be borrowed from the Oxford Group.

166. Defendant Lytle admitted that Defendants' claim that the positive interim and unverified Phase II Trial data is what allowed Defendant Peregrine to then satisfy one of the two (2) conditions necessary before Defendant Peregrine could then draw down the second tranche of $15 million of the Oxford Group Lenders' loan facility. *See* ¶ 43.

167. It was therefore shocking that the Oxford Group Lenders would declare a material adverse change in circumstances and accelerate the loan to Defendant Peregrine on the very day (September 24, 2012) that Defendant Peregrine announced to the market that its prior statements about the interim data could no longer be relied upon.

FIRST AMENDED COMPLAINT

168.   The compelling inference is that the deliberate recklessness of Defendant Peregrine and its management team (the Individual Defendants herein), in touting the Phase II Trial data findings as positive to induce the Oxford Group Lenders to make the loan without verifying the accuracy of the data and even failing to take the rudimentary step of verifying that the patients who were supposed to receive the placebo actually received it and those who were supposed to receive the 1 mg. of bavituximab actually received it, so alarmed the Oxford Group Lenders that it immediately accelerated the loan.

169.   Further, the Oxford Group Lenders had more to gain from the success of the Phase II Trial as they were issued warrants to purchase stock as part of the loan agreement.  Thus, the Oxford Group Lenders would have profited more had Peregrine drawn down the full $30 million as interest would have accumulated, the stock would not have been further diluted, and had the Phase III trial been successful, their warrants would be more valuable.  At that point, the warrants would have produced a large profit for the Oxford Group Lenders.  Only the deliberate recklessness of Defendants alarmed the Oxford Group Lenders into terminating the lending relationship on the same day Defendants' announced the "major discrepancies" with the interim data.

170.   Moreover, the Oxford Group loan was critical to Peregrine as it: (i) strengthened the Company's balance sheet (*see* August 30, 2012 Company press release entitled *Peregrine Pharmaceuticals Secures $30 Million Loan Facility* ("This loan facility strengthens our balance sheet . . .")); (ii) provided the Company with sufficient capital to fund its operations for 12 months as the Company advanced toward Phase III development (*see id.* ("With the potential $30 million in total funding, we will have sufficient capital to fund our operations for at least the next 12 months . . .")); (iii) demonstrated to the market that outside entities were confident in the bavituximab Phase II Trial; and (iv) stopped the issuance of Peregrine stock "at-

**FIRST AMENDED COMPLAINT**

the-market" offerings (and in turn stopped the dilution of Peregrine stock harmful to the Individual Defendants' ownership interest).

171.   Moreover, Defendants King, Lytle and Shan were motivated to make false and misleading statements regarding the Phase II Trial in order to retain their positions and lucrative annual salaries.   For example, Defendants received the following annual base salaries in 2012:

| Defendant | Position | Annual Base Salary |
|-----------|----------|--------------------|
| King | CEO, President and Director | $429,000 |
| Lytle | CFO | $325,812 |
| Shan | VP, Clinical and Regulatory Affairs | $260,000 |

172.   Further, according to the Company's Form 10-K for fiscal year ended April 30, 2013 ("2013 Form 10-K"), "[t]he approved target bonus percentages for named executive officers for fiscal year 2013, and each year thereafter unless and until modified by resolution of the Compensation Committee, were as follows: Steven W. King – 60%; Paul J. Lytle – 40%; […] [and] Joseph S. Shan  – 35% . . . ." "In addition, under the Bonus Plan, each participant's target bonus percentages can be further adjusted by a corporate factor ranging from 0 to 1.5 times, based on the Company's achievement of other factors as determined by the Compensation Committee, including but not limited to, performance of day-to-day responsibilities and participation in the achievement of the corporate goals and achievement of individual goals determined by the Compensation Committee."

173.   In addition, according to the Company's 2013 Form 10-K, "on July 8, 2013, following a detailed review of the status of the Company's fiscal year 2013 corporate goals, and each named executive officer's contribution to the attainment of such corporate goals, as well as his or her attainment of individual goals for fiscal year 2013, and such other factors under the Bonus Plan as the Compensation Committee deemed relevant, the Compensation Committee approved and awarded the following cash bonuses for fiscal year 2013 to the named executive officers

FIRST AMENDED COMPLAINT

1    pursuant to the Bonus Plan: Steven W. King – $313,706; Paul J. Lytle – $158,833;

2    […] [and] Joseph S. Shan – $88,725. . . ."

3      174.   According to CW2, Defendant Garnick is employed as a consultant to

4 the Company in the position as Head of Regulatory Affairs through Lone Mountain

5 Biotechnology and Medical Devices, Inc.   Defendant Garnick was motivated to

6 make false and misleading statements regarding the Phase II Trial in order to retain

7 his position as a consultant to the Company.

8      175.   Unbelievably, even though the Company had recently disclosed on

9 September 24, 2012 that the data announced from its Phase II Trial was not to be

10 relied upon, nonetheless, on December 27, 2012, Peregrine's Compensation

11 Committee "approved a broad base grant of stock options ("December 2012

12 Grants") to substantially all of the Company's employees, the Company's three non-

13 employee directors and four consultants to purchase an aggregate of 3,560,125

14 shares of common stock."   Defendants King and Lytle each received 200,000

15 options and Defendant Shan received 150,000 options.   The Company further stated

16 in its Form 8-K filed with the SEC on December 28, 2012 that the grants of options

17 were "non-routine" and that the Compensation Committee had deemed them

18 necessary for the following purposes:

19             promoting employee retention and in the best interest of

20             the Company and its stockholders given the Company's

21             (i) recent agreement with the U.S. Food and Drug

22             Administration on the design of a single registration trial

23             for Cotara in patients with recurrent glioblastoma

24             multiforme and the need to focus significant time and

25             effort on moving this trial forward, including efforts to

26             seek a partner, ***(ii) need to complete the Company's***

27             ***detailed internal review of its Phase II second-line non-***

28             ***small cell lung cancer trial with bavituximab***, (iii) need

**FIRST AMENDED COMPLAINT**

1                        for its biomanufacturing subsidiary, Avid Bioservices, to

2                        meet its existing customer obligations, plus continue to

3                        expand its client base, and (iv) need to meet other

4                        corporate goals and objectives, all of which are necessary

5                        to continue to maintain and enhance stockholder value.

6 (Emphasis added).

7      176.   In other words, the Individual Defendants were being rewarded for

8 verifying now the data they should have verified previously before they falsely

9 touted its accuracy and importance.

10      177.   That same day, the Company's Compensation Committee approved

11 increases in annual base salary for Peregrine's Executive Officers. The

12 Compensation Committee raised Defendant King's salary to $446,160, Defendant

13 Lytle's salary to $338,844, and Defendant Shan's to $270,400.

14      178.   Defendants' motive to prematurely tout the interim results of the Phase

15 II Trial was to tout the value of Peregrine and bavituximab in order to:  (1) induce

16 partners to joint venture with Peregrine; (2) obtain operating loans to avoid dilution

17 of Peregrine stock; (3) preserve their jobs and the value of their own personal

18 Peregrine stock and options; (4) keep the Company afloat; and (5) survive to move

19 into a Phase III clinical trial, all in the deliberately reckless hope that nothing amiss

20 with the data would be discovered and Peregrine could slide into a Phase III study.

21 **B.**    **Defendants Possessed The Information To Determine Who**

22        **Received Bavituximab and Who Received Placebo After The**

23        <u>**Trial Was Unblinded in May 2012**</u>

24      179.   The Protocol for the Phase II Trial required patients to receive the

25 second line chemotherapy drug docetaxel every twenty-one (21) days for six (6)

26 cycles.

27      180.   Patients in the Phase II Trial were also required to receive weekly

28 infusions of the bavituximab or placebo.  In other words, every week each patient,

**FIRST AMENDED COMPLAINT**

depending on which treatment arm he or she had been assigned to (on a blinded basis) received either bavituximab in 1 mg. or 3 mg. doses or the placebo.

181.   CWs 6, 7, and 8 stated that blood was drawn from each patient on a weekly basis.  *See* ¶¶ 149, 150, 152, 154, 155.  Peregrine's Phase II Trial Protocol required that some of the vials of patient blood be retained at the study site and subjected to analysis.  The lab results of the blood tested were entered into Case Reports and transmitted to Peregrine on a regular, periodic basis.  *See* CW1 at ¶ 115.

182.   CWs 1, 6, 7, and 8 also confirmed that Peregrine's Phase II Trial Protocol required that some of the patient blood vials drawn on a weekly basis be sent to the central laboratory for further lab tests, including studies to test for the presence or absence of the bavituximab in the blood samples.  *See* ¶¶ 115, 150, 152, 155.

183.   CW1 also confirmed that the Phase II Trial Protocol required the results of the central laboratory blood tests be sent to Peregrine on a regular, periodic basis. *See* ¶ 115.

184.   CW6 also confirmed that blood drawn from patients on each weekly visit was also sent, pursuant to the study Protocol, to the central laboratory where it was also subjected to further tests.  ¶ 150.  CW6 also confirmed that the results of these tests were sent to Defendant Peregrine and to those individuals supervising the Phase II Trial, which would be Defendants Shan and Garnick.  *Id.*

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

185.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Peregrine's securities between May 21, 2012 and September 26, 2012, inclusive, seeking to pursue remedies under the Exchange Act.

186.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff

**FIRST AMENDED COMPLAINT**

1    at this time and can only be ascertained through appropriate discovery, Plaintiff
2    believes that there are hundreds or thousands of members in the proposed Class.

3        187.   Record owners and other members of the Class may be identified from
4    records maintained by Peregrine or its transfer agent and may be notified of the
5    pendency of this action by mail, using the form of notice similar to that customarily
6    used in securities class actions.

7        188.   Plaintiff's claims are typical of the claims of the members of the Class
8    as all members of the Class are similarly affected by Defendants' wrongful conduct
9    in violation of federal law that is complained of herein.

10       189.   Plaintiff will fairly and adequately protect the interests of the members
11   of the Class and have retained counsel competent and experienced in class and
12   securities litigation.

13       190.   Common questions of law and fact exist as to all members of the Class
14   and predominate over any questions solely affecting individual members of the
15   Class.  Among the questions of law and fact common to the Class are:

16           (a)    whether the federal securities laws were violated by Defendants'
17       acts as alleged herein;

18           (b)    whether statements made by Defendants to the investing public
19       during the Class Period misrepresented material facts regarding the efficacy of
20       bavituximab in treating second-line NSCLC cancer patients; and

21           (c)    whether the members of the Class have sustained damages and, if
22       so, the proper measure of damages.

23       191.   A class action is superior to all other available methods for the fair and
24   efficient adjudication of this controversy since joinder of all members is
25   impracticable.  Furthermore, as the damages suffered by individual Class members
26   may be relatively small, the expense and burden of individual litigation make it
27   impossible for members of the Class to individually redress the wrongs done to
28   them.  There will be no difficulty in the management of this action as a class action.

**FIRST AMENDED COMPLAINT**

**Loss Causation**

192.   Defendant's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

193.   During the Class Period, as detailed herein, Defendants made materially false and misleading statements and were deliberately reckless such that the market was deceived and by this course of conduct, the price of Peregrine securities was artificially inflated and this deliberately reckless course of conduct operated as a fraud or deceit on Class Period purchasers of Peregrine securities by misrepresenting the significance of the clinical data gathered as to the efficacy of bavituximab in treating second-line NSCLC cancer patients.   Later, when Defendants' prior misrepresentations and material omissions became apparent to the market, the price of Peregrine securities fell precipitously, as the prior artificial inflation came out of the price.   As a result of their purchases of Peregrine securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**Applicability of Presumption of Reliance:**

**Fraud-on-the-Market Doctrine**

194.   At all relevant times, the market for Peregrine's securities was an efficient market for the following reasons, among others:

(a)   Peregrine met the requirements for listing on the NASDAQ, a highly efficient and automated market;

(b)   During the Class Period, on average, millions of shares were traded weekly, demonstrating a very active and broad market for Peregrine securities and permitting a strong presumption of an efficient market;

(c)   As a regulated issuer, Peregrine filed periodic public reports with the SEC;

(d)   Peregrine regularly communicated with public investors via established market communication mechanisms, including through regular

56

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     Unexpected material news about Peregrine was rapidly reflected and incorporated into the Company's securities price during the Class Period.

195.   As a result of the foregoing, the market for Peregrine's securities promptly digested current information regarding Peregrine from all publicly available sources and reflected such information in the price of Peregrine's securities.  Under these circumstances, all purchasers of Peregrine's securities during the Class Period suffered similar injury through their purchase of Peregrine's securities at artificially inflated prices, and a presumption of reliance applies.

## FIRST CLAIM

### Violation of Section 10(b) Of

### The Exchange Act and Rule 10(b)-5

### Promulgated Thereunder Against All Defendants

196.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

197.   This claim is brought against Peregrine and all of the Individual Defendants.

198.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) caused Plaintiff and other members of the Class to purchase Peregrine's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

**FIRST AMENDED COMPLAINT**

199.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Peregrine's securities in violation of Section 10(b) of the Exchange Act and Rule 10(b)-5 thereunder.   All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

200.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Peregrine's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Peregrine and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Peregrine's securities during the Class Period.

201.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (a) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's data from the Phase II Trial; (c) each of these defendants enjoyed significant personal contact and familiarity with the

**FIRST AMENDED COMPLAINT**

other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's Phase II Trial, finances and operations at all relevant times; and (d) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

202. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain, verify and to disclose such facts, even though such facts were available to them.  As demonstrated by Defendants' false and misleading statements issued throughout the Class Period, Defendants, if they did not have actual knowledge of the omissions alleged, were deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to verify whether the clinical data reported regarding the Phase II Trial was true and accurate or false and misleading.

203.  As a result of the dissemination of the materially false and misleading information and failure to verify and disclose material facts, as set forth above, the market price of Peregrine's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Peregrine's securities were artificially inflated, and relying directly or indirectly on the misleading statements and Company press releases issued by Defendants, or upon the integrity of the market in which the Company's securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Peregrine securities during the Class Period at artificially high prices and were or will be damaged thereby.

204.  At the time of said omissions and/or materially false and misleading statements, Plaintiff and other members of the Class were ignorant of their

misleading nature, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the clinical data reported regarding Peregrine's Phase II Trial, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Peregrine securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

205.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

206.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) Of

### The Exchange Act Against The Individual Defendants'

207.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

208.   The Individual Defendants acted as controlling persons of Peregrine within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the misleading interim Phase II data filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to the clinical data gathered in the Phase II Trial, including the patient blood

**FIRST AMENDED COMPLAINT**

samples, which would have revealed the falsity of their prior public statements and/or would have enabled them to make truthful statements from the outset about the data gathered from the Phase II Trial, as well as Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been false and misleading prior to and/or shortly after these statements were issued and thus had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

209. The Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

210. As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

211. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

FIRST AMENDED COMPLAINT

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Patrice L. Bishop
STULL, STULL & BRODY

Dated: September 16, 2013     By:  _Patrice Bishop_

Patrice L. Bishop
9430 West Olympic Boulevard
Suite 400
Beverly Hills, CA  90212
Tel:   (310) 209-2468
Fax:   (310) 209-2087
service@ssbla.com

*Liaison Counsel for Plaintiff and the Putative Class*

Thomas J. McKenna, *Pro Hac Vice*
tjmckenna@gme-law.com
GAINEY McKENNA & EGLESTON
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:   (212) 983-1300
Fax:   (212) 983-0383

*Lead Counsel for Plaintiff and the Putative Class*

62                                    FIRST AMENDED COMPLAINT

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
                     ) ss.:
COUNTY OF LOS ANGELES )

I am employed in the county of Los Angeles, State of California, I am over the age of 18 and not a party to the within action; my business address is 9430 West Olympic Boulevard, 4th Floor, Beverly Hills, California 90212.

On September 16, 2013, I caused the following document(s) to be served:

**FIRST AMENDED COMPLAINT**

I served the above document(s) as follows:

**By U.S. Mail**. I enclosed the document(s) in a sealed envelope(s) or package(s) addressed to the persons at the addresses below and placed the envelope(s) for collection and mail, following our ordinary business practices. I am readily familiar with this firm's practice for collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 16, 2013 at Beverly Hills, California 90212.

MELANIE JACOBS
Type or Print Name

Signature

## SERVICE LIST

Thomas J. McKenna
Gregory M. Egleston
GAINEY McKENNA & EGLESTON
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:   (212) 983-1300
Fax:   (212) 983-0383
tjmckenna@gme-law.com
gegleston@gme-law.com

**Counsel for Lead for Plaintiff and the Putative Class**

Koji F. Fukumura
Meghan O'Ryan Spieker
Peter M. Adams
COOLEY LLP
4401 Eastgate Mall
San Diego, CA 92121
Tel:   (858) 550-6000
Fax:   (858) 550-6420
kfukumura@cooley.com
mspieker@cooley.com
padams@cooley.com

**Counsel for Defendants**

Stephen R. Basser
BARRACK, RODOS & BACINE
600 West Broadway, Suite 900
San Diego, CA 92101
Tel:   (619) 230-0800
Fax:   (619) 230-1874
sbasser@barrack.com
sward@barrack.com

**Counsel for the Tereshko Investors Group**

Darren J. Robbins
David C. Walton
Catherine J. Kowalewski
Danielle S. Myers
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Tel:   (619) 231-1058
Fax:   (619) 231-7423
davew@rgrdlaw.com
katek@rgrdlaw.com
dmyers@rgrdlaw.com
e_file_sd@rgrdlaw.com

**Counsel for Plaintiff Nathaniel L. Anderson and the Tereshko Investors Group**

## CERTIFICATION OF NAMED PLAINTIFF

I, _James T. Fahey_ ("Plaintiff") hereby retain Gainey & McKenna and such co-counsel as appropriate, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff reviewed a copy of the complaint and is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in *Peregine Pharmaceuticals, Inc.* security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| See Transactions Sheet | | | | |
| | | | | |
| | | | | |
| | | | | |

Please list other transactions on a separate sheet of paper, if necessary.

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

None.

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _13_ day of _November_, 2012

_James J. Fahey_
Signature

_James T. FAHey_
Print Name (& Title if applicable)

**Exhibit A to the James T. Fahey Certification**

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price |
|---|---|---|---|---|
| 20,000 | PPHM | Buy | 8/9/2012 | $2.08 |
| 20,000 | PPHM | Buy | 8/9/2012 | $2.08 |
| 5,000 | PPHM | Buy | 8/9/2012 | $2.19 |
| 24,000 | PPHM | Buy | 8/9/2012 | $2.22 |
| 27,300 | PPHM | Buy | 8/9/2012 | $2.23 |
| 2,700 | PPHM | Buy | 8/9/2012 | $2.22 |
| 4,686 | PPHM | Buy | 8/9/2012 | $2.28 |
| 15,314 | PPHM | Buy | 8/9/2012 | $2.25 |
| 20,000 | PPHM | Buy | 8/9/2012 | $2.27 |
| 100 | PPHM | Buy | 8/9/2012 | $2.28 |
| 9,900 | PPHM | Buy | 8/9/2012 | $2.29 |
| 20,000 | PPHM | Buy | 8/10/2012 | $2.36 |
| 10,000 | PPHM | Buy | 8/10/2012 | $2.36 |
| 5,677 | PPHM | Buy | 8/14/2002 | $3.48 |
| 200 | PPHM | Buy | 8/14/2012 | $3.45 |
| 400 | PPHM | Buy | 8/14/2012 | $3.38 |
| 3,700 | PPHM | Buy | 8/14/2012 | $3.33 |
| 23 | PPHM | Buy | 8/14/2012 | $3.28 |
| 7,600 | PPHM | Buy | 8/14/2012 | $3.30 |
| 400 | PPHM | Buy | 8/14/2012 | $3.29 |
| 2,000 | PPHM | Buy | 8/14/2012 | $3.26 |
| 13,850 | PPHM | Buy | 8/14/2012 | $2.54 |
| 6,150 | PPHM | Buy | 8/14/2012 | $2.53 |
| 3,000 | PPHM | Buy | 8/14/2012 | $2.54 |
| 2,652 | PPHM | Buy | 8/14/2012 | $2.56 |
| 14,400 | PPHM | Buy | 8/14/2012 | $2.55 |
| 9,948 | PPHM | Buy | 8/14/2012 | $2.57 |
| 20,000 | PPHM | Buy | 8/14/2012 | $2.45 |
| 12,450 | PPHM | Buy | 8/14/2012 | $2.45 |
| 4,400 | PPHM | Buy | 8/14/2012 | $2.45 |
| 100 | PPHM | Buy | 8/14/2012 | $2.45 |
| 3,050 | PPHM | Buy | 8/14/2012 | $2.50 |
| 10,000 | PPHM | Buy | 8/14/2012 | $2.50 |
| 22,400 | PPHM | Buy | 8/14/2012 | $2.50 |
| 7,500 | PPHM | Buy | 8/14/2012 | $2.50 |
| 100 | PPHM | Buy | 8/14/2012 | $2.50 |
| 19,500 | PPHM | Buy | 8/14/2012 | $2.50 |
| 10,400 | PPHM | Buy | 8/14/2012 | $2.50 |
| 100 | PPHM | Buy | 8/14/2012 | $2.50 |
| 5,200 | PPHM | Buy | 8/14/2012 | $2.53 |
| 4,800 | PPHM | Buy | 8/14/2012 | $2.53 |

| | | | | |
|---|---|---|---|---|
| 10,000 | PPHM | Buy | 8/14/2012 | $2.54 |
| 10,000 | PPHM | Buy | 8/14/2012 | $2.55 |
| 10,000 | PPHM | Buy | 8/14/2012 | $2.59 |
| 10,000 | PPHM | Buy | 8/14/2012 | $2.59 |
| 4,600 | PPHM | Buy | 8/14/2012 | $2.58 |
| 800 | PPHM | Buy | 8/14/2012 | $2.58 |
| 200 | PPHM | Buy | 8/14/2012 | $2.58 |
| 4,050 | PPHM | Buy | 8/14/2012 | $2.59 |
| 350 | PPHM | Buy | 8/14/2012 | $2.59 |
| 10,000 | PPHM | Buy | 8/14/2012 | $2.63 |
| 5,000 | PPHM | Buy | 8/20/2012 | $2.85 |
| 5,000 | PPHM | Buy | 8/20/2012 | $2.86 |
| 20,000 | PPHM | Sell | 8/14/2012 | $2.62 |
| 5,000 | PPHM | Sell | 8/14/2012 | $2.63 |
| 5,000 | PPHM | Sell | 8/14/2012 | $2.59 |
| 100 | PPHM | Sell | 8/14/2012 | $2.60 |
| 100 | PPHM | Sell | 8/14/2012 | $2.59 |
| 7,201 | PPHM | Sell | 8/14/2012 | $2.59 |
| 10,000 | PPHM | Sell | 8/14/2012 | $2.52 |
| 4,700 | PPHM | Sell | 8/14/2012 | $2.56 |
| 5300 | PPHM | Sell | 8/14/2012 | $2.55 |
| 10000 | PPHM | Sell | 8/14/2012 | $2.50 |
| 4150 | PPHM | Sell | 8/14/2012 | $2.50 |
| 3600 | PPHM | Sell | 8/14/2012 | $2.48 |
| 2,250 | PPHM | Sell | 8/14/2012 | $2.48 |
| 10000 | PPHM | Sell | 8/14/2012 | $2.49 |
| 100 | PPHM | Sell | 8/14/2012 | $2.48 |
| 100 | PPHM | Sell | 8/14/2012 | $2.48 |
| 9800 | PPHM | Sell | 8/14/2012 | $2.48 |
| 10000 | PPHM | Sell | 8/14/2012 | $2.49 |
| 300 | PPHM | Sell | 8/14/2012 | $2.55 |
| 3700 | PPHM | Sell | 8/14/2012 | $2.54 |
| 10000 | PPHM | Sell | 8/14/2012 | $2.52 |
| 10000 | PPHM | Sell | 8/14/2012 | $2.53 |
| 10000 | PPHM | Sell | 8/14/2012 | $2.53 |
| 6000 | PPHM | Sell | 8/14/2012 | $2.52 |
| 10000 | PPHM | Sell | 8/14/2012 | $2.51 |
| 200 | PPHM | Sell | 8/14/2012 | $2.52 |
| 100 | PPHM | Sell | 8/14/2012 | $2.51 |
| 6850 | PPHM | Sell | 8/14/2012 | $2.51 |
| 100 | PPHM | Sell | 8/14/2012 | $2.50 |
| 100 | PPHM | Sell | 8/14/2012 | $2.50 |
| 19800 | PPHM | Sell | 8/14/2012 | $2.50 |

**Exhibit A to the James T. Fahey Certification**

| | | | | |
|---|---|---|---|---|
| 10,000 | PPHM | Sell | 8/14/2012 | $2.50 |
| 2850 | PPHM | Sell | 8/14/2012 | $2.50 |
| 20,000 | PPHM | Sell | 8/14/2012 | $2.50 |
| 100 | PPHM | Sell | 8/23/2012 | $2.36 |
| 1500 | PPHM | Sell | 8/23/2012 | $2.36 |
| 3400 | PPHM | Sell | 8/23/2012 | $2.36 |
| 5000 | PPHM | Sell | 8/23/2012 | $2.36 |
| 2300 | PPHM | Sell | 8/23/2012 | $2.40 |
| 2700 | PPHM | Sell | 8/23/2012 | $2.40 |
| 4500 | PPHM | Sell | 8/23/2012 | $2.41 |
| 35 | PPHM | Sell | 8/23/2012 | $2.41 |
| 3064 | PPHM | Sell | 8/23/2012 | $2.40 |
| 2600 | PPHM | Sell | 8/27/2012 | $1.97 |
| 7,400 | PPHM | Sell | 8/27/2012 | $1.97 |
| 19,050 | PPHM | Sell | 8/27/2012 | $1.97 |
| 950 | PPHM | Sell | 8/27/2012 | $1.96 |
| 20,000 | PPHM | Sell | 8/27/2012 | $1.96 |
| 50 | PPHM | Sell | 8/27/2012 | $1.95 |
| 11430 | PPHM | Sell | 8/27/2012 | $1.94 |
| 10000 | PPHM | Sell | 8/27/2012 | $1.86 |
| 7154 | PPHM | Sell | 8/27/2012 | $1.89 |
| 12846 | PPHM | Sell | 8/27/2012 | $1.88 |
| 3800 | PPHM | Sell | 8/27/2012 | $1.88 |
| 5900 | PPHM | Sell | 8/27/2012 | $1.88 |
| 2300 | PPHM | Sell | 8/27/2012 | $1.84 |
| 8000 | PPHM | Sell | 8/27/2012 | $1.84 |
| 20000 | PPHM | Sell | 8/27/2012 | $1.85 |
| 700 | PPHM | Sell | 8/27/2012 | $1.86 |
| 17820 | PPHM | Sell | 8/27/2012 | $1.85 |
| 2788 | PPHM | Sell | 8/27/2012 | $1.88 |
| 17212 | PPHM | Sell | 8/27/2012 | $1.87 |
| 2100 | PPHM | Sell | 8/27/2012 | $1.90 |
| 5952 | PPHM | Sell | 8/27/2012 | $1.89 |
| 3900 | PPHM | Sell | 8/27/2012 | $1.88 |
| 8048 | PPHM | Sell | 8/27/2012 | $1.88 |
| 400 | PPHM | Sell | 8/27/2012 | $1.90 |
| 400 | PPHM | Sell | 8/27/2012 | $1.89 |
| 100 | PPHM | Sell | 8/27/2012 | $1.89 |
| 9100 | PPHM | Sell | 8/27/2012 | $1.89 |

| Date Purchased | Calls Purchased | Strike Price | Price Paid |
|---|---|---|---|
| 8/9/2012 | 200 | 01/19/13 $2.5 | $0.60 |

| | | | |
|---|---|---|---|
| 8/9/2012 | 23 | 01/19/13 $2.5 | $0.60 |
| 8/9/2012 | 100 | 01/19/13 $2.5 | $0.70 |
| 8/9/2012 | 300 | 01/19/13 $2.5 | $0.75 |
| 8/9/2012 | 100 | 01/19/13 $2.5 | $0.75 |
| 8/9/2012 | 300 | 01/19/13 $2.5 | $0.90 |
| 8/9/2012 | 200 | 01/19/13 $2.5 | $0.90 |
| 8/9/2012 | 77 | 01/19/13 $2.5 | $0.90 |
| 8/9/2012 | 400 | 01/19/13 $2.5 | $0.90 |
| 8/9/2012 | 50 | 10/20/12 $2.5 | $0.55 |
| 8/9/2012 | 50 | 10/20/12 $2.5 | $0.60 |
| 8/9/2012 | 100 | 10/20/12 $2.5 | $0.60 |
| 8/9/2012 | 100 | 10/20/12 $2.5 | $0.60 |
| 8/9/2012 | 100 | 10/20/12 $2.5 | $0.70 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.55 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.55 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.55 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.55 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.55 |
| 8/27/2012 | 179 | 01/19/13 $2.5 | $0.60 |
| 8/27/2012 | 21 | 01/19/13 $2.5 | $0.55 |
| 8/27/2012 | 50 | 01/19/13 $2.5 | $0.55 |
| 8/27/2012 | 150 | 01/19/13 $2.5 | $0.60 |
| 8/27/2012 | 300 | 01/19/13 $2.5 | $0.65 |
| 8/27/2012 | 300 | 01/19/13 $2.5 | $0.60 |
| 8/27/2012 | 200 | 01/19/13 $2.5 | $0.60 |
| 8/27/2012 | 200 | 01/19/13 $2.5 | $0.60 |
| 8/27/2012 | 200 | 01/19/13 $2.5 | $0.60 |
| 8/27/2012 | 120 | 01/19/13 $2.5 | $0.60 |
| 8/27/2012 | 180 | 01/19/13 $2.5 | $0.65 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.65 |
| 8/27/2012 | 200 | 01/19/13 $2.5 | $0.65 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.65 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.65 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.65 |
| 8/27/2012 | 200 | 01/19/13 $2.5 | $0.70 |
| 8/27/2012 | 200 | 01/19/13 $2.5 | $0.70 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.70 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.70 |
| 8/27/2012 | 100 | 01/19/13 $2.5 | $0.70 |
| 9/5/2012 | 20 | 01/19/13 $2.5 | $1.00 |
| 9/5/2012 | 10 | 01/19/13 $2.5 | $1.00 |
| 9/7/2012 | 200 | 01/19/13 $5.0 | $1.00 |
| 9/7/2012 | 270 | 01/19/13 $2.5 | $2.25 |

**Exhibit A to the James T. Fahey Certification**

| | | | |
|---|---|---|---|
| 9/18/2012 | 50 | 01/19/13 $5.0 | $0.70 |
| 9/18/2012 | 10 | 01/19/13 $5.0 | $0.90 |
| 9/20/2012 | 140 | 01/19/13 $5.0 | $1.30 |
| 9/20/2012 | 124 | 01/19/13 $5.0 | $1.25 |
| 9/20/2012 | 76 | 01/19/13 $5.0 | $1.30 |
| 9/20/2012 | 200 | 01/19/13 $5.0 | $1.30 |
| 9/20/2012 | 300 | 01/19/13 $5.0 | $1.30 |
| 9/20/2012 | 50 | 01/19/13 $5.0 | $1.20 |
| 9/20/2012 | 150 | 01/19/13 $5.0 | $1.25 |
| 9/20/2012 | 100 | 01/19/13 $5.0 | $1.25 |
| 9/20/2012 | 200 | 01/19/13 $5.0 | $1.25 |
| 9/20/2012 | 350 | 01/19/13 $5.0 | $1.25 |
| 9/20/2012 | 40 | 01/19/13 $5.0 | $1.25 |
| 9/20/2012 | 110 | 01/19/13 $5.0 | $1.25 |
| 9/20/2012 | 50 | 01/19/13 $5.0 | $1.35 |
| 9/20/2012 | 150 | 01/19/13 $5.0 | $1.35 |
| 9/20/2012 | 200 | 01/19/13 $5.0 | $1.40 |
| 9/25/2012 | 45 | 01/19/13 $1.0 | $0.95 |

| Date Sold | Calls Sold | Strike Price | Price Paid |
|---|---|---|---|
| 9/7/2012 | 400 | 10/20/12 $2.5 | $2.15 |
| 9/20/2012 | 100 | 01/19/13 $2.5 | $2.55 |
| 9/20/2012 | 200 | 01/19/13 $2.5 | $2.60 |
| 9/20/2012 | 200 | 01/19/13 $2.5 | $2.50 |
| 9/20/2012 | 86 | 01/19/13 $2.5 | $2.50 |
| 9/20/2012 | 114 | 01/19/13 $2.5 | $2.30 |
| 9/20/2012 | 200 | 01/19/13 $2.5 | $2.35 |
| 9/20/2012 | 100 | 01/19/13 $2.5 | $2.35 |
| 9/20/2012 | 100 | 01/19/13 $2.5 | $2.45 |
| 9/20/2012 | 100 | 01/19/13 $2.5 | $2.50 |