1  Patrice L. Bishop (182256)
   service@ssbla.com
2  **STULL, STULL & BRODY**
   9430 West Olympic Boulevard
3  Suite 400
   Beverly Hills, CA 90212
4  Tel:  (310) 209-2468
   Fax:  (310) 209-2087
5
   *Liaison Counsel for Plaintiff and the Putative Class*
6

FILED
CLERK, U.S. DISTRICT COURT

JAN 2 2 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

7

8

9               **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11                    **WESTERN DIVISION**

12  NATHANIEL L. ANDERSON,           )   Case No. SACV12-01647 PSG (FMOx)
    Individually and on Behalf of All )
13  Others Similarly Situated,        )   **CLASS ACTION**
                                      )
14              Plaintiff,            )   **SECOND AMENDED COMPLAINT**
                                      )
15      v.                           )
                                      )
16  PEREGRINE PHARMACEUTICALS,        )
    INC., STEVEN W.KING, PAUL J.      )
17  LYTLE, JOSEPH S. SHAN and         )
    ROBERT L. GARNICK,                )
18                                    )
                Defendants.           )
19                                    )

20

21

22

23

24

25

26

27

28

Lead Plaintiff James T. Fahey ("Plaintiff"), individually and on behalf of all persons similarly situated, by his undersigned attorneys, for his second amended complaint against Defendants alleges the following based upon personal knowledge as to his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Peregrine Pharmaceuticals, Inc. ("Peregrine" or the "Company"), securities analysts' reports and advisories about the Company, interviews with past Company employees and other individuals with personal knowledge, and information readily obtainable from public sources.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of persons (the "Class") who purchased or otherwise acquired the Company's securities between May 21, 2012 and September 26, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Peregrine is a clinical-stage biopharmaceutical company that develops and manufactures monoclonal antibodies for the possible treatment of cancer and viral infections.   Peregrine's key product is bavituximab, a phosphatidylserine targeting antibody.   Peregrine is studying bavituximab as a primary (front-line) and second-line treatment for non-small cell lung cancer ("NSCLC") and other cancers.

3.     Monoclonal antibodies (mAb or moAb) are monospecific antibodies that are the same because they are made by identical immune cells that are all clones of a unique parent cell, in contrast to polyclonal antibodies which are made from several different immune cells.  Monoclonal antibodies have monovalent affinity, in

SECOND AMENDED COMPLAINT

that they bind to the same epitope.  An epitope is a molecular region on the surface of an antigen capable of eliciting an immune response and of combining with the specific antibody produced by such a response.

4.     It is possible to produce monoclonal antibodies that specifically bind to almost any substance.  Monoclonal antibodies can then serve to detect or purify that substance.  This has become an important tool in biochemistry, molecular biology and medicine.  When used as medications, the non-proprietary drug name ends in – mab.

5.     An issue involving the therapeutic use of monoclonal antibodies in medicine was that initial methods used to produce them yielded mouse, not human antibodies.  While structurally similar, differences between the two were sufficient to invoke an immune response when mouse monoclonal antibodies were injected into humans, resulting in their rapid removal from the blood, as well as systemic inflammatory effects, and the production of human anti-mouse antibodies ("HAMA").

6.     To avoid the immune response, approaches using recombinant DNA were developed.  In one approach, mouse DNA encoding the binding portion of a monoclonal antibody was merged with human antibody-producing DNA in living cells.  The expression of this "chimeric" DNA through cell culture yielded partially mouse, partially human monoclonal antibodies. The descriptive term "chimeric" monoclonal antibody has been used to reflect the combination of mouse and human DNA sources used in the recombinant process.  A chimeric antibody is named after a chimera, the Greek mythological fire-breathing female monster, with a lion's head, a goat's body, and a serpent's tail.

7.     Many chimeric protein drugs are monoclonal antibodies whose specificity for a target molecule was developed using mice and hence were initially "mouse" antibodies.   The chimerization process involves engineering the replacement of segments of the antibody molecule that distinguish it from a human

SECOND AMENDED COMPLAINT

antibody.   For example, human constant domains can be introduced, thereby eliminating most of the potentially immunogenic portions of the drug without altering its specificity for the intended therapeutic target. Antibody nomenclature indicates this type of modification by inserting -xi- into the non-proprietary name (*e.g.*, abci-xi-mab).   Hence "bavituximab."

8.   Even with chimeric antibodies that combine mouse and human DNA, the body will create new antibodies that target the chimeric antibody.   These new antibodies are known as human anti-chimeric antibodies ("HACA").

9.   The Phase II clinical trial in issue was named the "Study of Bavituximab Plus Docetaxel in Patients With Locally Advanced or Metastatic Non-Squamous Non-Small Cell Lung Cancer" (hereinafter, the "Phase II Trial").   The Phase II Trial enrolled 121 patients (117 evaluable per the study protocol) with second-line non-squamous NSCLC following one prior chemotherapy regimen at over 40 clinical centers.   Patients were equally randomized to 1 of the 3 treatment arms, docetaxel (75mg/m2) plus either placebo, 1 mg/kg bavituximab, or 3 mg/kg bavituximab until disease progression.

10.   The Phase II Trial was supposed to be double-blinded, meaning that each patient received a code number which concealed from Peregrine, the clinical investigators and the patients whether they were assigned to receive placebo, 1 mg or 3 mg of bavituximab.   Approximately 50% of the patients were enrolled in the United States and 50% were enrolled internationally with equal distribution between all treatment groups.

11.   Throughout the Class Period, Defendants violated the Exchange Act by disseminating materially false and misleading statements to the investing public about the effectiveness of the Company's experimental drug bavituximab as a treatment for NSCLC, making it impossible for shareholders to gain a meaningful or realistic understanding of the drug's prospects.   As a result of Defendants' materially false and misleading statements, Peregrine's securities traded at artificially inflated

SECOND AMENDED COMPLAINT

prices during the Class Period, reaching a high of $5.39 per share on September 21, 2012.

12.    This case is about the Phase II Trial which was the most important clinical trial in the history of Peregrine.  The purpose of the Phase II Trial was to determine if reliable scientific data could be obtained, indicating that bavituximab was more efficacious than placebo in a test group of 117 cancer patients.  When the Phase II Trial was unblinded on May 21, 2012, Peregrine, as the Sponsor of the Phase II Trial, had unfettered access to all the data generated, including the previously collected patient blood samples.  A routine P-K test (described below) of the patient blood confirms whether the patient received bavituximab or placebo.  Whether the patient received bavituximab or placebo is the necessary and crucial first step in confirming that all the other data generated by the Phase II Trial was accurate and reliable.

13.    On May 21, 2012, once the Phase II Trial was unblinded, Defendants began to immediately tout that the Phase II Trial demonstrated bavituximab was better than placebo.  Defendants began to tout the results of the Phase II Trial as true and accurate but failed to disclose to the market that they had not even verified through P-K testing of the collected patient blood samples that the patients designated to receive placebo and bavituximab had in fact correctly received the assigned substance.  This was a material omission actionable under the securities laws.

14.    Defendants also violated the securities laws by touting the Phase II Trial results as positive when they had actual knowledge that they had not verified whether the patients received the designated substance and thus they actually knew they did not know whether the Phase II Trial results they were touting were accurate or false.

15.    Then, suddenly, on September 24, 2012, after four months of touting the data as positive, Peregrine issued a press release warning of "major

4

discrepancies" in the results of the Phase II Trial and advising investors that they should not rely on the "clinical data" the Company had previously disclosed from September 7, 2012 and earlier as to the Phase II Trial.  Peregrine blamed the "major discrepancies" on a third-party vendor who worked on the Phase II Trial prior to its unblinding.   As described *infra*, that third-party vendor has specifically denied Peregrine's accusations.

16.   On this news, Peregrine's stock plummeted $4.23 per share to close at $1.16 per share on September 24, 2012, a one-day decline of 78%.

17.   On September 26, 2012, Peregrine filed a Form 8-K with the SEC, which disclosed that the Company had received on September 24, 2012 (the same day Peregrine issued its press release announcing "major discrepancies" in the results of the Phase II Trial) a written notice of default from Oxford Finance LLC ("Oxford"), Silicon Valley Bank ("SVB") and MidCap Financial SBIC, LP ("MidCap") (collectively, the "Oxford Group Lenders"), with respect to a security agreement the Company had entered into on August 30, 2012.  According to the Company, the lender deemed the Company's disclosure on September 24, 2012, concerning the "major discrepancies" in the results from its Phase II Trial to be a material adverse change under the terms of the loan agreement and, as result, the Oxford Group Lenders accelerated the repayment of the loan and demanded repayment in full for the outstanding amounts.

18.   On this news, Peregrine's stock declined $0.55 per share to close at $1.11 per share on September 27, 2012, a one-day decline of 33%.

19.   Defendants **admit** that they knew that the interim data regarding the Phase II Trial was false and misleading by no later than **on or about** September 20, 2012.  *See* Complaint for Breach of Contract and Negligence; Demand for Jury Trial, *Peregrine Pharmaceuticals, Inc. v. Clinical Supplies Mgmt.*, C.D. Cal. Civil Action No.: 12-cv-01608-JGB-AN ("*Peregrine v. CSM*") (Dkt. No. 1) at ¶ 10.

SECOND AMENDED COMPLAINT

20. As a result of Defendants' materially false and misleading statements, Peregrine securities traded at artificially inflated levels during the Class Period. However, after the above revelations were revealed to the market, the Company's securities dropped precipitously.

## JURISDICTION AND VENUE

21. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule l0(b)-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

22. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

23. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.

24. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

25. Lead Plaintiff James T. Fahey ("Plaintiff"), as set forth in the attached certification, purchased Peregrine securities at artificially inflated prices during the Class Period and has been damaged as a result of the revelations by Defendants of their prior false statements and material omissions.

26. ***Defendant Peregrine***, as stated *supra*, is a clinical-stage biopharmaceutical company that develops and manufactures monoclonal antibodies

SECOND AMENDED COMPLAINT

for the potential treatment of cancer and viral infections.  Peregrine's key product is bavituximab, a phosphatidylserine targeting antibody.  Peregrine is studying bavituximab as a primary (front-line) and second-line treatment for NSCLC and other cancers.

27.  ***Defendant Stephen W. King*** ("King") is, and at all relevant times was, the Company's Chief Executive Officer ("CEO"), President and a Director. Pursuant to the Company DEF 14A filed with the SEC on August 27, 2012, Defendant King owned 703,325 shares of Peregrine securities.  *See* Peregrine's DEF 14A, filed with the SEC August 27, 2012 at p. 19.  Further, pursuant to the Company's DEF 14A, filed with the SEC on August 26, 2013, Defendant King had increased his ownership to 1,224,340 shares of Peregrine securities.  *Id.* at p. 20.

28.  ***Defendant Paul J. Lytle*** ("Lytle") is, and at all relevant times was, the Company's Chief Financial Officer ("CFO").  Pursuant to the Company DEF 14A filed with the SEC on August 27, 2012, Defendant Lytle owned 374,557 shares of Peregrine securities.  *See* Peregrine's DEF 14A, filed with the SEC on August 27, 2012 at p. 19.  Further, pursuant to the Company's DEF 14A, filed with the SEC on August 26, 2013, Defendant Lytle had increased his ownership to 638,991 shares of Peregrine securities.  *Id.* at p. 20.

29.  ***Defendant Joseph S. Shan*** ("Shan") is, and at all relevant times was, the Company's Vice President, Clinical and Regulatory Affairs.  Pursuant to the Company DEF 14A filed with the SEC on August 27, 2012, Defendant Shan owned 221,936 shares of Peregrine securities.  *See* Peregrine's DEF 14A, filed with the SEC on August 27, 2012 at p. 19.  Further, pursuant to the Company's DEF 14A, filed with the SEC on August 26, 2013, Defendant Shan had increased his ownership to 422,936 shares of Peregrine securities.  *Id.* at p. 20.

30.  ***Defendant Robert L. Garnick*** ("Garnick") is, and at all relevant times was, the Head of Regulatory Affairs.

SECOND AMENDED COMPLAINT

31.     Defendants named above in ¶¶ 27-30 are referred to herein as the "Individual Defendants."

## BACKGROUND

**A.    The Company Background**

32.     The drug bavituximab, given by intravenous infusion, is a genetically engineered antibody designed to target a lipid molecule found on tumor blood vessels that acts to suppress the body's immune system.

33.     The antibody binds to the targeted molecule to reactivate "the immune response locally at the site of the tumor," allowing the immune system to combat cancer cells, stated Defendant Shan, head of clinical and regulatory affairs at Peregrine.  *See* Peregrine's Form 10-K for year ended April 30, 2010 ("2010 Form 10-K").

34.     Peregrine stated in its public statements to investors that lung cancer is the second most commonly diagnosed cancer with 219,440 new cases and 159,000 deaths in 2009 in the United States alone.

35.     Peregrine also stated in its public statements to investors that NSCLC is the most common type of lung cancer accounting for approximately 85% to 90% of all lung cancers.

36.     NSCLC is any type of epithelial lung cancer other than small cell lung carcinoma ("SCLC").  As a class, NSCLCs are relatively resistant to chemotherapy, compared to small cell carcinoma.

37.     Peregrine stated in its public statements to investors that the five (5) year survival for NSCLC patients is only 1%.

38.     Peregrine has attempted to develop bavituximab as a therapeutic agent against various types of cancer for many years.  As of fiscal year ended 2012, Peregrine was engaged in at least seven (7) clinical trials in Phase I and Phase II attempting to test whether bavituximab was efficacious against five (5) different types of cancer:  NSCLC, pancreatic, liver, prostate, and breast.

SECOND AMENDED COMPLAINT

39.    Clinical development of bavituximab for the treatment of cancer began in 2008.  Since that time, Peregrine has conducted at least twelve (12) Phase-I/-II studies and treated 613 cancer patients, but has yet to observe a statistically significant improvement over a contemporary standard-of-care ("SOC").

40.    As of April 30, 2012, Peregrine's only other potential product which had advanced through a Phase II Trial, was a second agent called Cotera.  Peregrine is attempting to develop Cotera as a single treatment brain cancer therapy.  Peregrine has conducted at least four (4) clinical trials and claims that "Cotera has demonstrated encouraging survival, localization to the tumor, and an acceptable safety profile in patients with brain cancer."  *See* Form 10-K for year ended April 30, 2012 ("2012 Form 10-K") at p. 8.  Despite the fact that Cotera has been granted Food and Drug Administration ("FDA") and European Medicines Agency ("EMA") orphan drug status for glioblastoma multiforme ("GBM") and anaplastic astrocytoma, and fast track designation in the U.S. for the treatment of recurrent GBM, Peregrine has been unable to develop Cotera as a commercial drug.  Orphan drug status refers to a pharmaceutical agent that has been developed specifically to treat a rare medical condition.  Even if Peregrine was able to commercially develop Cotera, the market for the drug is small.  According to Peregrine, there will be only an estimated 22,900 malignant brain tumors diagnosed in 2012 of which only 15% are GMB (approximately 3,435).  Accordingly, any profits that may ultimately been achieved from Cotera will not be enough to ensure the survival of Peregrine – only the commercial development of bavituximab can do that.

41.    Peregrine has not made a profit in its last eight (8) years of existence and, upon information and belief, has never made a profit during its entire existence.

42.    For its past eight (8) fiscal years, Peregrine has operated at a net loss:

      (a)    As of April 30, 2005, Peregrine had a net loss of $15,452,000;

      (b)    As of April 30, 2006, Peregrine had a net loss of $17,061,000;

      (c)    As of April 30, 2007, Peregrine had a net loss of $20,796,000;

9

(d)     As of April 30, 2008, Peregrine had a net loss of $23,176,000;

(e)     As of April 30, 2009, Peregrine had a net loss of $16,524,000;

(f)     As of April 30, 2010, Peregrine had a net loss of $14,494,000;

(g)     As of April 30, 2011, Peregrine had a net loss of $34,151,000;

(h)     As of April 30, 2012, Peregrine had a net loss of $42,119,000; and

(i)     As of April 30, 2013, Peregrine had a net loss of $29,780,000;

43.     Peregrine's only way to finance its operations, which consistently run at a loss, is to either borrow money from lenders or to issue stock into the public markets.

44.     In recent years, Peregrine has only been able to borrow money from lenders in two (2) instances.

45.     The first such loan was on or about December 9, 2008, when Peregrine entered into a loan and security agreement with MidCap Financial, LLC and BlueCrest Capital Finance, LP to borrow $10 million.  Peregrine received initial funding of $5 million under the loan and security agreement.

46.     Peregrine repaid this loan in full by December 2011 through Company stock sold into the public markets.

47.     Peregrine's second loan transaction was with the Oxford Group Lenders on or about August 30, 2012.  This loan provided for up to $30 million in total funding available in two (2) tranches of $15 million.  Peregrine took the first $15 million in funding available on or about August 30, 2012.

48.     Peregrine was able to secure the first tranche ($15 million) as a result of the false and misleading statements issued to the market during the Class Period.

49.     Peregrine represented to the public that, at its option, it could draw down the second $15 million tranche, "if, on or before March 31, 2013, we (i) achieve positive overall survival data in our bavituximab Phase II second-line non small cell lung cancer ('NSCLC') clinical trial and (ii) have a positive end of Phase

SECOND AMENDED COMPLAINT

II meeting with the U.S. Food and Drug Administration ('FDA') regarding our bavituximab second-line NSCLC clinical trial (defined as our ability to move into a Phase III trial design) (the 'End of Phase II Event')."  *See* Form 10-Q for period ending July 31, 2013 ("2Q 2012 Form 10-Q") at p. 12.

50.    The only other method for Peregrine to raise money to fund its operations and cover its net losses was to sell Company stock into the public markets.  Peregrine did this by making several shelf registrations of its common stock and entering into At Market Sales Issuance Agreements ("AIMs") whereby its agents consistently sold Peregrine's stock into the market, thereby raising funds but, each time, diluting the ownership interest of existing shareholders.

51.    From 2007 to the present, Peregrine sold its stock into the market, raising in excess of $335 million, and each time diluting shareholder value.

52.    Some of Peregrine's motives for being deliberately reckless in touting the so-called positive nature of the data from the bavituximab Phase II Trial were to obtain loans to show the public it was credit-worthy and be able to raise more money through stock sales to the market but to do so at higher, artificially inflated prices so that less stock would have to be sold to raise the target amount of money and thus causing less dilution of the Individual Defendants' ownership interests.

53.    Peregrine previously admitted that it does not have the technology, capacity or the money to bring bavituximab into a Phase III clinical trial by itself, though it is nonetheless presently attempting to conduct a Phase III trial on its own, having failed to attract any partners to joint venture with it.

54.    If Peregrine is unable to successfully bring bavituximab through a Phase III clinical trial and receive FDA approval to sell it as a commercial drug, either alone or with a partner, Peregrine will fail as a company.

**B.    Phase I Through III**

55.    In order to market a drug in the United States, developers must first obtain the approval of the FDA.  This approval process includes, among other

SECOND AMENDED COMPLAINT

required research, conducting a series of clinical trials to establish the safety and efficacy of the drug.  The maker of the drug then submits the clinical results of these trials to the FDA to satisfy the safety and efficacy of the new drug as part of its New Drug Application ("NDA"):

- **Phase I** trials test the safety, dose tolerance, and other pharmacokinetic/bioavailability properties of the drug.  Phase I trials also identify the primary side-effects, if any, that the drug may cause.

- In **Phase II** trials, researchers test the drug in a patient population to gather information about efficacy, optimal dosage levels, adverse effects, and safety risks versus the benefits.  Phase II studies are conducted in a significant patient population designed to assess the most effective and safe dose that will be evaluated in a Phase III study.  During the clinical development of a new drug, the results of a Phase II study will determine if a drug is safe and effective to administer in a larger patient population.  A Phase II study is critical in the new drug development process.  If the risks outweigh the benefits and the patient safety is severely jeopardized during the Phase II study, the research on that drug is almost always stopped.  The FDA will approve a drug that demonstrated sufficient data to show the most effective dose correlated with the safety profile.  This is established in the Phase II program and will be the dose selected to be evaluated in the Phase III study.

- **Phase III** trials test the efficacy and safety of the drug in an expanded patient population at geographically dispersed trial sites.  The results of the Phase III program must demonstrate that the drug is statistically significantly better than the current standard of care.

SECOND AMENDED COMPLAINT

## C.     Pharmacokinetic ("P-K") Testing

56.    Pharmacokinetics is the process by which a drug is absorbed, distributed, metabolized and eliminated by the body.  Pharmacokinetics is also the study of this process.

57.    Peregrine developed a pharmacokinetics test, called a P-K test, specifically designed to reveal the presence of bavituximab in a patient's blood sample and to study how bavituximab is absorbed, distributed, metabolized and eliminated by the body.

58.    As demonstrated by CW3 (¶ 130), CW10 (¶ 185, 186), CW11 (¶¶ 196, 201), CW17 (¶¶ 105), CW20 (¶ 96), Peregrine had possession and control over all patient blood samples drawn during the course of the Phase II Trial.

59.    Once the Phase II Trial was unblinded on May 21, 2012, Peregrine had the ability to test blood samples at very little cost (*see, e.g.*, CW9 (¶ 168), CW10 (¶¶ 183, 187), CW11 (¶¶ 63, 201), CW15 (¶ 103)) of all 117 patients involved in the Phase II Trial, and know, based on their unblinded identification code, which patients were supposed to have received placebo, which patients were supposed to have received 1 mg dosages of bavituxmiab and which patients were supposed to have received 3 mg dosages of bavituximab.  *See, e.g.*, *id.*

60.    Confidential Witness No. 11 ("CW11") is, for example, a former Peregrine employee and was a Research Associate in the Process Sciences department at Peregrine, charged with research and development ("R&D").  CW11 left Peregrine in approximately November of 2012.  As a Research Associate with the Process Sciences department, CW11 has personal knowledge regarding the Phase II Trial.

61.    CW11 has the skills and actual personal experience in the conducting of Peregrine's P-K test to detect the presence of bavituximab in a patient's blood sample.

13

62.     CW11 stated that a P-K test is an ELISA based assay.     The enzyme-linked immunosorbent assay ("ELISA") is a test that uses antibodies and color change to identify a substance.  ELISA is a popular format of a wet-lab type of analytic biochemistry assay that uses a solid-phase enzyme immunoassay ("EIA") to detect the presence of a substance, usually an antigen, in a liquid sample or wet sample.   In the ELISA based assay, antigens from the sample are attached to a surface.  Then, a further specific antibody is applied over the surface so it can bind to the antigen.   This antibody is linked to an enzyme, and, in the final step, a substance containing the enzyme's substrate is added.   The subsequent reaction produces a detectable signal, most commonly a color change in the substrate.

63.     CW11 stated that Peregrine's P-K test, which detects the presence of bavituximab, takes five (5) to six (6) hours to perform, and is relatively inexpensive to perform.   CW11 also stated that as many as ten (10) different patient blood samples can be applied to the plate on which the test is performed and that a research scientist such as himself/herself could, and does, easily simultaneously monitor at least four (4) plates with ten different patient blood samples per plate.

64.     Four (4) plates times ten (10) different patient blood samples per plate equals forty (40) different patient samples.  Thus, three (3) research scientists could test the entirety of the 117 patient cohort in the Phase II Trial for all three arms (placebo, 1 mg of bavituximab and 3 mg of bavituximab) in five (5) to six (6) hours, or one Peregrine research scientist could test all patients' blood samples in fifteen (15) to eighteen (18) hours.

65.     Thus, according to CW11, as early as May 21, 2012 when the Phase II Trial was unblinded, Peregrine had the ability to conduct a P-K test in less than one (1) to two (2) days to confirm the presence or absence of bavituximab in patient blood samples of every single patient in this Phase II Trial.  *See also* CW9 (¶ 168), CW10 (¶¶ 183, 187), CW15 (¶ 103).

SECOND AMENDED COMPLAINT

**D.     Human Anti-Chimeric Antibodies ("HACA") Test**

66.     Bavituximab is a monoclonal antibody, which was developed using mouse DNA and human DNA.  Because the antibody contains the DNA of two different species, it is often referred to as a chimeric antibody.

67.     When a chimeric antibody is administered to a human, the human's blood often recognizes the substance as a foreign substance because the body detects the presence of the foreign DNA, in this case mouse DNA.  When this happens, the body creates new antibodies in response to the presence of the foreign body.

68.     Therefore, when bavituximab is given to patients, additional antibodies are often generated by the body.  These new antibodies are called human anti-chimeric antibodies, abbreviated as HACA.

69.     Peregrine possesses a test to detect the presence of HACA in a patient's blood who has received bavituximab.  *See, e.g.*, CW1 (¶ 124), CW3 (¶ 130), CW9 (¶ 166), CW10 (¶ 173, 175), CW20 (¶ 96).  According to CW11, the HACA test is also an ELISA based test, a standard scientific test routinely conducted.

70.     CW3, CW9, and CW10 stated that they were familiar with the HACA test used by Peregrine and CW3 and CW10 stated that it had been conducted on patient blood samples many times during their tenure with Peregrine.  *See* ¶¶ 130, 173, 175.  A patient who had received placebo should not have any HACA in his or her blood sample as a person assigned to receive placebo should not have received bavituximab containing mouse DNA and thus no HACA should have been generated in his/her blood in response.

71.     Thus, as early as May 21, 2012, Peregrine had the ability to run two different types of test on patient blood, the HACA test and the P-K test.  The HACA test would have immediately alerted them to the fact that placebo-designated patients had potentially received bavituximab in error because HACA would be present in a blood sample where they should not be and thus an immediate follow up investigation was warranted to determine if the study data was false.  The P-K test

SECOND AMENDED COMPLAINT

1   would have told Defendants that placebo designated patients had definitely received

2   bavituximab in error because bavituximab was found in the placebo-designated

3   patient's blood sample and thus the study data was definitely false.

4   **E.   Icon Was The Central Laboratory for the Phase II Trial**

5        72.   Confidential Witness No. 12 ("CW12") is the Medical Director of MB

6   Quest in Moscow, Russia.  CW12 stated that MB Quest was a Contract Research

7   Organization ("CRO") for Peregrine for the Phase II Trial in issue.  MB Quest was

8   founded in Moscow in 1997 as one of the first international CROs to work in Russia.

9   MB Quest provides sponsors such as Peregrine with a full range of clinical trial

10  services in Russia, Ukraine, Belarus, Georgia, and Kazakhstan.  A CRO is defined

11  by Section 1.20 of E6 of the International Conference on Harmonisation ("ICH") on

12  Good Clinical Practices as "a person or an organization (commercial, academic or

13  other) contracted by the sponsor to perform one or more of a sponsor's trial-related

14  duties and functions."

15       73.   CW12 worked on the Phase II Trial in issue, and has personal

16  knowledge regarding the Phase II Trial.  CW12 stated that nurses at MB Quest

17  collected the patient blood samples according to the Protocol, and sent the results of

18  blood tests and the blood samples directly to the central laboratory, Icon.

19  **F.   Defendants Admit That Reliance On Third Parties to Conduct Clinical**

20  **     Trials Do Not Relieve Them of Conducting, Monitoring, Recording and**

21  **     Reporting the Results of Clinical Trials to Ensure That the Data and**

22  **     Results Are Scientifically Credible and Accurate**

23       74.   "Monitoring" is defined by Section 1.38 of E6 of the ICH on Good

24  Clinical Practices as "the act of overseeing the progress of a clinical trial, and of

25  ensuring that it is conducted, recorded, and reported in accordance with the protocol,

26  Standard Operating Procedures ("SOPs"), Good Clinical Practice ("GCP"), and the

27  applicable regulatory requirements."

28

SECOND AMENDED COMPLAINT

75.    Defendants admit in their 2012 Form 10-K that, in the course of discovery, preclinical testing and clinical trials, the Company relies on third parties, including universities, investigators and clinical research organizations, to perform critical services for them.   For example, the Company relies on third parties to conduct its clinical trials and many of its preclinical studies.   Clinical research organizations and investigators are responsible for many aspects of the trials, including finding and enrolling patients for testing and administering the trials. Although the Company relies on these third parties to conduct its clinical trials, "*the Company is responsible for ensuring that each of its clinical trials is conducted in accordance with its investigational plan and protocol*."   (Emphasis added). "Protocol" is defined by Section 1.44 of E6 of the ICH on Good Clinical Practices as "a document that describes the objective(s), design, methodology, statistical considerations, and organization of a trial."

76.    Moreover, the FDA and foreign regulatory authorities, including the ICH, require the Company to comply with regulations and standards, commonly referred to as *Good Clinical Practice* for conducting, monitoring, recording and reporting the results of clinical trials to ensure that the data and results are scientifically credible, accurate and viable and that the trial subjects are adequately informed of the potential risks of participating in clinical trials via a signed Informed Consent ("IC").   *The Company's reliance on third parties does not relieve it of these responsibilities and requirements*.   "Good Clinical Practice" is defined by Section 1.24 of E6 of the ICH on Good Clinical Practices as "a standard for the design, conduct, performance, monitoring, auditing, recording, analyses, and reporting of clinical trials that provides assurance that the data and reported results are credible and accurate, and that the rights, integrity and confidentiality of trial subjects are protected."

77.    According to the Company's SEC filings, Peregrine admits "[a] clinical trial must be conducted according to *good clinical practice* following protocols that

SECOND AMENDED COMPLAINT

detail the trial's objectives, inclusion and exclusion criteria, the parameters to be used to monitor safety and the efficacy criteria to be evaluated, and informed consent must be obtained from all study subjects." *See* 2012 Form 10-K at p. 14 (Emphasis added).

78.   The Company's participation in conducting clinical research on a new drug makes Peregrine totally obligated to follow GCP as outlined in the Code of Federal Regulations, the European Directives and the ICH Guidelines.   These regulations are specific and demand that all clinical research be conducted according to these regulations.   Any conduct by investigators, their staffs, third parties who package and distribute the drug, statisticians, internal staff, all come under the responsible persons in charge of a company or their designees and must follow GCP.

79.   It is up to the sponsor company (Peregrine) to monitor and ensure that every aspect of the clinical research development is conducted according to GCP. Any errors or omissions that occur during the clinical research development must be scrutinized and reported during the clinical trials.   Distribution of study medication must have a complete accountability.   Each study center must be monitored closely to guard against any protocol violations or mistakes in study drug administration to the patients participating in this study.

80.   The Phase II Trial in issue was not properly administered and monitored by Defendants in violation of GCP.

**G.     The Company Attempts to Divert the Attention Away from Its Deliberate Recklessness and Deviation from Good Clinical Practices and Places the Blame on Clinical Supplies Management, Inc.**

81.   In order to divert attention from Defendants' deliberate recklessness in their failure to properly monitor, record, verify and report the results of the Phase II Trial, on September 24, 2012 (the *same day* the Company announced to the investors that it had discovered "major discrepancies" in the Phase II clinical data

SECOND AMENDED COMPLAINT

1   previously reported), the Company filed a suit against Clinical Supplies

2   Management, Inc. ("CSM").  *See Peregrine v. CSM* (Dkt. No. 1).

3       82.   The reasonable inference is that Peregrine was aware of the "major

4   discrepancies" for many days or weeks enabling it time to retain counsel, discuss the

5   situation and have a complaint prepared, reviewed and filed in coordination with the

6   preparation and issuance of the September 24, 2012 press release.

7       83.   CSM is a third party, independent, FDA-approved CRO that the

8   Company contracted with to execute treatment group assignments and oversee

9   clinical trial material coding and distribution in its second-line NSCLC double-

10  blinded trial.

11      84.   The Company alleges in its complaint against CSM that "[o]n or about

12  September 20, 2012, Peregrine discovered major discrepancies between some

13  patient sample test results and patient treatment code assignments.  CSM's error(s)

14  call in to question the accuracy of the results noted and reported on September 7,

15  2012.  While the scope of CSM's error(s) is currently under review, its error(s) will

16  diminish the goodwill achieved from the trial results and require analysis and

17  evaluation presently under way and continuing.  The magnitude of the resulting

18  harm is currently unknown."  *Peregrine v. CSM* (Dkt. No. 1) at ¶ 10.

19      85.   On January 16, 2013 (only six days before the expiration of the 120

20  days provided for service under Fed. R. Civ. Proc. 4(m)), the Company served the

21  complaint on CSM.  *See Id.* (Dkt. No. 7).

22      86.   Shortly thereafter, on March 7, 2013, the Company and CSM entered

23  into a stipulation to stay the action (*see id.* (Dkt. No. 8)) because the Master Services

24  Agreement entered into between Peregrine and CSM, dated on or about March 18,

25  2010, required the parties to participate in a dispute resolution process in the event

26  of any controversy or claim arising out of, relating to or in connection with any

27  provision of said agreement, or the rights or obligations of the parties thereunder,

28  before pursuing their rights and remedies at law or equity.

SECOND AMENDED COMPLAINT

87.   Thus, there was no realistic chance that the Company's lawsuit against CSM could have proceeded without a prior participation in a dispute resolution process.  Indeed, had the Company not been looking to divert attention away from its own misconduct, it could have simply initiated a dispute resolution process with CSM directly and without the publicity of the lawsuit.

88.   On March 8, 2013, the Court in the *Peregrine v. CSM* lawsuit entered an order staying the proceedings for a period of 120 days from the entry of the Order to allow the parties to pursue the dispute resolution process.  *See id.* (Dkt. No. 11).

89.   On July 11, 2013, CSM answered Peregrine's complaint, denying any wrongdoing and making reference to "Change Orders" to the original contract which Peregrine had insisted upon receiving.  *See Peregrine v. CSM* (Dkt. No. 13) (the "CSM Answer" at ¶¶ 4, 9).  According to CSM's Answer, "Peregrine's alleged damages and losses, if any, were caused by its own actions or the actions of other parties or entities, which were not proximately caused by CSM" (CSM Answer at Eighth Affirmative Defense); "Peregrine consented to and approved the alleged acts for which it now complains.  Accordingly, Peregrine is barred in whole or in part from pursuing this action."  *Id.* at Ninth Affirmative Defense.

## CONFIDENTIAL WITNESSES

90.   Confidential Witness No. 16 ("CW16") was the physician in charge of the Phase II Trial at the investigator site in the county of Georgia, the City of Tbilissi and the clinic named Gvamichava.  CW16 worked on the Phase II Trial in issue, and has personal knowledge regarding the Phase II Trial.

91.   CW16 confirmed that patient blood was drawn on each patient visit and that general blood tests were performed at the investigator site.

92.   CW16 also confirmed that blood samples were taken and sent to the central laboratory for further testing.  CW16 confirmed that the central laboratory was Icon, located in Ireland.

SECOND AMENDED COMPLAINT

93.    CW16 confirmed that MB Quest was Peregrine's representative in Georgia.  CW16 confirmed that MB Quest was a contract research organization for Peregrine and acted as a monitor for Peregrine as to the European sites.

94.    Confidential Witness No. 20 ("CW20") is a Director of MB Quest in the country of Georgia.  CW20 worked on the Phase II Trial in issue, and has personal knowledge regarding the Phase II Trial.

95.    CW20 confirmed that MB Quest managed the Phase II Trial in issue for Peregrine at the European sites.

96.    CW20 confirmed that MB Quest collected blood samples of the patients and sent them to Peregrine who conducted the P-K and HACA tests themselves.

97.    CW20 confirmed that they communicated with Peregrine using an SRS electronic database platform and sent patient trial results to Peregrine via the SRS electronic database platform.

98.    Confidential Witness No. 13 ("CW13") is a nurse at the State Medical Preventive Institution "Chelyabinsk Regional Clinical Oncology" in Chelyabinsk, Russia.  Chelyabinsk Regional Clinical Oncology is one of the investigator sites in Russia.  CW13 worked on the Phase II Trial in issue, and has personal knowledge regarding the Phase II Trial.

99.    CW13 confirmed that this investigator site took blood samples of the Phase II Trial patients and sent them to the central laboratory, Icon.

100.    Confidential Witness No. 14 ("CW14") is the Head of the Chemotherapy Department at the State Medical Preventive Institution "Chelyabinsk Regional Clinical Oncology" in Chelyabinsk, Russia.  CW14 worked on the Phase II Trial in issue and has personal knowledge regarding the Phase II Trial.

101.    CW14 confirmed that this investigator site took blood samples of the Phase II Trial patients and sent them to the central laboratory, Icon.

102.    Confidential Witness No. 15 ("CW15") confirmed that he/she was the physician responsible for conducting the Phase II Trial in issue in the country of

SECOND AMENDED COMPLAINT

Ukraine at the Kharkiv investigator site known as State Institute, Institute of Medical Radiology named after S.P. Grygoryev of AMS of Ukraine, Department of Chemotherapy.  CW15 worked on the Phase II Trial in issue, and has personal knowledge regarding the Phase II Trial.

103.   CW15 confirmed that his/her clinic received the vials of the placebo and the bavituximab in a blinded and coded fashion and then sent the results of the Phase II Trial -- organized by which patient received which coded substance -- to Peregrine so that Peregrine could analyze the patient results once the Phase II Trial was unblinded.

104.   Confidential Witness No. 17 ("CW17") was the main Oncologist working on the Phase II Trial in issue in the country of Georgia, in the city of Tbilissi at the Medulla Chemotherapy and Immunotherapy clinic.   CW17 worked on the Phase II Trial in issue, and has personal knowledge regarding the Phase II Trial.

105.   CW17 confirmed that blood samples were drawn from the patients and those blood samples were sent to Peregrine for P-K testing to be done by Peregrine.

106.   Confidential Witness No. 18 ("CW18") was a nurse in the Oncology Department at the investigator site at the State Institute of Healthcare, Ivanovo Regional Oncology Dispensary in Ivanovo, Russia, responsible for the Phase II Trial in issue.  CW18 worked on the Phase II Trial in issue, and has personal knowledge regarding the Phase II Trial.

107.   CW18 confirmed that the physician and oncologist responsible for conducting the Phase II Trial at the Ivanovo investigator site was Confidential Witness No. 19 ("CW19").

108.   CW19 worked on the Phase II Trial in issue, and has personal knowledge regarding the Phase II Trial.   CW19 confirmed that patient blood samples were drawn every time the patient visited the investigator site.   CW19

SECOND AMENDED COMPLAINT

1   confirmed that blood tests were conducted at the investigator site and that samples of

2   the patient blood were sent to the central laboratory, which was Icon.

3       109.   CW19 confirmed that MB Quest was a contract research organization

4   ("CRO") overseeing the Phase II Trial at the investigator sites in Europe.

5       110.   Confidential Witness No. 6 ("CW6") was the clinical trial coordinator

6   for the Phase II Trial in issue at one of the investigator sites in California.   As the

7   clinical trial coordinator for the Phase II Trial in issue at this investigator site, CW6

8   has personal knowledge regarding the Phase II Trial.

9       111.   CW6 confirmed that his/her office was one of the clinical sites

10   participating in the Phase II Trial.

11       112.   CW6 confirmed that pursuant to the Protocol for this Phase II Trial in

12   issue, on every weekly visit by the patients assigned to the Phase II Trial, vials of

13   blood were drawn from the patients.   Some of the blood was retained by the

14   investigator site and tested.   The results of the tests were noted on the Case Report

15   Forms and the Case Report Forms were sent to Peregrine on a periodic basis.

16       113.   CW6 also confirmed that blood drawn from patients on each weekly

17   visit was also sent, pursuant to the study Protocol, to the central laboratory where it

18   was also subjected to further tests.   CW6 stated that the results of these tests were

19   sent to Peregrine and to those persons in charge of supervising the Phase II Trial,

20   which in this instance were Defendants Shan and Garnick.

21       114.   Confidential Witness No. 7 ("CW7") was the coordinator of clinical

22   trials (which included the Phase II Trial in issue) at one of the investigator sites in

23   Florida.   As the clinical trial coordinator for the Phase II Trial in issue at this

24   investigator site, CW7 has personal knowledge regarding the Phase II Trial.

25       115.   CW7 confirmed that, pursuant to the study Protocol, blood drawn on

26   the weekly patient visits was sent to the central laboratory for tests to be run and

27   reported to Peregrine.

28

SECOND AMENDED COMPLAINT

116. Confidential Witness No. 8 ("CW8") was the Clinical Research Manager for the Phase II Trial in issue at one of the investigator sites on the eastern coast of the United States other than Florida. As the Clinical Research Manager for the Phase II Trial at this investigator site, CW8 has personal knowledge regarding the Phase II Trial.

117. CW8 confirmed that, pursuant to the study Protocol, blood was drawn on every patient visit. The blood was tested at the investigator site and Case Report Forms were completed and sent to Peregrine, with the results of the tests.

118. In addition, CW8 confirmed that other vials of patient blood drawn at the time of each visit were sent, pursuant to the study Protocol, to the central laboratory for further testing.

119. Confidential Witness No. 1 ("CW1") is a former employee of Peregrine and was employed in a high level managerial position in the capacity of Chief Operating Officer ("COO") from April 2009 through December 2011. CW1 was responsible for all operations of the Company. CW1 stated that his/her job responsibilities as COO included the obligation to manage and oversee Peregrine's subsidiary Avid Bioservices, Inc. ("Avid") and all of Peregrine's quality control issues.

120. CW1 stated that the Company had a pattern and practice of announcing positive preliminary data when, in his/her opinion, nothing should be announced until the data was verified.

121. CW1 stated that the Company lacked internal controls related to conducting clinical trials and reporting the data results of the clinical trials. CW1 further stated that there was a very secretive inner circle in the Company, which only included Defendants King, Lytle, Shan and Garnick.

122. CW1 confirmed that patient blood is collected during clinical trials of bavituximab and sent to the central laboratory for "safety lab" testing (meaning tests to determine that the bavituximab was not making the patients sicker) and that the

24

results are regularly and periodically reported to Peregrine and specifically to Defendant Shan.

123.  CW1 confirmed that P-K testing was conducted at Peregrine by the Process Sciences department, under the supervision of Director Connie Chang. CW1 confirmed that Connie Chang reported directly to Defendant King.  CW1 also confirmed that the P-K testing was a test developed by Peregrine to detect the presence of bavituximab in the patient's blood.

124.  CW1 stated that Peregrine also performs HACA tests at their headquarters.

125.  Confidential Witness No. 2 ("CW2") is a former employee of Peregrine's subsidiary Avid and was employed as Senior Vice President of Manufacturing at Avid from October 1996 to July 2011.  CW2 reported to CW1 during part of his/her employment with Avid.

126.  CW2 stated that he/she was in charge of the manufacturing of all the drugs which were used for the clinical tests at the Company, including the bavituximab.  The manufacturing included filling the vials for the bavituximab clinical trials, which included the placebo and different strengths of the bavituximab being tested.  CW2 also stated that once the vials were filled they were shipped to a third party vendor to have them labeled.

127.  CW2 stated that Peregrine was trying to blame CSM for what he/she believed to be Peregrine's mistakes.

128.  CW2 stated that he/she was shocked at what Peregrine initially reported regarding the data from the Phase II Trial.  CW2 stated that the Company overstated the positive nature of the data and the final positive data that the Company promised was not present.  CW2 further stated that the announced Phase II Trial results were incredible and hard to believe.

129.    Confidential Witness No. 3 ("CW3") is a former employee of Peregrine and was a Process Development Scientist at the Company from July 2010 to September 2012.

130.    CW3 stated that the P-K and HACA tests were conducted at Peregrine using patient blood samples sent to Peregrine from the investigator sites and the central lab.

131.    CW3 stated that he/she reported directly to Connie Chang (Director of the Process Sciences department at Peregrine).   CW3 stated that Connie Chang was in charge of conducting the P-K testing and the HACA antibody assay.

132.    CW3 stated that the Company never performed its due diligence on any project.   CW3 stated that "[i]f the Company received good results on a project they would never verify the results, they would just report the good news."

133.    CW3 further stated that the Company should have known that its Phase II Trial could not be relied upon, as major discrepancies existed between patient sample test results and patient treatment codes.   CW3 stated that in "typical Peregrine fashion a result that is beneficial to them is what they want.  The Company does not try to see if it is reproducible or even makes sense."   CW3 further stated that "[i]n typical fashion they [Peregrine] looked at only the things that would make their case look good and not what was actually occurring.  Other people not even intimately familiar with the Phase II Trial pointed out discrepancies in the safety profile that should have caused them to take a second, third or fourth look."   CW3 stated, for example, that he/she observed internet posting from persons reviewing the interim Phase II Trial results.  Those postings commented that the placebo arm had less desirable safety results than the 1 mg and 3 mg bavituximab arms.  According to CW3, this should have caused Peregrine to investigate why the placebo arm had a worse safety record and should have enabled them to discover that placebo-designated patients had received bavituximab in error.

SECOND AMENDED COMPLAINT

134.   CW3 also stated every decision ultimately is done by Steve King.   "He is not a scientist of any stature.  I would say the intellectual honesty of a Peregrine trial is very similar to those people who found WMDs in Iraq when none existed. While I worked there I never heard one word from management about what is owed the shareholders in terms of giving them a return, of being honest, of getting a drug to market, of having any obligation to the shareholders.  They got the result they wanted to have, not the truth."

135.   CW3 confirmed that Defendants were successful, after touting the interim and unverified results of the Phase II Trial, in inducing a potential partner, Abbvie, Inc. ("Abbvie"), to review the data produced by the Phase II Trial.  Abbvie came on-site to Peregrine's headquarters in late August 2012 to do an audit of the results of the Phase II Trial.  CW No. 3 believes, based on his experience at Peregrine and the flurry of activity following the Abbvie on-site audit of Peregrine, that it was Abbvie who discovered the "major discrepancies" in the data from the results of the prior P-K testing performed at Peregrine.  Abbvie then soured on a partnership when Peregrine admitted that its prior statements about the results of the data were false and misleading.

136.   CW3 also confirmed that Defendant King flew to Chicago to meet with representatives of Abbvie in an effort to keep them interested in a partnership with Peregrine, but to no avail.

137.   Upon information and belief, CW3 believes that Abbvie refused to do business with a company or its executives who would be deliberately reckless in releasing statements about the positive nature of clinical data before verifying the accuracy of the data or the truth and accuracy of their own statements or who even failed to verify which patients received which substance, placebo or bavituximab.

138.   Abbvie is a major company in the industry of developing proprietary drugs and bringing them to market.  Abbvie is a spin-off from Abbott Laboratories, Inc. ("Abbott").  On October 19, 2011, Abbott announced plans to separate into two

SECOND AMENDED COMPLAINT

1  publicly traded companies, one in diversified medical products and the other in

2  research-based pharmaceuticals.

3      139.   The diversified medical products company consisted of Abbott's

4  existing diversified medical products portfolio, including its branded generic

5  pharmaceutical, devices, diagnostic and nutritional businesses and retained the

6  Abbott name.

7      140.   The research-based pharmaceutical company consisted of Abbott's

8  current portfolio of proprietary pharmaceuticals and biologics and was named

9  Abbvie.

10     141.   At the time of the announcement, the Abbvie research-based

11 pharmaceutical division had delivered market-leading performance with a

12 sustainable mix of products and built a strong pipeline of proprietary medicines

13 through internal discovery, in-licensing and collaboration efforts.

14     142.   At the time of the announcement, the Abbvie division had

15 approximately $18 billion in annual revenue and had a sustainable portfolio of

16 market-leading brands, including Humira, Lupron, Synagis, Kaletra, Creon and

17 Synthroid.   Abbvie also had an attractive pipeline of innovative R&D assets in

18 important specialty therapeutic areas such as Hepatitis C, immunology, chronic

19 kidney disease, women's health, oncology and neuroscience.

20     143.   Abbvie continued as a division of Abbott until the actual separation

21 occurred on January 1, 2013.

22     144.   Prior to the actual separation, Abbvie expressed an interest in a

23 collaboration partnership effort with Peregrine as to bavituximab after Peregrine

24 unblinded the Phase II Trial in May 2012 and began touting the interim data it was

25 releasing as positive and accurate.

26     145.   A partnership with Abbvie would be everything that Peregrine and the

27 Individual Defendants had dreamed.   Such a partnership would be a lifeline for

28 Peregrine and very lucrative for the Individual Defendants.   To entice Abbvie into

SECOND AMENDED COMPLAINT

1   partnership, during the Class Period, Defendants, with deliberate recklessness,

2   touted the efficacy of bavituximab and released public statements about the positive

3   (but unverified) results of the Phase II Trial in the hope no errors in the Phase II

4   Trial would be discovered.

5       146.   Confidential Witness No. 4 ("CW4") was a former consultant at

6   Peregrine for Clinical Operations from mid-2007 until March 2012.

7       147.   CW4 stated that all the Peregrine clinical trials, including the

8   bavituximab clinical trial in issue, follow a standard set of operating procedures

9   ("SOPs") and a Clinical Protocol specific to each clinical trial.

10      148.   CW4 stated that the Clinical Protocol details all aspects of the clinical

11  trial including the drug supply, packaging, labeling, shipping arrangements, safety

12  procedures, patient population, preparation of Case Reports on patient treatment and

13  data gathered, manufacturing processes and all other steps in the clinical trial.

14      149.   CW4 stated that the SOPs described how the data generated from the

15  clinical trial should be monitored to ensure its accuracy.

16      150.   CW4 stated that all Peregrine employees involved in the trial are

17  required to follow the SOPs and the Clinical Protocol.

18      151.   In addition, according to CW4, Peregrine has Case Report Forms that

19  are distributed to the clinical investigators and on which they are required to record

20  the data collected from the patients in the clinical trial.   The data collected and

21  reported back to Peregrine by the clinical investigators includes the patient's height,

22  weight, date of birth, sex, date of diagnosis, and reports of treatments, including the

23  results   of   diagnostic   tests   such   as   blood   tests,   radiology   reports   and

24  electrocardiograms.

25      152.   CW4 stated that the SOPs, the Clinical Protocol and the Case Report

26  Forms for the Phase II Trial are found on the main frame computer at Peregrine's

27  offices.

28

SECOND AMENDED COMPLAINT

153.   According to CW4, these documents are subject to non-disclosure agreements signed by Peregrine employees which prevent them from releasing these documents to outside parties without a subpoena.

154.   According to CW4, the SOPs, Clinical Protocol and Case Report Forms cannot be obtained from the FDA with a Freedom of Information Act ("FOIA") request as they are considered proprietary.

155.   Plaintiff Fahey made a FOIA demand upon the FDA to obtain the SOPs, the Clinical Protocol and the Case Report Forms on the Phase II Trial, but the FDA refused to produce them.

156.   Confidential Witness No. 5 ("CW5") was a former project manager at Clinical Supplies Management ("CSM"), the Contract Resource Organization ("CRO") hired by Peregrine to manage the bavituximab clinical trial in issue, including the blinding of the drug and placebo vials and the distribution of the drug and placebo vials to the clinical investigators.

157.   CW5 stated that each clinical trial managed by CSM had its own set of Standard Operating Procedures (SOPs) and had a Clinical Protocol supplied to CSM by the drug company such as Peregrine conducting the clinical trial.   These documents were stored in the office of CSM in electronic format and hard copies were maintained in large binders in the work area for easy reference by the CSM workers.

158.   CW5 stated that these documents were never supposed to leave the CSM facility.

159.   CW5 stated that he/she and other CSM employees signed confidentiality agreements that would prevent them from revealing the contents of the SOPs and Clinical Protocol without a lawful subpoena.

160.   Confidential Witness No. 9 ("CW9") was a former Peregrine Clinical Research Associate who was employed at Peregrine from March 2011 through

SECOND AMENDED COMPLAINT

January 2013.  As a Clinical Research Associate, CW9 was personally familiar with the Phase II Trial.

161.   CW9 confirmed that blood is drawn from the patients at the clinical investigation sites.  CW9 also confirmed that local laboratories and the central lab performed tests on the patient blood samples.  The results of the blood tests were entered into the Phase II Trial electronic database and sent to Peregrine.

162.   CW9 also confirmed that all of the Case Report Forms are stored in the Peregrine electronic database.

163.   CW9 also stated that bavituximab targets part of the immune system and suppresses particular proteins.  CW9 stated that in the early stages of the research into bavituximab, scientists looked at mice and saw what happens to proteins in their body when they got the drug, and depending on what the mouse blood results showed them, they developed a way to detect bavituximab.

164.   CW9 confirmed that P-K testing detected whether bavituximab is in the patient's blood and it also tells whether the drug is working and how long the drug stays in the patient's body.

165.   CW9 also confirmed that HACA can form in a human body dosed with bavituximab because of the mouse DNA that is part of bavituximab.

166.   CW9 confirmed that HACA tests were also performed at Peregrine.

167.   CW9 also confirmed that Peregrine's subsidiary, Avid, can perform P-K testing.

168.   CW9 stated that she believed that P-K testing was performed sometime after the study was unblinded in May of 2012, though he/she confirmed that P-K testing could be done at any time on any patient's blood sample and if the P-K test was performed after the study was unblinded, then the patient identification code could be matched to the previously tested blood sample to determine whether it was supposed to contain placebo or bavituximab.

SECOND AMENDED COMPLAINT

169.   CW9 confirmed that there is a Statistical Testing Timetable (also sometimes called a Data Analysis Plan) which is in the Protocol that sets forth when a particular event, such as P-K testing, should take place.

170.   Confidential Witness No. 10 ("CW10") is a former employee of Peregrine and was employed as a Manager of Clinical Operations from March 2011 through July 2012.  As Manager of Clinical Operations for Peregrine, CW10 has personal knowledge regarding the Phase II Trial.

171.   CW10 stated that Peregrine was disorganized and needed an Operations Manager to push several clinical trials through to completion.

172.   CW10's job was to plan for several upcoming Phase III trials.  This included the drug Cotara, where all Phase II trials had been completed and the long term survival rates had been received.  In addition, there were Phase II trials underway with bavituximab as an anti-cancer agent (which included the Phase II Trial in issue).  Finally, there was a Phase I trial near completion with an imaging compound and Peregrine was planning for Phase II for the imaging compound. CW10 had personal knowledge of the Phase II Trial in issue due to his/her responsibility to oversee it.

173.   CW10 described his job as Manager of Clinical Operations as a "high level" view of how to strategize and move traffic through each clinical trial.  In other words, CW10 would strategize what companies to hire; what outside vendors to hire; what the time flow would be on how the drugs would be manufactured and shipped to outside contract research organizations and investigative sites; where blood samples would be collected; when the patient blood samples would be tested for "safety labs" and subjected to P-K testing and HACA testing; and by whom and how reports would be generated.  In other words, CW10 was responsible for creating global flow charts for all clinical trials and overseeing the movement of drugs and data from various CROs, investigator sites and the central lab to keep it all moving and to get all clinical trials done in a timely and organized fashion.

SECOND AMENDED COMPLAINT

174.   CW10 also stated that there was a manager for each clinical study who reported to him/her.

175.   CW10 stated that there were tests to determine the presence of bavituximab in the patient's blood stream:  (i) a P-K test and (ii) a HACA test.

176.   CW10 emphasized that there is a difference between P-K and HACA testing.

177.   CW10 confirmed that P-K testing detects the presence of bavituximab in the patient's blood.

178.   CW10 stated that another purpose of the P-K test is to test bavituximab in the patient's blood and determine the rate of dosage of bavituximab and how the half-life of bavituximab is affected as it is being processed by the human body.

179.   CW10 confirmed that bavituximab is a drug that would generate HACA (human anti-chimeric antibodies) because the body could recognize the mouse portion of bavituximab as a foreign body and generate the anti-chimeric antibodies.

180.   CW10 confirmed that Ms. Connie Chang was the Director of the Process Sciences department at Peregrine.

181.   CW10 stated that data generated by the P-K tests was sent to Ms. Connie Chang and Defendant Shan in the form of a spreadsheet and it was linked to a patient code using the ID assigned to each patient.  A written narrative report was then generated, analyzing the P-K test data on the spreadsheet.  That written narrative report then gets reviewed by Ms. Connie Chang and her department before it is finalized and sent to Defendant Shan.

182.   CW10 stated that the written report, when it is finalized, is in narrative form and it discusses the technique and the process and gives an analysis of the various data generated by the P-K testing.  For example, "it would look at how the concentration of bavituximab changed over time in the patient's blood, graphs would be created from the data, and so on."

SECOND AMENDED COMPLAINT

183.   CW10 confirmed that a well-known P-K scientist whose name he/she could not recall was retained by Peregrine to also review all of the data generated by the P-K tests.  This P-K scientist was an outside contractor who CW10 believed worked with bavituximab previously.  This P-K scientist would have produced a report synthesizing all the P-K test results and sent it to Defendant Shan and Connie Chang.  CW10 confirmed that once the Phase II Trial was unblinded, Peregrine conducted P-K tests to began to analyze how bavituximab was working based on which patient received which dosage.

184.   CW10 believed based on his/her tenure with Peregrine that Peregrine itself developed the P-K test to detect the presence of bavituximab because no other entity would have had access to sufficient quantities of the drug to develop such a test.

185.   CW10 stated that the Protocol would set forth all of the events and when they should happen.  CW10 believes that all the patient blood samples were all collected at the central lab.  Thereafter, the blood samples were sent to Peregrine so the Company could perform P-K, HACA and biomarker tests.  A biomarker is a measurable characteristic that reflects the severity or presence of some disease state.  More generally, a biomarker is anything that can be used as an indicator of a particular disease state or some other physiological state of an organism.

186.   CW10 stated that Icon, the central lab, probably did the "safety labs," meaning regular blood tests to determine that the bavituximab was not making the patients sicker.  As to the collection of blood samples, CW10 stated that some investigator sites hold the blood for the entire trial and send it all at once and other investigator sites send the blood each time it is collected in waves to either the central lab or Peregrine.

187. CW10 confirmed that the results of the P-K testing would be meaningful once the Phase II Trial results were unblinded and the patient codes were applied to each P-K test so that Peregrine could determine whether that patient had

received bavituximab, what dosage that patient received, when was the blood drawn, and how long was the bavituximab present in their blood.

188.   Confidential Witness No. 21 ("CW21") was an employee of Peregrine from August 2007 to July of 2011.   CW21's job duties included business development for Peregrine and Avid.   CW21 split his time equally between Peregrine and Avid.

189.   CW21's duties for Peregrine were to find commercial business partners who would help Peregrine share the cost of developing bavituximab as a commercial drug.   CW21 stated that he was unsuccessful in ever finding any other entity, including Abbvie and numerous other "big players," willing to partner with Peregrine to develop bavituximab as a commercial drug.

190.   The work CW21 performed for Avid was to find customers who would hire Avid to do manufacturing work.

191.   CW21 confirmed that Peregrine developed an ELISA based assay which could detect the presence of bavituximab in patient blood samples.

192.   CW21 confirmed that a patient blood sample could be tested to determine if bavituximab was present in the blood and that this could be done at any time Peregrine had a patient blood sample to test.

193.   Confidential Witness No. 11 ("CW11") is a former employee of Peregrine and was employed as a Research Associate with the Process Sciences department for approximately three (3) years.   CW11 left Peregrine in approximately November of 2012.   As a Research Associate with the Process Sciences department for Peregrine, CW11 has personal knowledge regarding the Phase II Trial.

194.   CW11 stated that the corporate culture of Peregrine was one of secrecy and to keep lower level people in the dark and not to encourage questions.   CW11 stated that Connie Chang is the Director of the Process Sciences department at Peregrine.   Then, there were two supervisors – Janet Doerr and Gary Larson.

1   CW11's supervisor was Gary Larson and then there were associates such as him/her

2   under the supervisors.

3       195.   CW11 stated from his/her own personal knowledge, P-K testing was

4   performed at Peregrine.

5       196.   CW11 stated that P-K testing was a standard type of test to measure the

6   content of something (bavituximab) in a sample.  In this case, CW11 stated that the

7   patients' blood is received by Peregrine in a 1.5 milliliter test tube.  The blood

8   comes from the clinic or the central laboratory in small boxes with 80 to 100 tubes

9   arranged in slots like little wine racks.  CW11 also stated that the P-K testing

10  performed by Peregrine is designed to test for the presence of bavituximab in human

11  blood.  It is simple to do and could be done at any time on any patient blood sample.

12      197.   CW11 also stated that during the P-K test (which is an ELISA based

13  assay), the sample of the patient's blood is put on a plate and then usually another

14  antibody is applied to the blood to capture the thing of interest, in this case the

15  bavituximab.  Then TMB, a second chemical, is added to the plate, which causes the

16  sample to change color.  Then, according to CW11, the sample is run through a

17  spectrum analysis and based on the amount of the color change, a graph can be

18  generated and other data can be extrapolated to measure dose response, how much

19  bavituximab is in the patient's body, what is the concentration per liter of volume

20  and other things.

21      198.  CW11 stated that Peregrine's P-K test to detect the presence of

22  bavituximab takes five (5) to six (6) hours to perform and is a normal standard test

23  that is frequently conducted and it is relatively inexpensive to perform.  According

24  to CW11, "you can let the plate sit so the chemicals can react, and leave your office

25  to do other tests or work."

26      199.  CW11 stated that as many as ten (10) different patient blood samples

27  can be applied to the plate on which the P-K test is performed and that a research

28

36                                    SECOND AMENDED COMPLAINT

scientist such as himself could, and does, easily simultaneously monitor at least four (4) plates with ten (10) different patient blood samples per plate.

200. CW11 stated that four (4) plates times ten (10) different patient blood samples per plate equals forty (40) different patient samples. Thus, three (3) research scientists could test the entirety of the 117 patient cohort in the Phase II Trial for all three arms (placebo, 1 mg of bavituximab and 3 mg of bavituximab) in five (5) to six (6) hours, or one Peregrine research scientist could test all patients' blood samples in fifteen (15) to eighteen (18) hours.

201. CW11 stated that as early as May 21, 2012, when the study was unblinded, Peregrine had the ability to conduct a P-K test in five (5) to eighteen (18) hours to confirm the presence or absence of bavituximab in patient blood samples of every single patient in this Phase II Trial depending on whether Peregrine wanted to deploy one (1) scientist or three (3) to conduct the P-K tests.

202. CW11 stated that Mike Brown and Gary Larson were the persons who performed the actual P-K testing for the Phase II Trial in issue.

## DEFENDANTS' MATERIALLLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

203. A "Case Report Form" is defined by Section 1.10 of E6 of the ICH on Good Clinical Practices as "a printed, optical, or electronic document designed to record all of the protocol required information to be reported to the sponsor on each trial subject."

204. On May 21, 2012, Peregrine unblinded the Phase II Trial. At that point in time, Peregrine (as the sponsor) had, upon information and belief based on interviews with confidential witnesses as to how the Phase II Trial was conducted, all of the patient Case Report Forms listing the treatments received, tests conducted and data gathered to date and Peregrine had in its possession and under its control all patient blood samples.

SECOND AMENDED COMPLAINT

205.   As of May 21, 2012, Peregrine (as the sponsor) also had the ability to verify the accuracy of the unblinded clinical data gathered to date and confirm through P-K testing of patient blood samples that each patient in the Phase II Trial had received the proper dose assigned to them (placebo, 1 mg or 3 mg of bavituximab).  *See, e.g.*, CW9 (¶ 168), CW10 (¶¶ 183, 187), CW11 (¶¶ 63, 201), CW15 (¶ 103).

206.  On May 21, 2012, the Company issued a press release entitled *Peregrine Announces Positive Top-Line Data from Randomized, Double-Blind Bavituximab Phase II Trial in Second-Line Non-Small Cell Lung Cancer -- Bavituximab Plus Chemotherapy Demonstrates Doubling of Overall Response Rates Versus Chemotherapy Alone -- 50% Improvement in Progression-Free Survival and Overall Survival Trends Support Phase III Development*.

207.   Nowhere in this May 21, 2012 press release did Defendants disclose that the data was preliminary data which Peregrine had not verified as accurate.  The following bold and italicized statements were materially false and misleading:

> Peregrine Pharmaceuticals, Inc. (NASDAQ: PPHM) today announced ***positive top-line results*** from its randomized, double-blind, placebo-controlled Phase IIb trial evaluating two dose levels of bavituximab plus docetaxel versus docetaxel plus placebo (control arm) in patients with second-line non-small cell lung cancer (NSCLC).  ***Data from the trial showed a doubling of overall response rates (ORR), the primary endpoint, and an improvement in progression-free survival (PFS), a secondary endpoint, in patients treated in the bavituximab-containing arms when compared to the control arm***.  […]

SECOND AMENDED COMPLAINT

Based on independent radiology reviews and current status of patients, top-line data from the trial are as follows:

| Treatment Arm | Placebo plus docetaxel | Bavituximab (1 mg/kg) plus docetaxel | Bavituximab (3 mg/kg) plus docetaxel) |
|---|---|---|---|
| *Overall Response Rate* | *7.9%* | *15%* | 17.9% |
| *Median Progression-Free Survival* | *3.0 months* | *4.2 months* | 4.5 months |

*The compelling results from this rigorously designed trial clearly demonstrate that the combination of bavituximab and docetaxel is more active than docetaxel alone in treating second-line non-small cell lung cancer. We saw twice as many patients demonstrating an objective tumor response, increased progression-free survival, and already promising survival trends in this refractory setting.* […]

\*   \*   \*

"After working on 17 drug approvals, it is data like this that continues to energize me. *These robust data* will be important in discussions with the FDA regarding advancing bavituximab's clinical development in second-line non-small cell lung cancer," said Robert Garnick, PhD, head of regulatory affairs at Peregrine. "We look forward to working closely with the FDA to identify the most efficient path toward commercialization for this

SECOND AMENDED COMPLAINT

promising candidate in this indication where new therapies are desperately needed."

\*   \*   \*

"*These data are a significant validation of the clinical potential of bavituximab for patients with few effective treatment options*.  These data will be instrumental in planning Phase III development in NSCLC and we are excited to share these data as part of ongoing partnering discussions," said Steven W. King, president and chief executive officer of Peregrine.

(Emphasis added).

208.   Notably, in the May 21, 2012 press release, Defendants misleadingly informed shareholders that Defendants themselves "saw" (*see, e.g.,* "we saw") the claimed advantages of bavituximab, but gave no indication that Defendants had not verified the accuracy of the data or confirmed through P-K testing of the patient blood samples that the patients received the correct assigned dosage of placebo or bavituximab.

209.   On this news, Peregrine stock traded up from $0.44 to $0.53.

210.   According to Defendants' admissions in the September 24, 2012 press release and later, all the unverified data reported regarding the placebo and 1 mg arms in the Phase II Trial was false and misleading and any conclusions drawn comparing the 3 mg arm results to the results of the placebo and 1 mg arms were false and misleading.  Defendants later admitted they did not know which patients received the placebo or the 1 mg dosage when they were touting the data as true and accurate.

211.   On July 16, 2012, the Company issued a press release entitled *Peregrine Pharmaceuticals Reports Fourth Quarter and Fiscal Year 2012 Financial Results and Recent Developments -- Exceptional Data from Bavituximab Proof-of-*

40

*Concept Phase II Trial in Second-Line NSCLC Validates Platform and Positions Program for Phase III Development -- Wholly-owned Subsidiary Reports Record Revenue and Over $30 Million in Revenue Backlog from Contract Manufacturing Business.* (Emphasis added).

212.   Nowhere in the July 16, 2012 press release did Defendants disclose that the data was preliminary data which Peregrine had not verified as accurate nor did Defendants disclose that they failed to confirm through P-K testing of the patient blood samples which patients received which substance, placebo or bavituximab. The following bold and italicized statements below were materially false and misleading for the reasons discussed in ¶ 210 (above):

> "Since our last quarterly update, we reported ***transformational data*** from a robust double-blinded, placebo-controlled Phase II proof-of-principle trial evaluating the potential of bavituximab in treating second-line non-small cell lung cancer patients. ***The doubling of tumor response rates, a 50% increase in median progression free survival, and trends toward significant improvement in median overall survival*** strongly support advancing the program toward Phase III development. " said Steven W. King, president and chief executive officer of Peregrine.  "We could not be happier with the ***strength of the data*** from this robustly designed trial which gives us a clear direction and greatly enhances the probability of success as we look to Phase III development . . . ."

(Emphasis added).

213.   On this news, Peregrine stock traded up from $0.97 to $1.06.

41

214.   The following bold and italicized statements in the Company's 2012 Form 10-K were materially false and misleading regarding the Phase II Trial for the reasons discussed in ¶ 210 (above):

In May 2012, we announced ***positive top-line data*** from this trial from 117 evaluable patients, based on independent radiology reviews and current status of patients as of that date, as shown in the following table:

| Treatment Arm | Placebo plus docetaxel | Bavituximab (1 mg/kg) plus docetaxel | Bavituximab (3 mg/kg) plus docetaxel) |
|---|---|---|---|
| *Overall Response Rate* | *7.9%* | *15%* | 17.9% |
| *Median Progression-Free Survival* | *3.0 months* | *4.2 months* | 4.5 months |

***Both dose levels of bavituximab and docetaxel combination treatment were generally safe and well tolerated with adverse events being similar to the patients receiving docetaxel with placebo. Another secondary endpoint***, ***median OS, in the control arm has already been determined at less than 6 months, while the median has not been reached in either bavituximab-containing arm.***  We anticipate announcing median OS from this trial in the second half of calendar year 2012, but this is a time-to-event endpoint and could take longer to reach.

1
2
3
4

Based on these **encouraging data** and our discussions with medical advisors, our strategy is to pursue Phase III development with bavituximab in second-line NSCLC.

(Emphasis added).

5
6
7

215. On July 16, 2012, the Company conducted a Fourth Quarter 2012 Earnings Conference Call ("4Q Conference Call"). It was on this call that Defendant King, President, CEO and a director of the Company, falsely stated:

8
9
10
11
12
13

It has been a transformational time at Peregrine since our last quarterly conference call. Since that call, **our lead clinical program, bavituximab, yielded exceptional proof of principle data that was announced May 21**, [2012] when the trial testing bavituximab in combination with docetaxel versus docetaxel alone was unblinded.

14
15
16
17
18
19
20
21

**Results from the study showed a doubling of tumor shrinkage or tumor response; 50% improvement in progression-free survival, or PFS; and a significant trend in overall survival, or OS, in which median OS has already been reached in the docetaxel alone arm, and a majority of patients are still alive in both bavituximab-containing arms of the trial**. […].

22
23

\*   \*   \*

24
25
26
27

**The strength of this data** in this large area of high unmet medical need has also sparked a surge in partnering discussions that has included over 15 in-person partnering meetings since that time with major players in

28

43

1    oncology, with follow-up discussions ongoing and
2    additional parties showing interest.

3  (Emphasis added).

4    216. The preceding bold and italicized statements made by Defendant King

5  in the 4Q Conference Call were materially false and misleading regarding the Phase

6  II Trial for the reasons discussed in ¶ 210 (above).

7    217. In addition, at no time during the 4Q Conference Call did Defendant

8  King warn the market that Peregrine had not verified the accuracy of the data, had

9  not confirmed through P-K testing of the patient blood samples that those patients

10  assigned to receive placebo or 1 mg bavituximab had actually received the assigned

11  dose, and thus none of the Defendants knew whether the statements they were

12  making were true.

13    218. In that same 4Q Conference Call, Defendant Shan, Vice President of

14  Clinical and Regulatory Affairs, falsely stated:

15    ***We truly could not have expected anything more from***
16    ***this successful proof of concept trial, in which not only***
17    ***did the control arm produce expected results, but both***
18    ***bavituximab doses yielded similar improved efficacy***
19    ***results,*** as we expected going into the study, which
20    mirrored the consistently positive trend across all
21    efficacy end points that we observed in our prior single
22    arm studies, as well as our overall clinical experience to
23    date with bavituximab. ***We have also conducted further***
24    ***analyses of the top line results, and determined that not***
25    ***only were baseline characteristics well-balanced across***
26    ***all treatment groups, but there are no subgroup***
27    ***differences in geography, age, gender, race, et cetera***.
28    And because of the rigorous trial design, these data have

44

SECOND AMENDED COMPLAINT

ignited a great deal of excitement within the medical
community, with our clinical advisors as well as thought
leaders in the field supporting advancement to Phase III.

(Emphasis added).

219.   The preceding bold and italicized statements made by Defendant Shan in the 4Q Conference Call were materially false and misleading regarding the Phase II Trial for the reasons discussed in ¶ 210 (above).

220.   In addition, at no time during the 4Q Conference Call did Defendant Shan warn the market that Peregrine had not verified the accuracy of the data, had not confirmed that those patients assigned to receive placebo or 1 mg bavituximab had actually received the assigned dose, and thus none of the Defendants knew whether the statements they were making were true.

221.   However, Defendant Shan's statement that Peregrine had "conducted further analyses" of the results of the Phase II Trial misleadingly led investors to believe that the Company had verified the accuracy of the data and thus was truthfully reporting the results of the Phase II Trial.

222.   On August 30, 2012, the Company announced that it had secured a $30 million term loan from the Oxford Group Lenders.  Under the loan facility, the Company received initial funding of $15 million and had the option to receive an addition $15 million.

223.   On this news, Peregrine stock traded up from $2.47 to $2.51.

224.   Defendants were able to secure the loan and draw down the first tranche as a result of the false and misleading statements (¶¶ 47, 48) regarding the Phase II Trial.

225.   On September 7, 2012, the Company issued a press release announcing data from the Phase II Trial was presented at the 2012 Chicago Multidisciplinary Symposium in Thoracic Oncology.  According to the Company, the results indicated that lung cancer patients taking bavituximab lived twice as many months as those

45

1    treated with only chemotherapy.   ("***The interim data showed a statistically***
2    ***significant improvement in overall survival (Hazard Ratio 0.524, p-value .0154)***
3    ***and a doubling of median overall survival (OS) in the bavituximab-containing***
4    ***arms compared to the control arm***.") (Emphasis added).  This statement was false
5    and misleading.  Defendants also claim that the patients given a lower dose of
6    bavituximab and the chemotherapy drug docetaxel lived for a median of 11.1
7    months compared with 5.6 months for patients treated with the chemotherapy drug
8    and a placebo.  Patients given a higher dose of the drug lived for a median of 13.1
9    months, resulting in a pooled survival time of 12.1 months for the treated group.
10   These statements were false and misleading for the reasons discussed in ¶ 210.

11          226.   The Company's September 7, 2012 press release also falsely stated in
12   relevant part:

13                 "***This study was a rigorous trial designed to minimize***
14                 ***bias and we are encouraged that this trial yielded such***
15                 ***positive results in the most important endpoint, overall***
16                 ***survival***.  ***The positive overall response rates and***
17                 ***progression free survival in both bavituximab-***
18                 ***containing arms seen earlier in the study has now***
19                 ***translated into a statistically significant extension in***
20                 ***overall survival for patients, a result rarely achieved in***
21                 ***phase II clinical trials***." said Joseph Shan, vice president
22                 of clinical and regulatory affairs at Peregrine.  "***The***
23                 ***quality of this data gives us a solid foundation for***
24                 ***designing a Phase III trial with an increased probability***
25                 ***of success***.  We are planning for an end-of-phase II
26                 meeting with the FDA as we plan to initiate this trial by
27                 mid-2013."

28

SECOND AMENDED COMPLAINT

The trial enrolled 121 patients (117 evaluable per the study protocol) with second-line non-squamous NSCLC following one prior chemotherapy regimen at over 40 clinical centers.  Patients were equally randomized to 1 of the 3 treatment arms, docetaxel (75mg/m2) plus either placebo, 1 mg/kg bavituximab, or 3 mg/kg bavituximab until disease progression.  Approximately 50% of the patients were enrolled in the U.S. and 50% were enrolled internationally with equal distribution between all treatment groups.

"*Robust data from this Phase II trial clearly demonstrate a significant benefit in overall survival with a good safety profile in patients receiving bavituximab plus docetaxel compared to those receiving docetaxel plus placebo*," said Steven W. King, president and chief executive officer of Peregrine.  […]

*The interim results from the study showed no significant safety differences between the three treatment arms as determined by the trial's independent data monitoring committee*.  Baseline characteristics were well balanced across all three treatment arms of the study, including performance (ECOG) status, age, gender, and race.  Tumor responses were determined in accordance with Response Evaluation Criteria In Solid Tumors (RECIST 1.1) based on blinded central radiology review.

47

SECOND AMENDED COMPLAINT

*"**The median overall survival results from the Proof-of Concept study are truly outstanding and great news for patients**. […]*

(Emphasis added).

227.   The preceding bolded and italicized statements in the September 7, 2012 press release were false and misleading for the reasons discussed in ¶ 210.  In addition, the September 7, 2012 press release failed to warn the market that Peregrine had not verified the accuracy of the data, had not confirmed through P-K testing of the patient blood samples that those patients assigned to receive placebo or 1 mg bavituximab had actually received the assigned dose, and thus none of the Defendants knew whether the statements they were making were true.

228.   After this news, the Company's stock rose from $3.07 to close on September 7, 2012 at $4.50.

229.   On September 10, 2012, the Company issued a press release announcing its First Quarter fiscal year 2013 financial results.

230.   The September 10, 2012 press release noted that the Phase II Trial was unblinded in May 2012 ("We have achieved major milestones since the end of last quarter with the ***unblinding of our proof-of-principle bavituximab study in second-line NSCLC in May*** and the recent announcement of overall survival data from the study being the most significant.") (Emphasis added).

231.   Further, the September 10, 2012 press release falsely stated the following:

[…] ***The statistically significant overall survival seen in that study is an obvious green light for us to begin plans to advance the program into phase III and goes a long way toward validating the technology platform***," said

48

1                  Steven W. King, president and chief executive officer of

2                  Peregrine.

3  (Emphasis added).

4        232.  The preceding bolded and italicized statements in the September 10,

5  2012 press release were false and misleading for the reasons discussed in ¶ 210.  In

6  addition, the September 10, 2012 press release failed to warn the market that

7  Peregrine had not verified the accuracy of the data, had not confirmed through P-K

8  testing of the patient blood samples that those patients assigned to receive placebo or

9  1 mg bavituximab had actually received the assigned dose, and thus none of the

10  Defendants knew whether the statements they were making were true.

11        233.  On September 10, 2012, the Company conducted its First Quarter 2013

12  Conference Call ("1Q Conference Call").  It was on that call that Defendant King

13  stated the following:

14                  Since the beginning of last quarter, it has been an

15                  exceptional time for Peregrine, as we have seen two of

16                  the most important milestones in the Company history

17                  achieved, transitioning the Company toward late-stage

18                  drug development.  ***The exclamation point for these***

19                  ***milestones came just last Friday with the report that***

20                  ***patients receiving Bavituximab plus chemotherapy in***

21                  ***our proof-of-concept studying second-line non-small-***

22                  ***cell lung cancer had double the median overall survival***

23                  ***compared to patients receiving chemotherapy plus***

24                  ***placebo***.  ***These are truly remarkable results that are not***

25                  ***only great for the program, providing a clear signal to***

26                  ***proceed toward a Phase III clinical trial, providing***

27                  ***proof of concept that Bavituximab is an active drug***

28

1         ***when given with Docetaxel, but also great news for the***

2         ***non-small-cell lung cancer patients in the trial***.

3 (Emphasis added).

4     234.   Defendant Kings' bolded statements in paragraph 233 (above) were

5 materially false and misleading for the reasons set forth in ¶ 210 above.

6     235.   In addition, Defendant King failed to warn the market that Peregrine

7 had not verified the accuracy of the data, had not confirmed through P-K testing of

8 the patient blood samples that those patients assigned to receive placebo or 1 mg

9 bavituximab had actually received the assigned dose, and thus none of the

10 Defendants knew whether the statements they were making were true.

11     236.   At the same 1Q Conference Call, Defendant Shan stated in relevant

12 part:

13         ***Bavituximab continues to demonstrate a favorable***

14         ***safety profile, with a combination of Docetaxel plus***

15         ***Bavituximab being well tolerated, with no increase in***

16         ***frequency or nature of adverse events compared to the***

17         ***control arm***.  Notably, no increase in bleeding or clotting

18         adverse events were reported with the addition of

19         Bavituximab, unlike the experience with other

20         compounds which target blood vessels.

21

22         In terms of efficacy outcomes, let me start with the

23         primary endpoint, overall response rate, or ORR, which

24         was determined by independent central radiology reviews

25         according to RECIST criteria, or Response Evaluation

26         Criteria in Solid Tumors.  ***As reported in May when the***

27         ***study was initially unblinded, the response rate in the***

28         ***Docetaxel plus placebo arm was 8% compared to 15%***

> *in the Bavituximab 1-milligram per kilogram arm.  And*
> *18% in the Bavituximab 3-milligramper kilogram arm.*
> *And 16.5% in the pooled Bavituximab arm.*

(Emphasis added).

237.  Defendant Shan's bold and italicized statements in paragraph 236 (above) were materially false and misleading for the reasons set forth in ¶ 210 above.

238.  In addition, Defendant Shan failed to warn the market that Peregrine had not verified the accuracy of the data, had not confirmed through P-K testing of the patient blood samples that those patients assigned to receive placebo or 1 mg bavituximab had actually received the assigned dose, and thus none of the Defendants knew whether the statements they were making were true.

239.  At the same 1Q Conference Call, Defendant Garnick, Head of Regulatory Affairs at the Company, stated in relevant part:

> As you have just heard from Joe, *the data we announced*
> *last week has far exceeded our expectations*.  […]

(Emphasis added).

240.  Defendant Garnick' statements in paragraph 239 (above) were materially false and misleading for the reasons set forth in ¶ 210 above.

241.  In addition, Defendant Garnick failed to warn the market that Peregrine had not verified the accuracy of the data, had not confirmed through P-K testing of the patient blood samples that those patients assigned to receive placebo or 1 mg bavituximab had actually received the assigned dose, and thus none of the Defendants knew whether the statements they were making were true.

242.  At the same 1Q Conference Call, Defendant Lytle, CFO of the Company, stated in relevant part:

> *This second tranche becomes available to us upon the*
> *attainment of certain pre-determined milestones, one of*

SECOND AMENDED COMPLAINT

> *which was just achieved last Friday with the announcement of the positive overall survival data from our second-line lung cancer trial*.  […]

(Emphasis added).

243.   Defendant Lytle's statements in paragraph 242 (above) were materially false and misleading for the reasons set forth in ¶ 210 above.

244.   In addition, Defendant Lytle failed to warn the market that Peregrine had not verified the accuracy of the data, had not confirmed through P-K testing of the patient blood samples that those patients assigned to receive placebo or 1 mg bavituximab had actually received the assigned dose, and thus none of the Defendants knew whether the statements they were making were true.

245.   On September 10, 2012, the Company filed its 1Q 2013 Form 10-Q. The 1Q 2013 Form 10-Q contained the positive findings concerning bavituximab that were contained in the Company's September 7, 2012 press release.  Defendants King and Lytle signed the 1Q 2013 Form 10-Q attesting to the accuracy of the information presented in the SEC filing.

246.   The 1Q 2013 Form 10-Q stated the following regarding the Company's Phase II Trial in Second-Line Non-Small Cell Lung Cancer, and the statements in bold were materially false and misleading:

> […]  *In May 2012, we announced positive top-line overall response rate ("ORR") data (primary endpoint) and median progression-free survival ("PFS") (one secondary endpoint) from this trial from 117 evaluable patients, based on independent radiology reviews and current status of patients as of that date, as shown in the following table*:

52

| Treatment Arm | Placebo plus docetaxel | Bavituximab (1 mg/kg) plus docetaxel | Bavituximab (3 mg/kg) plus docetaxel) |
|---|---|---|---|
| *Overall Response Rate* | *7.9%* | *15%* | 17.9% |
| *Median Progression-Free Survival* | *3.0 months* | *4.2 months* | 4.5 months |

In addition, on September 7, 2012, we presented compelling interim median overall survival data ("OS"), another secondary endpoint from the trial, at the 2012 Chicago Multidisciplinary Symposium in Thoracic Oncology. ***The data presented showed a doubling of median OS in each of the bavituximab-containing arms compared to the control arm, representing a significant improvement in survival***.

(Emphasis added).

247. The 1Q 2013 Form 10-Q statements in bold were materially false and misleading for the reasons set forth in ¶ 210 above.

248. In addition, the 1Q 2013 Form 10-Q failed to warn the market that Peregrine had not verified the accuracy of the data, had not confirmed through P-K testing of the patient blood samples that those patients assigned to receive placebo or 1 mg bavituximab had actually received the assigned dose, and thus none of the Defendants knew whether the statements they were making were true.

249. Further, the statements made in ¶¶ 206, 207, 211, 212, 214, 215, 218, 225, 226, 230, 231, 233, 236, 239, 242, 246 (above) regarding the efficacy of bavituximab in treating second-line NSCLC patients were materially false and misleading because:

53

SECOND AMENDED COMPLAINT

(a)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Sections 5.1.1 of the ICH on Good Clinical Practice, E6 ("***The sponsor is responsible for implementing and maintaining quality assurance and quality control systems*** with written SOPs to ensure that trials are conducted and data are generated, documented (recorded), and reported in compliance with the protocol, GCP, and the applicable regulatory requirement(s)") (Emphasis added).  "Quality Assurance (QA)" is defined by Section 1.46 of E6 of the ICH on Good Clinical Practices as "all those planned and systematic actions that are established to ensure that the trial is performed and the data generated, documented (recorded), and reported in compliance with Good Clinical Practice (GCP) and the applicable regulatory requirements.";

(b)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Section 5.1.3 of the ICH on Good Clinical Practice, E6 ("Quality control should be applied to each stage of data handling to ensure that all data are reliable and have been processed correctly");

(c)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Section 5.2.1 of the ICH on Good Clinical Practice, E6 ("A sponsor may transfer any or all of the sponsor's trial-related duties and functions to a [Contract Research Organization] CRO, ***but the ultimate responsibility for the quality and integrity of the trial data always resides with the sponsor***") (Emphasis added);

(d)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Section 5.5.1 of the ICH on Good Clinical Practice, E6 ("The sponsor should utilize appropriately qualified individuals to supervise the overall conduct of the trial, to handle the data, to verify the data, to conduct the statistical analyses, and to prepare the trial reports.");

SECOND AMENDED COMPLAINT

(e)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Section 5.13.1 of the ICH on Good Clinical Practice, E6 ("The sponsor should ensure that the investigational product(s) (including active comparator(s) and placebo, if applicable) is characterized as appropriate to the stage of development of the product(s), is manufactured in accordance with any applicable GMP, and is coded and labeled in a manner that protects the blinding, if applicable. In addition, the labeling should comply with applicable regulatory requirement(s).");

(f)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Section 5.18.1 of the ICH on Good Clinical Practice, E6 ("The purposes of trial monitoring are to verify that: . . . *The reported trial data are accurate, complete, and verifiable from source documents*.  […].") (Emphasis added).  "Source Documents" is defined by Section 1.52 of E6 of the ICH on Good Clinical Practices as "original documents, data, and records (e.g., hospital records, clinical and office charts, laboratory notes, memoranda, subjects' diaries or evaluation checklists, pharmacy dispensing records, recorded data from automated instruments, copies or transcriptions certified after verification as being accurate copies, microfiches, photographic negatives, microfilm or magnetic media, x-rays, subject files, and records kept at the pharmacy, at the laboratories and at medico-technical departments involved in the clinical trial.";

(g)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Section 5.18.3 of the ICH on Good Clinical Practice, E6 ("*The sponsor should ensure that the trials are adequately monitored*. […].") (Emphasis added);

(h)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Section 5.18.4(d) of the ICH on Good

SECOND AMENDED COMPLAINT

Clinical Practice, E6 ("Verifying that the investigator follows the approved protocol and all approved amendment(s), if any.");

(i)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Section 5.18.4(h) of the ICH on Good Clinical Practice, E6 ("**_Verifying_** that the investigator and the investigator's trial staff are performing the **_specified trial functions_**, in accordance with the protocol and any other written agreement between the sponsor and the investigator/institution, and have not delegated these functions to unauthorized individuals.") (Emphasis added);

(j)     Defendants had not properly administered and monitored the Phase II Trial in accordance with Section 5.18.3 of the ICH on Good Clinical Practice, E6 ("**_The sponsor should ensure that the trials are adequately monitored_**. [...]") (Emphasis added);

(k)     Defendants violated FDA Guideline on the Preparation of Investigational New Drug Products, 21 CFR § 211.125 ("**_Strict control shall be exercised over labeling issued for use in drug product labeling operations_** . . . .") (Emphasis added);

(l)     Defendants violated FDA Guideline on the Preparation of Investigational New Drug Products, 21 CFR § 211.130 ("written procedures be designed **_and followed_** to assure that correct labels and labeling materials are used for drug products") (Emphasis added);

(m)     Defendants admitted in the Company's 2012 Form 10-K that the Company's reliance on third parties does not relieve them of Good Clinical Practice for conducting, monitoring, recording and reporting the results of clinical trials to ensure that the data and results are scientifically credible, accurate and viable; however, this statement was false as Defendants never conducted a **_thorough operational review_** of the third-party vendor operation

56

1    to ensure the accuracy of their interim reporting of the Phase II Trial (as

2    Defendants later admitted to in the Company's January 7, 2013 press release);

3    (n)    Defendants failed to properly ensure that "all clinical trial

4    information" was "recorded, handled and stored in a way that allows its

5    accurate reporting, interpretation and verification"  in violation of Section

6    2.10 of the ICH on Good Clinical Practice, E6; and

7    (o)    Defendants had not properly administered and monitored the

8    Phase II Trial in accordance with Section 5.18.4(k) of the ICH on Good

9    Clinical Practices, E6 ("*Verifying* that source documents and other trial

10   records are accurate, complete, kept up-to-date and maintained.") (Emphasis

11   added).

12   250.  Furthermore, Peregrine lacked the proper internal controls related to

13   conducting clinical trials and reporting the results of the clinical trials (*see* CW1 (¶

14   121), CW3 (¶¶ 132, 133), CW10 (¶ 171)).

15   251.  During the Class Period, the Company's reports on the significance of

16   the data from the Phase II Trial gave investors a false-positive conclusion of the

17   outcome from the Phase II Trial.  Until a clinical study is completed and proper

18   administration of the study's medications to the patients is confirmed and analyzed,

19   a projected outcome based on partial data cannot be cited as statistical evidence of

20   safety or efficacy.

21   252.  Further, one of the most important values that can be assigned to

22   findings by the process of statistical analysis is the p-value, or "probability" value.

23   253.  The p-value is a number between 0.00 and 1.0, and is used to

24   demonstrate the strength of a conclusion drawn from clinical trial data.  It enables

25   analysts to assign a widely accepted numerical value to the strength of a statement or

26   hypothesis.  Essentially, the p-value measures consistency between the results

27   actually obtained in the trial and the "pure chance" explanation for those results.

28

SECOND AMENDED COMPLAINT

254.   A statement and corresponding p-value are considered of strong significance if the probability of the same reaction occurring randomly or by chance is less than one in twenty, or 5%, corresponding to a p-value of $p<0.05$.

255.   The Company made an announcement on September 7, 2012, about the interim data as to the overall survival of patients purportedly gathered from the Phase II Trial and claimed that the p-value was .0154.  This p-value, if accurate, would be statistically significant in showing that bavituximab had been efficacious in the Phase II Trial.  However, this description of the p-value as to the overall survival of patients was false and misleading as it was based on false data.  Peregrine later admitted on February 19, 2013, that the p-value as to the overall survival of patients was 0.217, which means that chance would be responsible for the outcome of the data in more than one of five times, which is not statistically significant.  Peregrine also failed to disclose any reason for the extreme negative change as to the p-value in the overall survival of patients from the earlier reported data.

256.   On September 24, 2012, the Company issued a press release entitled *Peregrine Pharmaceuticals Announces That It Has Discovered Major Discrepancies in Treatment Group Coding by an Independent Third-Party Vendor Responsible for Distribution of Blinded Investigational Product Used in Its Bavituximab Phase II Second-Line Non-Small Cell Lung Cancer Trial*, which stated in relevant part:

> Peregrine Pharmaceuticals announced today that during the course of preparing for an end-of-phase II meeting with regulatory authorities and following recent data announcements from its randomized, double-blind placebo-controlled Phase II trial of bavituximab in second-line non-small cell lung cancer, *it discovered major discrepancies between some patient sample test results and patient treatment code assignments*.  Due to the double-blind nature of the trial, Peregrine was not

58

SECOND AMENDED COMPLAINT

1    permitted to have access to either patient group
2    assignments or related product coding information.  As
3    part of the trial's execution, Peregrine contracted with
4    independent third-party contractors to execute treatment
5    group assignments and oversee clinical trial material
6    coding and distribution according to established
7    procedures.  A subsequent review of information has
8    determined that the source of these discrepancies appear
9    to have been associated with the independent third-party
10   contracted to code and distribute investigational drug
11   product.

12

13   This discrepancy is specific to this trial and will have no
14   impact on other ongoing bavituximab trials.

15

16   Peregrine intends to communicate further as soon as it is
17   able to determine the impact of this issue.  *__In the__*
18   *__meantime, investors should not rely on clinical data that__*
19   *__the company disclosed__* __*on or before*__ *__September 7, 2012__*
20   *__from its Phase II bavituximab trial in patients with__*
21   *__second-line non-small cell lung cancer or any__*
22   *__presentations or other documents related to this Phase__*
23   *__II trial__*.

24   (Emphasis added).

25       257.  After this news, the Company's stock plummeted $4.23 per share to
26   close at $1.16 per share on September 24, 2012, a one-day decline of 78%.

27       258.  Further, the Company's September 24, 2012 press release directs
28   investors not to "rely on the clinical data that the company disclosed on or before

SECOND AMENDED COMPLAINT

September 7, 2012" but it makes **no mention of the clinical data the company disclosed on September 10, 2012** (*see* ¶¶ 229-46 above).  Defendants' exclusion of the September 10, 2012 statements to investors in the September 24, 2012 press release was false and misleading as it gave the impression that the various statements made by Defendants on September 10, 2012 discussing the data from the Phase II Trial were still true and accurate when they were not.

259.  On September 26, 2012, the Company filed a Form 8-K with the SEC, which disclosed that it had received a written notice of default from the Oxford Group Lenders on September 24, 2012 (**the same day** the Company issued a press release that investors should not rely on the clinical data), with respect to a security agreement the Company had entered into on August 30, 2012.  According to the Company, the Oxford Group Lenders deemed the Company's disclosure on September 24, 2012, concerning the major discrepancies in the results from its cancer trial to be a material adverse change under the terms of the loan agreement and, as result, the Oxford Group Lenders accelerated the repayment of the loan and demanded repayment in full for the outstanding amounts.  The Company's Form 8-K stated in relevant part:

> On September 24, 2012, we received a written notice of default ("Notice of Default") from Oxford Finance LLC, as collateral agent ("Collateral Agent"), on behalf of itself, Silicon Valley Bank, and MidCap Financial SBIC, LP (collectively, the "Lenders"), with respect to that certain loan and security agreement dated as of August 30, 2012, by and among Peregrine, its wholly owned subsidiary, Avid Bioservices, Inc., and the Lenders (the "Loan Agreement").  **Pursuant to the Notice of Default, all amounts due under the Loan Agreement were accelerated as a result of the above event**, **which was**

SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8

*deemed a material adverse change under the Loan Agreement, and the Lenders demanded full payment of all obligations under the Loan Agreement, including the outstanding principal amount of $15 million and all accrued interest thereon, plus a final payment fee equal to 6.5% of the principal amount repaid*.  On September 25, 2012 Peregrine paid the Lenders all outstanding obligations and the Loan Agreement was terminated.

9  (Emphasis added).

10    260.  It is no coincidence that on September 24, 2012 all of the following happened: (a) Peregrine announced the "major discrepancies" with the Phase II Trial data; (b) Peregrine filed suit against CSM; and (c) Oxford Group Lenders called the loan.  The reasonable inference is that Peregrine had knowledge of the "major discrepancies" many days in advance of September 24, 2012 in order to retain counsel and research, prepare and file a complaint against CSM.

16    261.  It is also a reasonable inference that Peregrine gave the Oxford Group Lenders advanced information on the "major discrepancies" well in advance of September 24, 2012 so that Oxford could consider its rights under the loan documents and Peregrine could have an opportunity to attempt to persuade Oxford not to call the loans.

21    262.  On this September 26, 2012 news that Oxford Group Lenders was calling its loan, the Company's stock declined $0.55 per share to close at $1.11 per share on September 27, 2012, a one-day decline of 33% as demonstrated in the chart below:

25
26
27
28

61

SECOND AMENDED COMPLAINT



263.   Defendants' concealment that the Oxford Group Lenders had called the loan on September 24, 2012 was a material omission that further damaged investors.

264.   As a result of Defendants' materially false and misleading statements made regarding the data gathered from the Phase II Trial from May 2012 through September 26, 2012, Peregrine securities traded at artificially inflated levels during the Class Period.  However, after the September 24 and 26 statements by Defendants reached the market, the Company's shares were hammered by massive sales, sending them down first 78% and the 33%.

### POST CLASS PERIOD ADMISSIONS

265.   Defendants admit that it was through a "*routine collection* of data in advance of the [C]ompany's end-of-Phase II meeting with regulatory authorities" that they discovered the discrepancies they claim existed in the randomized, double-blind placebo-controlled Phase II Trial of bavituximab in second-line NSCLC.  *See* December 10, 2012 Company press release entitled *Peregrine Pharmaceuticals*

SECOND AMENDED COMPLAINT

1    *Reports Second Quarter Fiscal Year 2013 Financial Results and Recent*

2    *Developments* (emphasis added) and October 17, 2012 press release entitled

3    *Peregrine Pharmaceuticals Provides Update on Corporate Activities* ("Peregrine is

4    also conducting a detailed internal review into the discrepancies tied to the

5    randomized, double-blind placebo-controlled Phase II trial of bavituximab in

6    second-line NSCLC ***that were discovered as part of the routine collection of data*** in

7    advance of the company's end-of-Phase II meeting with regulatory authorities.")

8    (Emphasis added).

9    **A.      The Individual Defendants Had Substantial**

10            **Motivation to Make False and/or Misleading Statements**

11            266.   Oxford is a lending institution with a long history of providing capital

12   exclusively to life sciences and healthcare services companies throughout the world.

13   Oxford prides itself on having a valued reputation for fairness and flexibility and

14   claims to have achieved success by building solid relationships with its many clients.

15   Oxford claims to have an extraordinarily knowledgeable lending team well-versed in

16   science and healthcare and states that it works diligently to understand the specific

17   goals of individual clients and provide sound financial solutions for their growth and

18   development.   Oxford prides itself on partnering with its clients for the long-term

19   and represents that it is committed to serve as a steadfast resource to its clients.

20            267.  MidCap is a commercial finance firm that focuses exclusively on

21   providing debt solutions to middle-market life-science and healthcare companies.

22   MidCap provides a broad array of products intended to finance the growth and

23   manage the working capital of companies spanning the breadth of the healthcare

24   industry.   MidCap believes that companies in the life-science and healthcare

25   industries need a lender that understands their business and has the creativity and

26   flexibility to provide financing solutions that are suited to their needs.   MidCap

27   prides itself on its years of experience and strong balance sheet which make it the

28   lender of choice for these companies.

SECOND AMENDED COMPLAINT

268.   SVB has $23 billion in assets and more than 1,600 employees.  SVB provides commercial, international and private banking through 34 locations worldwide.  SVB prides itself on being the bank of choice for the world's most innovative companies and exclusive wineries, and believes that its diverse financial services, knowledge, global network, and world class service increase their clients' probability of success.  SVB also takes pride in being ranked by *Forbes* magazine as America's Best Banks.

269.   The Individual Defendants were deliberately reckless in their positive touting of the unverified data of the Phase II Trial because they needed to achieve positive results in this Phase II Trial in order to induce the Oxford Group Lenders to make the loan and allow Peregrine to draw down the first tranche ($15 million) of money that could be borrowed.

270.   Defendant Lytle admitted that Defendants' statements that the Phase II Trial data was positive is what allowed Peregrine to satisfy one of the two (2) conditions necessary before Peregrine could then draw down the second tranche of $15 million of the Oxford Group Lenders' loan facility.  *See* ¶ 242.

271.   It was therefore shocking that the Oxford Group Lenders would declare a material adverse change in circumstances and accelerate the loan to Peregrine **on the very day** (September 24, 2012) that Peregrine announced to the market that its prior statements about the interim data could no longer be relied upon.

272.   The compelling inference is that the deliberate recklessness of Peregrine and its management team (the Individual Defendants herein), in touting the Phase II Trial data findings as positive to induce the Oxford Group Lenders to make the loan without verifying the accuracy of the data and even failing to take the rudimentary step of verifying that the patients who were supposed to receive the placebo actually received it and those who were supposed to receive the 1 mg of bavituximab actually received it, so alarmed the Oxford Group Lenders that it called the loan.

SECOND AMENDED COMPLAINT

273.   Further, the Oxford Group Lenders had more to gain from the success of the Phase II Trial than from calling the loan as they were issued warrants to purchase stock as part of the loan agreement.   Thus, the Oxford Group Lenders would have profited more had Peregrine drawn down the full $30 million as greater interest would have accumulated, the stock would not have been further diluted, and had the Phase III trial been successful, their warrants would be more valuable.   At that point, the warrants would have produced a large profit for the Oxford Group Lenders.   Only the deliberate recklessness of Defendants alarmed the Oxford Group Lenders into terminating the lending relationship because of the "major discrepancies" with the Phase II Trial data.

274.   Moreover, the Oxford Group loan was critical to Peregrine as it: (i) strengthened the Company's balance sheet (*see* August 30, 2012 Company press release entitled *Peregrine Pharmaceuticals Secures $30 Million Loan Facility* ("This loan facility strengthens our balance sheet . . .")); (ii) provided the Company with sufficient capital to fund its operations for 12 months as the Company advanced toward Phase III development (*see id.* ("With the potential $30 million in total funding, we will have sufficient capital to fund our operations for at least the next 12 months . . .")); (iii) demonstrated to the market that outside entities were confident in the Phase II Trial; and (iv) stopped the issuance of Peregrine stock "at-the-market" offerings (and in turn stopped the dilution of Peregrine stock harmful to the Individual Defendants' ownership interest).

///
///
///

SECOND AMENDED COMPLAINT

275.   Defendants King, Lytle and Shan were also motivated to make false and misleading statements regarding the Phase II Trial in order to retain their positions and lucrative annual salaries.   For example, Defendants received the following annual base salaries in 2012:

| Defendant | Position | Annual Base Salary |
|---|---|---|
| King | CEO, President and Director | $429,000 |
| Lytle | CFO | $325,812 |
| Shan | VP, Clinical and Regulatory Affairs | $260,000 |

276.   Further, according to the Company's Form 10-K for fiscal year ended April 30, 2013 ("2013 Form 10-K"),[1] "[t]he approved target bonus percentages for named executive officers for fiscal year 2013, and each year thereafter unless and until modified by resolution of the Compensation Committee, were as follows: Steven W. King – 60%; Paul J. Lytle – 40%; […] [and] Joseph S. Shan – 35% . . . ." "In addition, under the Bonus Plan, each participant's target bonus percentages can be further adjusted by a corporate factor ranging from 0 to 1.5 times, based on the Company's achievement of other factors as determined by the Compensation Committee, including but not limited to, performance of day-to-day responsibilities and participation in the achievement of the corporate goals and achievement of individual goals determined by the Compensation Committee."

277.   In addition, according to the Company's 2013 Form 10-K, (*which covers the Company's fiscal quarters ending July 31, 2012 and October 31, 2012 – the First and Second Quarter of the Company's fiscal year*) "on July 8, 2013, following a detailed review of the status of the Company's fiscal year 2013 corporate goals, and each named executive officer's contribution to the attainment of such corporate goals, as well as his or her attainment of individual goals for fiscal

---

[1]     Peregrine operates on a fiscal year calendar which ends April 30th of each year.

SECOND AMENDED COMPLAINT

year 2013 (which includes **the Company's fiscal quarters ending July 31, 2012 and October 31, 2012 – the First Quarter and Second Quarter of the Company's fiscal year**), and such other factors under the Bonus Plan as the Compensation Committee deemed relevant, the Compensation Committee approved and awarded the following cash bonuses for fiscal year 2013 to the named executive officers pursuant to the Bonus Plan: Steven W. King – $313,706; Paul J. Lytle – $158,833; […] [and] Joseph S. Shan – $88,725. . . ."

278.   Defendant Garnick is employed as a consultant to the Company in the position as Head of Regulatory Affairs through Lone Mountain Biotechnology and Medical Devices, Inc.   Defendant Garnick was motivated to make false and misleading statements regarding the Phase II Trial in order to retain his position as a consultant to the Company.

279.   On May 4, 2012, the Compensation Committee granted King an award of 500,000 stock options under the Company's shareholder-approved 2011 Stock Incentive Plan (the "Incentive Plan").   At the time the award was made, the Incentive Plan limited the number of shares covered by an award that could be granted to an executive officer in a fiscal year to 250,000.   Specifically, Section 5.4 of the Incentive Plan stated: "the maximum number of shares of Stock that may be granted to any one Participant, who is a Covered Employee, during any of the Company's fiscal years with respect to one or more Awards shall be two hundred fifty thousand (250,000)."

280.   Further, even though the Company had recently disclosed on September 24, 2012 that the data announced from its Phase II Trial was not to be relied upon, nonetheless, on December 27, 2012, Peregrine's Compensation Committee "approved a broad base grant of stock options ("December 2012 Grants") to substantially all of the Company's employees, the Company's three non-employee directors and four consultants to purchase an aggregate of 3,560,125 shares of common stock."   Defendants King and Lytle each received 200,000 options and

SECOND AMENDED COMPLAINT

Defendant Shan received 150,000 options.  The Company further stated in its Form 8-K filed with the SEC on December 28, 2012 that the grants of options were "non-routine" and that the Compensation Committee had deemed them necessary for the following purposes:

> promoting employee retention and in the best interest of the Company and its stockholders given the Company's (i) recent agreement with the U.S. Food and Drug Administration on the design of a single registration trial for Cotara in patients with recurrent glioblastoma multiforme and the need to focus significant time and effort on moving this trial forward, including efforts to seek a partner, ***(ii) need to complete the Company's detailed internal review of its Phase II second-line non-small cell lung cancer trial with bavituximab***, (iii) need for its biomanufacturing subsidiary, Avid Bioservices, to meet its existing customer obligations, plus continue to expand its client base, and (iv) need to meet other corporate goals and objectives, all of which are necessary to continue to maintain and enhance stockholder value.

(Emphasis added).

281.   In other words, the Individual Defendants were being rewarded for verifying now the Phase II Trial data they should have verified previously through simple P-K testing before they falsely touted its accuracy and importance.

282.   That same day, the Company's Compensation Committee approved increases in annual base salary for Peregrine's Executive Officers.  The Compensation Committee raised Defendant King's salary to $446,160, Defendant Lytle's salary to $338,844, and Defendant Shan's to $270,400.

SECOND AMENDED COMPLAINT

283.   In addition, as demonstrated in ¶¶ 27, 28, 29 above, Defendants King, Shan and Lytle all succeeded in increasing their stock ownership in the Company from fiscal year end 2012 to fiscal year end 2013.

284.   Defendants' motive to prematurely trumpet the Phase II Trial results as positive and true was to tout the value of Peregrine and bavituximab in order to:  (1) increase the amount of stock holdings each owned in the Company while the stock price was depressed; (2) make themselves invaluable to the Company; (3) make the Company dependent upon them to fix any problems they themselves caused; (4) induce partners to joint venture with Peregrine; (5) obtain operating loans to avoid dilution of Peregrine stock; (6) preserve their jobs and the value of their own personal Peregrine stock and options; (7) keep the Company afloat; and (8) survive to move into a Phase III clinical trial, all in the deliberately reckless hope that nothing amiss with the Phase II Trial data would be discovered and Peregrine could slide into a Phase III study.

**B.     Defendants Possessed The Information To Determine Who Received Bavituximab and Who Received Placebo After The Trial Was Unblinded in May 2012**

285.   As early as the unblinding of the Phase II Trial in May of 2012, Peregrine also possessed a test to detect the presence of HACA in a patient's blood who received bavituximab.  *See, e.g.*, CW1 (¶ 124), CW3 (¶ 130), CW9 (¶ 166), CW10 (¶ 173, 175), CW20 (¶ 96).  CW3, CW9, and CW10 stated that they were familiar with the HACA test used by Peregrine and CW3 and CW 10 stated that it had been conducted on patient blood samples many times during his tenure with Peregrine.  *See* ¶¶ 130, 173, 175.  A patient who had received placebo should not have any HACA in his or her blood sample as a person assigned to receive placebo should not have received bavituximab containing mouse DNA and thus no HACA should have been generated in his/her blood in response.

SECOND AMENDED COMPLAINT

286. As early as the unblinding of the Phase II Trial in May of 2012, Peregrine had the ability to conduct P-K tests on blood samples of all of the 117 patients in the Phase II Trial and confirm using the now unblinded patient identification codes that those who were supposed to have received placebo did not in fact have bavituximab in their blood and to confirm that those who were supposed to have received bavituximab did in fact have bavituximab in their blood samples. *See, e.g.*, CW1 (¶¶ 123, 131); CW3 (¶¶ 135); CW9 (¶¶ 164, 167, 168, 169); CW10 (¶¶ 175, 181, 182, 183, 184, 187); CW11 (¶¶ 61, 63, 195, 196, 197, 198, 199, 201, 202); CW15 (¶ 103); CW17 (¶ 105).

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

287. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired Peregrine's securities between May 21, 2012 and September 26, 2012, inclusive, seeking to pursue remedies under the Exchange Act.

288. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

289. Record owners and other members of the Class may be identified from records maintained by Peregrine or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

290. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

291. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

SECOND AMENDED COMPLAINT

292.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts regarding the efficacy of bavituximab in treating second-line NSCLC cancer patients; and

(c)   whether the members of the Class have sustained damages and, if so, the proper measure of damages.

293.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### Loss Causation

294.   Defendant's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

295.   During the Class Period, as detailed herein, Defendants made materially false and misleading statements and were deliberately reckless such that the market was deceived and by this course of conduct, the price of Peregrine securities was artificially inflated and this deliberately reckless course of conduct operated as a fraud or deceit on Class Period purchasers of Peregrine securities by misrepresenting the significance of the clinical data gathered as to the efficacy of bavituximab in treating second-line NSCLC cancer patients.   Later, when Defendants' prior misrepresentations and material omissions became apparent to the market, the price of Peregrine securities fell precipitously, as the prior artificial inflation came out of

SECOND AMENDED COMPLAINT

1  the price.  As a result of their purchases of Peregrine securities during the Class

2  Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*,

3  damages, under the federal securities laws.

**Applicability of Presumption of Reliance:**

**<u>Fraud-on-the-Market Doctrine</u>**

6  296.  At all relevant times, the market for Peregrine's securities was an

7  efficient market for the following reasons, among others:

8      (a)    Peregrine met the requirements for listing on the NASDAQ, a

9  highly efficient and automated market;

10      (b)    During the Class Period, on average, millions of shares were

11  traded weekly, demonstrating a very active and broad market for Peregrine

12  securities and permitting a strong presumption of an efficient market;

13      (c)    As a regulated issuer, Peregrine filed periodic public reports with

14  the SEC;

15      (d)    Peregrine regularly communicated with public investors via

16  established market communication mechanisms, including through regular

17  disseminations of press releases on the national circuits of major newswire

18  services and through other wide-ranging public disclosures, such as

19  communications with the financial press and other similar reporting services;

20  and

21      (e)    Unexpected material news about Peregrine was rapidly reflected

22  and incorporated into the Company's securities price during the Class Period.

23  297.  As a result of the foregoing, the market for Peregrine's securities

24  promptly digested current information regarding Peregrine from all publicly

25  available sources and reflected such information in the price of Peregrine's

26  securities.  Under these circumstances, all purchasers of Peregrine's securities during

27  the Class Period suffered similar injury through their purchase of Peregrine's

28  securities at artificially inflated prices, and a presumption of reliance applies.

1

2

3

4

## FIRST CLAIM

### Violation of Section 10(b) Of

### The Exchange Act and Rule 10(b)-5

### Promulgated Thereunder Against All Defendants

5   298. Plaintiff repeats and re-alleges each and every allegation contained

6   above as if fully set forth herein.

7   299. This claim is brought against Peregrine and all of the Individual

8   Defendants.

9   300. During the Class Period, Defendants carried out a plan, scheme and

10  course of conduct which was intended to and, throughout the Class Period, did: (a)

11  deceive the investing public, including Plaintiff and other Class members, as alleged

12  herein; and (b) caused Plaintiff and other members of the Class to purchase

13  Peregrine's securities at artificially inflated prices. In furtherance of this unlawful

14  scheme, plan and/or reckless course of conduct, Defendants, and each of them, took

15  the actions set forth herein.

16  301. Defendants (a) employed devices, schemes, and artifices to defraud; (b)

17  made untrue statements of material fact and/or omitted to state material facts

18  necessary to make the statements not misleading; and (c) engaged in acts, practices,

19  and a course of business that operated as a fraud and deceit upon the purchasers of

20  the Company's securities in an effort to maintain artificially high market prices for

21  Peregrine's securities in violation of Section 10(b) of the Exchange Act and Rule

22  10(b)-5 thereunder. All Defendants are sued either as primary participants in the

23  wrongful and illegal conduct charged herein or as controlling persons as alleged

24  below.

25  302. Defendants employed devices, schemes and artifices to defraud, while

26  in possession of material adverse non-public information and engaged in acts,

27  practices, and/or a reckless course of conduct as alleged herein in an effort to assure

28  investors of Peregrine's value and performance and continued substantial growth,

73

which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Peregrine and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and/or a reckless course of business that operated as a fraud and deceit upon the purchasers of Peregrine's securities during the Class Period.

303.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (a) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's data from the Phase II Trial; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's Phase II Trial, finances and operations at all relevant times; and (d) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

304.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain, verify and to disclose such facts, even though such facts were available to them.   As demonstrated by Defendants' false and misleading statements issued throughout the Class Period, Defendants, if they did not have actual knowledge of the omissions alleged, were deliberately reckless in failing to obtain such knowledge by deliberately refraining from taking those steps

SECOND AMENDED COMPLAINT

1   necessary to verify whether the clinical data reported regarding the Phase II Trial
2   was true and accurate or false and misleading.

3   305.   As a result of the dissemination of the materially false and misleading
4   information and failure to verify and disclose material facts, as set forth above, the
5   market price of Peregrine's securities was artificially inflated during the Class
6   Period. In ignorance of the fact that market prices of Peregrine's securities were
7   artificially inflated, and relying directly or indirectly on the misleading statements
8   and Company press releases issued by Defendants, or upon the integrity of the
9   market in which the Company's securities trades, and/or on the absence of material
10  adverse information that was known to or recklessly disregarded by Defendants but
11  not disclosed in public statements by Defendants during the Class Period, Plaintiff
12  and the other members of the Class acquired Peregrine securities during the Class
13  Period at artificially high prices and were or will be damaged thereby.

14  306.   At the time of said omissions and/or materially false and misleading
15  statements, Plaintiff and other members of the Class were ignorant of their
16  misleading nature, and believed them to be true.  Had Plaintiff and the other
17  members of the Class and the marketplace known the truth regarding the clinical
18  data reported regarding Peregrine's Phase II Trial, Plaintiff and other members of
19  the Class would not have purchased or otherwise acquired their Peregrine securities,
20  or, if they had acquired such securities during the Class Period, they would not have
21  done so at the artificially inflated prices that they paid.

22  307.   By virtue of the foregoing, Defendants have violated Section 10(b) of
23  the Exchange Act, and Rule 10b-5 promulgated thereunder.

24  308.   As a direct and proximate result of Defendants' wrongful conduct,
25  Plaintiff and the other members of the Class suffered damages in connection with
26  their respective purchases and sales of the Company's securities during the Class
27  Period.

28

SECOND AMENDED COMPLAINT

**SECOND CLAIM**

**Violation of Section 20(a) Of**

**The Exchange Act Against The Individual Defendants'**

309. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

310. The Individual Defendants acted as controlling persons of Peregrine within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the misleading interim Phase II data filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to the clinical data gathered in the Phase II Trial, including the patient blood samples, which would have revealed the falsity of their prior public statements and/or would have enabled them to make truthful statements from the outset about the data gathered from the Phase II Trial, as well as Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been false and misleading prior to and/or shortly after these statements were issued and thus had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

311. The Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

SECOND AMENDED COMPLAINT

312.   As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

313.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Awarding such other and further relief as the Court may deem just and proper.

///
///
///

SECOND AMENDED COMPLAINT

1

## **JURY TRIAL DEMANDED**

2       Plaintiff hereby demands a trial by jury.

3

4                                                    Patrice L. Bishop
                                                     STULL, STULL & BRODY
5

6   Dated: January 22, 2014          By:   *Patrice Bishop*

7                                                    Patrice L. Bishop
                                                     9430 West Olympic Boulevard
                                                     Suite 400
8                                                    Beverly Hills, CA 90212
                                                     Tel:   (310) 209-2468
9                                                    Fax:   (310) 209-2087
                                                     service@ssbla.com
10

11                                                   *Liaison Counsel for Plaintiff and the*
                                                     *Putative Class*
12

13                                                   Thomas J. McKenna (*Pro Hac Vice*)
                                                     tjmckenna@gme-law.com
14                                                   GAINEY McKENNA & EGLESTON
                                                     440 Park Avenue South, 5th Floor
15                                                   New York, NY 10016
                                                     Tel:   (212) 983-1300
16                                                   Fax:   (212) 983-0383

17                                                   *Lead Counsel for Plaintiff and the Putative*
                                                     *Class*

18

19

20

21

22

23

24

25

26

27

28

78                                   SECOND AMENDED COMPLAINT

1

**PROOF OF SERVICE**

2  STATE OF CALIFORNIA      )
                                             ) ss.:
3  COUNTY OF LOS ANGELES )

4        I am employed in the county of Los Angeles, State of California, I am over
5  the age of 18 and not a party to the within action; my business address is 9430 West
   Olympic Boulevard, 4th Floor, Beverly Hills, California 90212.

6        On January 22, 2014, I caused the following document(s) to be served:

7
                        **SECOND AMENDED COMPLAINT**
8
   I served the above document(s) as follows:
9
         **By U.S. Mail**.   I enclosed the document(s) in a sealed envelope(s) or
10  package(s) addressed to the persons at the addresses below and placed the
    envelope(s) for collection and mail, following our ordinary business practices. I am
11  readily familiar with this firm's practice for collection and processing
    correspondence for mailing.   On the same day that correspondence is placed for
12  collection and mailing, it is deposited in the ordinary course of business with the
    United States Postal Service, in a sealed envelope with postage fully prepaid.
13

14        I declare that I am employed in the office of a member of the bar of this Court
   at whose direction the service was made.
15
         Executed on January 22, 2014 at Beverly Hills, California 90212.
16

17

18  PAUL HARRIGAN
    Type or Print Name                                    Signature
19

20

21

22

23

24

25

26

27

28

## <u>SERVICE LIST</u>

Thomas J. McKenna
Gregory M. Egleston
GAINEY McKENNA  & EGLESTON
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel:    (212) 983-1300
Fax:    (212) 983-0383
tjmckenna@gme-law.com
gegleston@gme-law.com

**Counsel for Lead Plaintiff and the
Putative Class**

Koji F. Fukumura
Meghan O'Ryan Spieker
COOLEY LLP
4401 Eastgate Mall
San Diego, CA 92121
Tel:    (858) 550-6000
Fax:    (858) 550-6420
kfukumura@cooley.com
mspieker@cooley.com

**Counsel for Defendants**

Stephen R. Basser
BARRACK, RODOS & BACINE
600 West Broadway, Suite 900
San Diego, CA 92101
Tel:    (619) 230-0800
Fax:    (619) 230-1874
sbasser@barrack.com

**Counsel for the Tereshko Investors
Group**

Darren J. Robbins
Danielle S. Myers
ROBBINS GELLER RUDMAN &
DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Tel:    (619) 231-1058
Fax:    (619) 231-7423
darrenr@rgrdlaw.com
dmyers@rgrdlaw.com

**Counsel for Plaintiff Nathaniel L.
Anderson and the Tereshko
Investors Group**

## CERTIFICATION OF NAMED PLAINTIFF

I, _James T. Fahey_ ("Plaintiff") hereby retain Gainey & McKenna and such co-counsel as appropriate, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff reviewed a copy of the complaint and is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in *Peregine Pharmaceuticals, Inc.* security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| See Transactions Sheet | | | | |
| | | | | |
| | | | | |
| | | | | |

Please list other transactions on a separate sheet of paper, if necessary.

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

None.

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _13_ day of _November_, 2012

_James J. Fahey_
Signature

_James T. FAHEY_
Print Name (& Title if applicable)

**Exhibit A to the James T. Fahey Certification**

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price |
|---|---|---|---|---|
| 20,000 | PPHM | Buy | 8/9/2012 | $2.08 |
| 20,000 | PPHM | Buy | 8/9/2012 | $2.08 |
| 5,000 | PPHM | Buy | 8/9/2012 | $2.19 |
| 24,000 | PPHM | Buy | 8/9/2012 | $2.22 |
| 27,300 | PPHM | Buy | 8/9/2012 | $2.23 |
| 2,700 | PPHM | Buy | 8/9/2012 | $2.22 |
| 4,686 | PPHM | Buy | 8/9/2012 | $2.28 |
| 15,314 | PPHM | Buy | 8/9/2012 | $2.25 |
| 20,000 | PPHM | Buy | 8/9/2012 | $2.27 |
| 100 | PPHM | Buy | 8/9/2012 | $2.28 |
| 9,900 | PPHM | Buy | 8/9/2012 | $2.29 |
| 20,000 | PPHM | Buy | 8/10/2012 | $2.36 |
| 10,000 | PPHM | Buy | 8/10/2012 | $2.36 |
| 5,677 | PPHM | Buy | 8/14/2002 | $3.48 |
| 200 | PPHM | Buy | 8/14/2012 | $3.45 |
| 400 | PPHM | Buy | 8/14/2012 | $3.38 |
| 3,700 | PPHM | Buy | 8/14/2012 | $3.33 |
| 23 | PPHM | Buy | 8/14/2012 | $3.28 |
| 7,600 | PPHM | Buy | 8/14/2012 | $3.30 |
| 400 | PPHM | Buy | 8/14/2012 | $3.29 |
| 2,000 | PPHM | Buy | 8/14/2012 | $3.26 |
| 13,850 | PPHM | Buy | 8/14/2012 | $2.54 |
| 6,150 | PPHM | Buy | 8/14/2012 | $2.53 |
| 3,000 | PPHM | Buy | 8/14/2012 | $2.54 |
| 2,652 | PPHM | Buy | 8/14/2012 | $2.56 |
| 14,400 | PPHM | Buy | 8/14/2012 | $2.55 |
| 9,948 | PPHM | Buy | 8/14/2012 | $2.57 |
| 20,000 | PPHM | Buy | 8/14/2012 | $2.45 |
| 12,450 | PPHM | Buy | 8/14/2012 | $2.45 |
| 4,400 | PPHM | Buy | 8/14/2012 | $2.45 |
| 100 | PPHM | Buy | 8/14/2012 | $2.45 |
| 3,050 | PPHM | Buy | 8/14/2012 | $2.50 |
| 10,000 | PPHM | Buy | 8/14/2012 | $2.50 |
| 22,400 | PPHM | Buy | 8/14/2012 | $2.50 |
| 7,500 | PPHM | Buy | 8/14/2012 | $2.50 |
| 100 | PPHM | Buy | 8/14/2012 | $2.50 |
| 19,500 | PPHM | Buy | 8/14/2012 | $2.50 |
| 10,400 | PPHM | Buy | 8/14/2012 | $2.50 |
| 100 | PPHM | Buy | 8/14/2012 | $2.50 |
| 5,200 | PPHM | Buy | 8/14/2012 | $2.53 |
| 4,800 | PPHM | Buy | 8/14/2012 | $2.53 |

| Symbol | Side | Date | Price | Quantity |
|---|---|---|---|---|
| PPHM | Buy | 8/14/2012 | $2.54 | 10,000 |
| PPHM | Buy | 8/14/2012 | $2.55 | 10,000 |
| PPHM | Buy | 8/14/2012 | $2.59 | 10,000 |
| PPHM | Buy | 8/14/2012 | $2.59 | 10,000 |
| PPHM | Buy | 8/14/2012 | $2.58 | 4,600 |
| PPHM | Buy | 8/14/2012 | $2.58 | 800 |
| PPHM | Buy | 8/14/2012 | $2.58 | 200 |
| PPHM | Buy | 8/14/2012 | $2.59 | 4,050 |
| PPHM | Buy | 8/14/2012 | $2.59 | 350 |
| PPHM | Buy | 8/14/2012 | $2.63 | 10,000 |
| PPHM | Buy | 8/20/2012 | $2.85 | 5,000 |
| PPHM | Buy | 8/20/2012 | $2.86 | 5,000 |
| PPHM | Sell | 8/14/2012 | $2.62 | 20,000 |
| PPHM | Sell | 8/14/2012 | $2.63 | 5,000 |
| PPHM | Sell | 8/14/2012 | $2.59 | 5,000 |
| PPHM | Sell | 8/14/2012 | $2.60 | 100 |
| PPHM | Sell | 8/14/2012 | $2.59 | 100 |
| PPHM | Sell | 8/14/2012 | $2.59 | 7,201 |
| PPHM | Sell | 8/14/2012 | $2.52 | 10,000 |
| PPHM | Sell | 8/14/2012 | $2.56 | 4,700 |
| PPHM | Sell | 8/14/2012 | $2.55 | 5300 |
| PPHM | Sell | 8/14/2012 | $2.50 | 10000 |
| PPHM | Sell | 8/14/2012 | $2.50 | 10000 |
| PPHM | Sell | 8/14/2012 | $2.48 | 4150 |
| PPHM | Sell | 8/14/2012 | $2.48 | 3600 |
| PPHM | Sell | 8/14/2012 | $2.49 | 2,250 |
| PPHM | Sell | 8/14/2012 | $2.48 | 10000 |
| PPHM | Sell | 8/14/2012 | $2.48 | 100 |
| PPHM | Sell | 8/14/2012 | $2.49 | 100 |
| PPHM | Sell | 8/14/2012 | $2.55 | 9800 |
| PPHM | Sell | 8/14/2012 | $2.54 | 10000 |
| PPHM | Sell | 8/14/2012 | $2.52 | 300 |
| PPHM | Sell | 8/14/2012 | $2.53 | 3700 |
| PPHM | Sell | 8/14/2012 | $2.53 | 10000 |
| PPHM | Sell | 8/14/2012 | $2.52 | 10000 |
| PPHM | Sell | 8/14/2012 | $2.51 | 6000 |
| PPHM | Sell | 8/14/2012 | $2.52 | 10000 |
| PPHM | Sell | 8/14/2012 | $2.51 | 200 |
| PPHM | Sell | 8/14/2012 | $2.51 | 100 |
| PPHM | Sell | 8/14/2012 | $2.50 | 6850 |
| PPHM | Sell | 8/14/2012 | $2.50 | 100 |
| PPHM | Sell | 8/14/2012 | $2.50 | 100 |
| PPHM | Sell | 8/14/2012 | $2.50 | 19800 |

**Exhibit A to the James T. Fahey Certification**

| Date Purchased | Calls Purchased | Strike Price | Price Paid |
| --- | --- | --- | --- |
| 8/9/2012 | 200 | 01/19/13 $2.5 | $0.60 |

| | | | | |
| --- | --- | --- | --- | --- |
| 10,000 | PPHM | Sell | 8/14/2012 | $2.50 |
| 2850 | PPHM | Sell | 8/14/2012 | $2.50 |
| 20,000 | PPHM | Sell | 8/14/2012 | $2.50 |
| 100 | PPHM | Sell | 8/23/2012 | $2.36 |
| 1500 | PPHM | Sell | 8/23/2012 | $2.36 |
| 3400 | PPHM | Sell | 8/23/2012 | $2.36 |
| 5000 | PPHM | Sell | 8/23/2012 | $2.40 |
| 2300 | PPHM | Sell | 8/23/2012 | $2.40 |
| 2700 | PPHM | Sell | 8/23/2012 | $2.40 |
| 4500 | PPHM | Sell | 8/23/2012 | $2.41 |
| 35 | PPHM | Sell | 8/23/2012 | $2.41 |
| 3064 | PPHM | Sell | 8/23/2012 | $2.40 |
| 2600 | PPHM | Sell | 8/27/2012 | $1.97 |
| 7,400 | PPHM | Sell | 8/27/2012 | $1.97 |
| 19,050 | PPHM | Sell | 8/27/2012 | $1.97 |
| 950 | PPHM | Sell | 8/27/2012 | $1.96 |
| 20,000 | PPHM | Sell | 8/27/2012 | $1.96 |
| 50 | PPHM | Sell | 8/27/2012 | $1.95 |
| 11430 | PPHM | Sell | 8/27/2012 | $1.94 |
| 10000 | PPHM | Sell | 8/27/2012 | $1.86 |
| 7154 | PPHM | Sell | 8/27/2012 | $1.89 |
| 12846 | PPHM | Sell | 8/27/2012 | $1.88 |
| 3800 | PPHM | Sell | 8/27/2012 | $1.88 |
| 5900 | PPHM | Sell | 8/27/2012 | $1.88 |
| 2300 | PPHM | Sell | 8/27/2012 | $1.84 |
| 8000 | PPHM | Sell | 8/27/2012 | $1.84 |
| 20000 | PPHM | Sell | 8/27/2012 | $1.85 |
| 700 | PPHM | Sell | 8/27/2012 | $1.86 |
| 17820 | PPHM | Sell | 8/27/2012 | $1.85 |
| 2788 | PPHM | Sell | 8/27/2012 | $1.88 |
| 17212 | PPHM | Sell | 8/27/2012 | $1.87 |
| 2100 | PPHM | Sell | 8/27/2012 | $1.90 |
| 5952 | PPHM | Sell | 8/27/2012 | $1.89 |
| 3900 | PPHM | Sell | 8/27/2012 | $1.88 |
| 8048 | PPHM | Sell | 8/27/2012 | $1.88 |
| 400 | PPHM | Sell | 8/27/2012 | $1.90 |
| 400 | PPHM | Sell | 8/27/2012 | $1.89 |
| 100 | PPHM | Sell | 8/27/2012 | $1.89 |
| 9100 | PPHM | Sell | 8/27/2012 | $1.89 |

| Date | Qty | Date | Type | Price |
|---|---|---|---|---|
| 8/9/2012 | 23 | 01/19/13 | $2.5 | $0.60 |
| 8/9/2012 | 100 | 01/19/13 | $2.5 | $0.70 |
| 8/9/2012 | 300 | 01/19/13 | $2.5 | $0.75 |
| 8/9/2012 | 100 | 01/19/13 | $2.5 | $0.75 |
| 8/9/2012 | 300 | 01/19/13 | $2.5 | $0.90 |
| 8/9/2012 | 200 | 01/19/13 | $2.5 | $0.90 |
| 8/9/2012 | 77 | 01/19/13 | $2.5 | $0.90 |
| 8/9/2012 | 400 | 01/19/13 | $2.5 | $0.90 |
| 8/9/2012 | 50 | 10/20/12 | $2.5 | $0.55 |
| 8/9/2012 | 50 | 10/20/12 | $2.5 | $0.60 |
| 8/9/2012 | 100 | 10/20/12 | $2.5 | $0.60 |
| 8/9/2012 | 100 | 10/20/12 | $2.5 | $0.60 |
| 8/9/2012 | 100 | 10/20/12 | $2.5 | $0.70 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.55 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.55 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.55 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.55 |
| 8/27/2012 | 179 | 01/19/13 | $2.5 | $0.60 |
| 8/27/2012 | 21 | 01/19/13 | $2.5 | $0.55 |
| 8/27/2012 | 50 | 01/19/13 | $2.5 | $0.55 |
| 8/27/2012 | 150 | 01/19/13 | $2.5 | $0.60 |
| 8/27/2012 | 300 | 01/19/13 | $2.5 | $0.60 |
| 8/27/2012 | 300 | 01/19/13 | $2.5 | $0.65 |
| 8/27/2012 | 200 | 01/19/13 | $2.5 | $0.60 |
| 8/27/2012 | 200 | 01/19/13 | $2.5 | $0.60 |
| 8/27/2012 | 200 | 01/19/13 | $2.5 | $0.60 |
| 8/27/2012 | 120 | 01/19/13 | $2.5 | $0.60 |
| 8/27/2012 | 180 | 01/19/13 | $2.5 | $0.65 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.65 |
| 8/27/2012 | 200 | 01/19/13 | $2.5 | $0.65 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.65 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.65 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.65 |
| 8/27/2012 | 200 | 01/19/13 | $2.5 | $0.70 |
| 8/27/2012 | 200 | 01/19/13 | $2.5 | $0.70 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.70 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.70 |
| 8/27/2012 | 100 | 01/19/13 | $2.5 | $0.70 |
| 9/5/2012 | 20 | 01/19/13 | $2.5 | $1.00 |
| 9/5/2012 | 10 | 01/19/13 | $2.5 | $1.00 |
| 9/7/2012 | 200 | 01/19/13 | $5.0 | $1.00 |
| 9/7/2012 | 270 | 01/19/13 | $2.5 | $2.25 |

**Exhibit A to the James T. Fahey Certification**

| Date Sold | Calls Sold | Strike Price | | Price Paid |
|---|---|---|---|---|
| 9/18/2012 | 50 | 01/19/13 | $5.0 | $0.70 |
| 9/18/2012 | 10 | 01/19/13 | $5.0 | $0.90 |
| 9/20/2012 | 140 | 01/19/13 | $5.0 | $1.30 |
| 9/20/2012 | 124 | 01/19/13 | $5.0 | $1.25 |
| 9/20/2012 | 76 | 01/19/13 | $5.0 | $1.30 |
| 9/20/2012 | 200 | 01/19/13 | $5.0 | $1.30 |
| 9/20/2012 | 300 | 01/19/13 | $5.0 | $1.30 |
| 9/20/2012 | 50 | 01/19/13 | $5.0 | $1.20 |
| 9/20/2012 | 150 | 01/19/13 | $5.0 | $1.25 |
| 9/20/2012 | 100 | 01/19/13 | $5.0 | $1.25 |
| 9/20/2012 | 200 | 01/19/13 | $5.0 | $1.25 |
| 9/20/2012 | 350 | 01/19/13 | $5.0 | $1.25 |
| 9/20/2012 | 40 | 01/19/13 | $5.0 | $1.25 |
| 9/20/2012 | 110 | 01/19/13 | $5.0 | $1.25 |
| 9/20/2012 | 50 | 01/19/13 | $5.0 | $1.35 |
| 9/20/2012 | 150 | 01/19/13 | $5.0 | $1.35 |
| 9/20/2012 | 200 | 01/19/13 | $5.0 | $1.40 |
| 9/25/2012 | 45 | 01/19/13 | $1.0 | $0.95 |
| | | | | |
| Date Sold | Calls Sold | Strike Price | | Price Paid |
| 9/7/2012 | 400 | 10/20/12 | $2.5 | $2.15 |
| 9/20/2012 | 100 | 01/19/13 | $2.5 | $2.55 |
| 9/20/2012 | 200 | 01/19/13 | $2.5 | $2.60 |
| 9/20/2012 | 200 | 01/19/13 | $2.5 | $2.50 |
| 9/20/2012 | 86 | 01/19/13 | $2.5 | $2.50 |
| 9/20/2012 | 114 | 01/19/13 | $2.5 | $2.30 |
| 9/20/2012 | 200 | 01/19/13 | $2.5 | $2.35 |
| 9/20/2012 | 100 | 01/19/13 | $2.5 | $2.35 |
| 9/20/2012 | 100 | 01/19/13 | $2.5 | $2.45 |
| 9/20/2012 | 100 | 01/19/13 | $2.5 | $2.50 |